## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS<br>501 Front St.<br>Norfolk, VA 23510,<br><br>MADELINE KRASNO,*<br><br>RYAN HARTKOPF,<br>6633 Raymond Rd.<br>Madison, WI 53711,<br><br>       Plaintiffs,<br><br>   v.<br><br>FRANCIS M. COLLINS, in his official capacity as Director of the National Institutes of Health<br>9000 Rockville Pike<br>Bethesda, MD 20892,<br><br>XAVIER BECERRA, in his official capacity as Secretary of the U.S. Department of Health and Human Services<br>200 Independence Ave, S.W.<br>Washington, D.C. 20201,<br><br>       Defendants. | Civil Action No. 21-2380 |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### <u>Introduction</u>

1. This lawsuit seeks to stop the Secretary of the U.S. Department of Health and Human Services ("HHS") and the Director of the National Institutes of Health ("NIH") (collectively, "Defendants") from unconstitutionally blocking comments posted to the agencies' social media accounts based on the viewpoint and/or content of that speech. The NIH, the federal agency charged with supporting biomedical research, uses its social media accounts to

---

* In a concurrently filed motion, Plaintiff Madeline Krasno has requested a waiver of her obligation under Local Rule 5.1(c)(1) to provide her home address in the caption of this complaint.

communicate with members of the public about scientific breakthroughs, to announce new research efforts, to host live interviews and videos, and to provide critical updates about COVID-19 research, treatment, and vaccines. HHS oversees the NIH and, as the agency responsible for promoting the health and well-being of Americans, communicates with members of the public about health care, aging, and public health policy through its social media pages. These official accounts are important public fora for speech about medical research, science, and bioethics.

2.      Plaintiffs are animal rights advocates, including an animal rights organization, who believe that the government's continued support of primate testing is unconscionable. They have attempted to raise these concerns by commenting on the NIH's Facebook and Instagram pages, but the NIH routinely hides Plaintiffs' comments from public view by using keyword blocking tools to prevent certain words and phrases associated with disfavored viewpoints, content, or speakers—like "PETA" and "#stopanimaltesting"—from appearing on its social media pages. Plaintiffs would also like to express their views about primate testing on HHS's Facebook pages, but HHS, too, blocks comments containing keywords associated with critical viewpoints, like "monkey." If a comment on any of these social media pages contains one of these prohibited words and phrases, it cannot be viewed or engaged with by members of the public.

3.      Defendants' actions violate the First Amendment. Multiple courts have held that government-run social media accounts that are open for comments from the general public are public forums. *See, e.g.*, *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019); *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 234 (2d Cir. 2019), *vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021). It is well-settled that the government may not, consistent with the First Amendment, exclude speech from such forums based on viewpoint or unjustifiable content-based restrictions. Defendants' viewpoint-

discriminatory and content-based suppression of comments about animal testing violates Plaintiffs' right to speak in a public forum. It also violates their right to read the speech of others who have used blocked keywords in comments.

4.      Plaintiffs respectfully ask that the Court declare that Defendants' viewpoint-discriminatory and content-based use of keyword blocking violates the First Amendment. Plaintiffs also ask that the Court order Defendants to remove these keyword filters and order other relief as requested below.

<u>**Jurisdiction and Venue**</u>

5.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the U.S. Constitution.

6.      The Court has authority to issue declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and this Court's inherent equitable jurisdiction. The Court also has authority to award costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

7.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(A).

<u>**Parties**</u>

8.      Plaintiff People for the Ethical Treatment of Animals ("PETA") is a nonprofit animal rights organization based in Norfolk, Virginia. Founded in 1980, PETA is dedicated to establishing and defending the rights of all animals. PETA's public education and campaign activities have a particular focus on animal mistreatment in laboratories, the food industry, the clothing trade, and the entertainment industry.

9.      Plaintiff Madeline Krasno, who resides in Oakland, California, is a former animal research technician turned animal rights advocate. She operates an Instagram account under the

handle @madeline_krasno, and she maintains a Facebook profile under the name Madeline Krasno.

10.     Plaintiff Ryan Hartkopf, who resides in Madison, Wisconsin, is an engineer in the digital health field. He operates an Instagram account under the handle @ryanhartkopf, and he maintains a Facebook profile under the name Ryan Hartkopf.

11.     Defendant Francis S. Collins is the Director of the NIH. The NIH is a medical research center and is one of the eight health agencies of the Public Health Service. The Public Health Service is part of HHS. Defendant Collins has authority over all NIH policies and practices, including those challenged here. Plaintiffs sue him in his official capacity only.

12.     Defendant Xavier Becerra is the Secretary of HHS. HHS is a cabinet-level department and federal agency that oversees the government's public health, social services, medical, and scientific efforts. Defendant Becerra has authority over all HHS policies and practices and those of HHS's operating divisions, including the NIH. Plaintiffs sue him in his official capacity only.

## Factual Allegations

### I.     Background

#### A.     The Facebook platform

13.     Facebook is the world's largest social networking platform, with approximately 2.7 billion monthly active users worldwide, including more than 179 million monthly active users in the United States.

14.     The platform allows users to post content, including writings, links, photographs, and videos, for the public or other Facebook users to see. Facebook users can also engage with the speech of others on the platform, including by sharing others' posts, "liking" those posts, and commenting on or replying to comments attached to a post. Individuals and organizations who

create Facebook accounts can communicate publicly on the platform. Many public officials and government agencies have created Facebook pages and communicate with their constituents and the general public.

15.     **Users.** Any individual or organization that has created an account on the platform is a Facebook "user." Individual Facebook users can connect with other users by "friending" them; these connected users are called Facebook "friends." When users post content on the Facebook platform, they have the option of making their posts visible to the public (including non-Facebook users), to their friends only, or to a subset of their friends.

16.     **Pages.** Users who want to create Facebook accounts for "businesses, brands, organizations, [or] public figures" can create Facebook "pages." Facebook pages include the title of the business or organization, and an "About" section where the administrator can provide the organization's contact information, photos, and more. Part of the NIH and HHS Facebook pages recently looked like this:





17.     All internet users can view Facebook pages, regardless of whether they are Facebook users. Facebook users can also "like" a page in order to get continuous updates from that page in their "News Feed"—a personalized, constantly updating stream of content posted on the platform by others.

18.     **Verification.** Public figures, brands, and official organizations can request "verification" of their pages and profiles on Facebook. When it verifies a Facebook page, Facebook confirms that the operators of the page are the authentic representatives of the entity represented in the page. Verified pages feature a blue checkmark next to their page name or profile name.

19.     **Posts.** A Facebook "post" is any combination of text, images, videos, audio, or Internet hyperlinks published by a Facebook user on the user's Facebook page. Users who visit or follow a Facebook page can see all of the posts published by the administrator of the page. Posts on the NIH page include links to news stories and press releases about NIH research,

advertisements for virtual events (such as conversations with leading health researchers), and infographics. These are recent posts on the NIH and HHS pages.



20.    **Facebook Live.** Facebook users can also engage with others by going "Live" through the Facebook Live feature. Facebook Live allows users or pages to stream video in real-time for viewing by other users. After they first air, the videos remain viewable on the posting

user's page or profile. All Live videos are visible to the public by default, although page administrators may also choose to broadcast only to a specific subset of their page's followers.

21.     **Comments and comment threads.** Facebook users can respond to others' posts—including Live videos—by commenting on them. Facebook comments can include the same type of content as Facebook posts, including text, images, and hyperlinks. Comments appear beneath the original post. Facebook users may also reply to other comments appended to a post or to replies that have been posted by others. The collection of replies and replies-to-replies is sometimes referred to as a "comment thread." In comment threads, users engage with other users and with the corporations, public officials, and organizations that post content on Facebook through their pages and accounts. Any Facebook user can comment on a public post, and comment threads on public posts function as venues for public debate.

22.     **Likes and reactions.** Users can also "react" to others' posts by clicking the "Like" button and selecting emojis corresponding to "Like," "Love," "Care," "Haha," "Wow," "Sad," and "Angry." When a user reacts to a post, other users will be able to see the user's reaction in a list of reactions on the post. The total number of reactions and shares are listed on each post. This is a recent post from the NIH's Facebook page, displaying the associated comments and likes.

8



23.   **Sharing.** In addition to commenting on and reacting to posts, users can also choose to "share" them. "Sharing" a post causes it to appear on an individual user's own Facebook profile and increases the likelihood that a user's friends will see it. When users share posts, they can add text that appears above the shared posts. Users often employ this feature to provide commentary on the posts they are sharing.

24.   **Comment filtering and keyword blocking.** Administrators of Facebook pages can limit comments that appear on their posts by using Facebook's moderation tools, including comment filtering. Page administrators may, for example, filter all comments that contain profanity by turning on Facebook's built-in "profanity filter." Administrators may also input their

own lists of words or phrases that they wish to filter from other users' comments on their posts. When a page administrator adds a word to this list, any past or future comments from users containing the word will automatically be hidden from public view. Although a hidden comment remains visible to the user who posted it and to the user's friends, other Facebook users are unable to read or engage with the comment. The practice of preventing comments containing certain keywords from being publicly visible is commonly known as "keyword blocking."

25.     Page administrators may also block individual comments by "hiding" or deleting them from the comment threads associated with their posts. When a comment is deleted, it is erased from the page altogether.

26.     Typically, the user whose comment has been affected does not receive notice of these moderation actions. Hiding a specific comment changes its visibility, but the user who posted the comment will not be notified. The same is true of users who post comments containing filtered words: they will not be aware that their comments contain filtered words, and they will not be notified that their comments' visibility has been limited. On information and belief, users only receive notifications of blocked content (a red box indicating that the comment was "unable to post") if they attempt to post comments during a Live video that run afoul of moderation settings the video host selected for that Live video session. In most instances, then, users whose comments are hidden would not be aware that their comments have been suppressed.

27.     **Banning and blocking.** Page administrators may "ban" or "block" individual users from their pages. Banning a user prevents the user from commenting on or liking any content from the page, but it permits the user to continue to access the page and its posts. Blocking a user, by contrast, prevents the user from accessing the page altogether: the user is no longer able to view the content posted to the page or even locate the page using Facebook's search function.

28.     These moderation features permit page administrators to exclude particular viewpoints, types of content, or specific individuals from public discussion on their Facebook pages.

**B.     The Instagram platform**

29.     Instagram is a social media platform with over one billion monthly active users worldwide and nearly 120 million monthly active users in the United States. Instagram, which was acquired by Facebook in 2012, is a platform for visual content, allowing users to share photos and videos and engage with content through likes or comments. Although Instagram began as a primarily personal social media platform, numerous brands, celebrities, public officials, and public entities have Instagram accounts and post pictures or videos to communicate with the public at large.

30.     **Users.** An Instagram "user" is an individual or organization that has created an account on the platform. Each Instagram user creates a unique username, such as "@nihgov." Other Instagram users can locate an account by searching for the account's username on Instagram's website or mobile application to access the user's profile page.

31.     **Profiles.** Each Instagram user has a unique webpage or "profile." Each user's profile displays the associated username as well as other information about the account, including the profile photo associated with the user, the account's followers, and the accounts the user is following. If a user's profile is public, any Instagram user or member of the public who navigates to the user's profile can view all of the user's posts. If a user's profile is private, only approved followers of the user may view the user's posts. Below is a screenshot of the NIH Instagram public profile page.



32.     **Followers.** Instagram users may "follow" the profiles of other users by clicking on the "Follow" button that appears at the top of an account's profile. Following an account means subscribing to it—all of the followed account's posts will automatically appear in the user's "Instagram feed," a personalized, constantly updating page on the Instagram platform that displays all of the content shared by the accounts that a user follows.

33.     **Posts.** An Instagram post is a discrete piece of content that a user shares to the user's profile page. A post on Instagram can be an image, a video, or a collection of images or videos. When a user shares an image or video, the user can include a text-based caption that will be displayed alongside or underneath the post.

34.     **Instagram Stories.** In addition to standard Instagram posts, users may also share content via the platform's "Instagram Story" feature. The Instagram Story is a slideshow-like multimedia presentation that displays all content—images, videos, and text—users share to their Stories. Unlike an Instagram post, content shared to a story remains visible to other users for only 24 hours after it is shared. Instagram stories can be accessed by clicking on the profile image of an

Instagram user when it is circled by a colorful ring—the indicator that the user has posted a story. Although Instagram stories are normally visible for only 24 hours, users can save stories to their profiles indefinitely by making them "highlights." Highlights remain at the top of the user's page and are publicly accessible by default. For example, the top of the NIH profile page recently looked like this, indicating that the NIH had posted at least one Instagram story in the preceding 24 hours and had saved and highlighted previous stories relating to COVID-19 updates, past live events, and important NIH news:



35.    **IGTV.** Instagram also permits users to upload long-form video content using a feature called "IGTV." Videos uploaded to this feature are accessible from a user's profile by clicking on a tab labeled "IGTV." Recent content uploaded to the NIH's IGTV page can be seen below.



36.    **Comments and comment threads.** Instagram users can interact with posts and IGTV videos by commenting on them, or by replying to other comments on an Instagram post. This creates a space for discussion beneath each Instagram post, a type of comment thread. Users can express approval or disagreement with the post in the comment thread, or even make tangential or unrelated remarks. The author of a post may also comment or respond to comments in the comment thread, allowing the author to engage with the other users who have commented or replied. By default, all comments and replies to posts from a public profile are visible to the public at large. Comment threads are a space for public debate and conversation about whatever post is being commented on.

37.    **Likes.** In addition to commenting on posts, users may "like" posts by clicking on the heart-shaped button next to the image. Liking a post indicates approval or acknowledgment of the content. This is a recent post from @nihgov with likes and comments shown.



38.     **Mentions and Tags.** A user may also "mention" another user in a comment or "tag" a user in a post by using the "@" feature on Instagram and entering the user's username. Mentions of users in comments will appear in the comment section of a post. If the tagging user's profile is set to public, the post with the tagged user will appear under the "tagged" section of a tagged user's profile.

39.     **Comment filtering and keyword blocking.** Instagram provides account holders with a variety of tools to control or moderate the conversations on their posts. Account holders may, for example, control the content of the comments on their posts by keyword filtering. The comment filtering function permits users to hide all comments containing specified words or phrases. Thus, if an account holder designates the word "testing" as a filtered keyword on the account holder's page, any user's comment containing that word will automatically be hidden from public view as soon as it is posted. The filtered comment will be visible *only* to the user who posted it and to the account holder if they choose to "view hidden comments." No other user, including users who follow the comment author, will be able to see, reply to, or engage with the hidden comment.

40.     Account holders may also hide comments that contain any keyword in a list of "Default Keywords" created and maintained by Instagram. Enabling the "Use Default Keywords" setting automatically hides comments containing keywords that are commonly found in posts reported as violating Instagram's terms of service. Unlike keyword-blocked comments, comments automatically hidden under this setting do not disappear completely for all users. Rather, any user can view these comments by scrolling to the bottom of a post's comments section and clicking on a "view hidden comments" button.

41. **Restricting comments.** Instagram account holders may also moderate the comments on their posts by "restricting" another user's comments. This option automatically hides all comments from a particular user, but gives the restricting account holder the option to pre-screen the comments and decide whether to allow certain comments to be seen. This feature allows a given user prior review over each comment that appears on their profile.

42. **Blocking a user's comments.** Account holders may also "block" other users from commenting on any of their posts by using the platform's "block comments" function. The blocked user's comments and replies are then automatically rendered invisible to all other users. In addition to blocking a user's comments, account holders may block the user from viewing the account holder's profile or any of their posts.

43. Instagram users are not notified when their comments have been hidden, restricted, or blocked. Because these comments remain visible to the user making them, users will generally be unaware that their comments are invisible to others.

## II.   Defendants' social media accounts

### A.   The NIH's verified Facebook page

44. The NIH established the Facebook page "@nih.gov" on October 14, 2008. The page is registered as a "Government Organization" and the page's profile photo is the NIH logo. The account features a blue checkmark, indicating that Facebook has deemed it an "authentic Page for this public figure, media company or brand." The page includes links to the external NIH website, and the phone number listed in the "About" section is the phone number for the main operator for the NIH. The "About" section also reads "NIH...Turning Discovery Into Health ®. Read our Privacy Policy: http://www.nih.gov/about/privacy.htm. Visit http://www.nih.gov for more information." The links made available on the NIH Facebook page direct users to the NIH homepage or to the "Web Policies and Notices" page on the NIH's external website.

45.     The NIH Facebook page is public and accessible to all other Facebook users, and 561,584 users currently "follow" the page, allowing them to see updates from the NIH in their own Facebook News Feeds. The NIH uses the account to post: information about its work, such as interviews with NIH experts, including a Facebook Live interview with Mark Zuckerberg and Dr. Anthony Fauci; links to stories or blogs on the NIH website, such as a post titled "Lack of Sleep in Middle Age May Increase Dementia Risk"; and updates regarding the ongoing COVID-19 pandemic. Facebook users can comment on the posts, "react" to the NIH's posts through the "reaction" options Facebook offers, and share the NIH's posts to their own Facebook profile pages.

46.     The NIH publishes guidelines for commenting on its social media accounts. The guidelines state that the agency will review all comments "before they can be posted" and will prohibit certain content, including comments with external links or "off-topic" comments. Although the comment guidelines are available on the NIH's own website, the NIH does not link to the guidelines or otherwise explain its social media policy on its Facebook page.

**B.      The @nihgov Instagram account**

47.     The NIH officially launched the Instagram account "@nihgov" on January 23, 2018. In the first post on the account, the NIH urged Instagram users to "Follow us for cool science images, health tips, and a behind-the-scenes look at the nation's top biomedical research institute! #Followus #FirstPost #Health #Wellness #Science #research."



48.     The Instagram page is registered as a "Government Organization" and the page's profile photo is the NIH logo. The account features a blue checkmark, indicating that it is a verified Instagram account.

49.     A portion of the NIH Instagram page is accessible to anyone with Internet access, but only Instagram users can see all of the previous posts on the page. The NIH page currently has 196,000 followers, meaning that those users see the NIH's posts in their personal timelines without needing to navigate directly to the @nihgov Instagram page.

50.     The NIH has posted more than one thousand times to its Instagram page. It uses the account to post photos, videos, and information about its work, including interviews with NIH experts, news about numerous NIH health campaigns, and updates regarding the ongoing COVID-19 pandemic. Instagram users can comment on or "like" NIH's posts on the page.

51.     Many of the NIH's Instagram stories are highlighted on its profile page, as well as numerous videos that appear on the "IGTV" section of the account. Further, users who click on the "Tagged" tab can access some of the photos that @nihgov has been tagged in by other users.

52.     As with its Facebook page, the NIH's Instagram page does not mention or link to its social media guidelines.

**C.      HHS's verified Facebook page**

53.     HHS established the Facebook page "@HHS" on May 6, 2013. The page is listed as a "Government Organization" and the page's profile photo is the HHS logo. Like the NIH's Facebook page, the account features a blue checkmark, indicating that Facebook has deemed it "authentic." The page includes links to the external HHS website as well as to its Instagram account. The "About" section reads: "Follow this page to share information that can benefit someone you know. The U.S. Department of Health and Human Services (HHS) touches the lives of nearly all Americans from research to food safety, health care, aging and much more." A link in the "About" section labeled "Privacy Policy" directs users to the "HHS Privacy Policy Notice" page on HHS's external website.

54.     The HHS Facebook page is public and accessible to all other Facebook users, and 434,687 people currently "follow" the page, allowing them to see updates from HHS in their own Facebook News Feeds. HHS uses the account to post a variety of content: health- and safety-related resources, such as "sunscreen tips and guidelines"; information about the work of HHS and its sub-agencies, including interviews with Secretary Becerra; the latest CDC guidelines on COVID-19 vaccines and social distancing; and links to stories about biomedical research by the Department's agencies, such as "Studies Confirm COVID-19 mRNA Vaccines Safe, Effective for Pregnant Women." Facebook users can comment on the posts, "react" to them, and share them to their own Facebook profile pages.

55.     HHS publishes guidelines for the operation of its official social media accounts, including a section on content moderation. Like the NIH's social media commenting guidelines, HHS guidelines state that the agency will "review[]" and "clear[]" comments before they are posted. The guidelines also contemplate that HHS employees will suppress certain comments, including those that contain views that may be considered offensive or "blatantly partisan." The guidelines are available on the HHS's website, but the HHS Facebook page does not link to them or otherwise describe HHS's content moderation policies.

## III.   Defendants' viewpoint-discriminatory and content-based blocking of comments from their social media accounts.

56.     Plaintiffs are Facebook and Instagram users who have had their comments to Defendants' Facebook and/or Instagram pages hidden because the comments were critical of, or contained keywords associated with criticism of, the government's role in animal testing. Defendants' actions of hiding or filtering Plaintiffs' comments prevent them from fully participating in the comment threads and from expressing their views to others who are reading Defendants' Instagram and Facebook posts.

57.     The NIH, through individuals acting as administrator(s) and/or account holder(s), uses keyword blocking to target and hide comments that criticize the government's animal testing practices, including Plaintiffs' comments. As explained in detail below, *see* ¶¶ 60–79, Plaintiffs discovered the blocked keywords through their own experiences attempting to communicate on the NIH's social media pages and through a FOIA request submitted by Mr. Hartkopf. The following keywords are blocked from the NIH's Instagram and/or Facebook accounts:

a.   #stopanimaltesting

b.   #stoptesting

c.   #stoptestingonanimals

d.  Animal(s), animalitos, animales

e.  Chimpanzee(s), chimp(s)

f.  Primate(s)

g.  Marmoset(s)

h.  Cats, gatos [*i.e.*, Spanish for "cats"]

i.  Monkey(s), monkies

j.  Mouse, mice

k.  Experiment

l.  Test(ing), testing facility

m.  Stop

n.  PETA, PETALatino

o.  Suomi,[1] Harlow[2]

p.  Hurt, hurting

q.  Kill

r.  Torture(s), torturing

s.  Torment(ing)

t.  Cruel

---

[1] Stephen J. Suomi is currently the Chief of the Laboratory of Comparative Ethology at the National Institute of Child Health and Human Development. He has conducted extensive research on behavioral development by testing on monkeys and other nonhuman primates. *See* Jessica Firger, *Questions Raised About Mental Health Studies on Baby Monkeys at NIH Labs*, CBS News (Sep. 8, 2014 12:55 PM), https://perma.cc/FS97-HE48. Following an extensive public campaign by PETA, the NIH announced that Dr. Suomi's laboratory would be closed down and that he would no longer be involved in any testing on animals. *See* Michelle Kretzer, *NIH Ending Baby Monkey Experiments*, PETA (Dec. 11, 2015), https://perma.cc/49QP-F9XR.

[2] Harry Harlow was an American psychologist known for his testing on the effect of maternal deprivation on monkeys. The Harlow Center on Biological Psychology, named for Mr. Harlow, is affiliated with the Wisconsin National Primate Research Center and houses the monkeys and nonhuman primates used in experiments. *Harlow Center for Biological Psychology*, University of Wisconsin Madison, https://perma.cc/N9B7-RENQ. After Dr. Harlow died in 1981, PETA campaigned against the NIH's continuation of his work and frequently mentions Dr. Harlow in their advocacy against animal testing. *Psychological Torture Experiments at NIH Must Stop*, PETA, https://perma.cc/956S-ZKQS.

u.  Revolting

58.      HHS also uses keyword blocking to hide comments that criticize the government's animal testing practices. As explained in further detail below, *see* ¶ 65, through attempts to communicate on HHS's page, Plaintiff PETA discovered that HHS blocks all comments containing the keyword "monkey."

59.      Defendants' practice of hiding comments containing words associated with animal rights advocacy, including the name of a well-known animal rights organization, is a viewpoint-discriminatory and content-based restriction on speech that infringes Plaintiffs' First Amendment rights. It violates Plaintiffs' right to speak in a public forum and their right to read the speech of others who have used blocked keywords in comments on Defendants' social media pages.

*PETA*

60.      PETA is a nonprofit animal rights organization based in Norfolk, Virginia. Founded in 1980, PETA is dedicated to establishing and defending the rights of all animals. PETA's public education and campaign activities have a particular focus on animal mistreatment in laboratories, the food industry, the clothing trade, and the entertainment industry. To accomplish these goals, PETA and its affiliates frequently launch social media campaigns in order to pressure public and private entities to change their animal treatment practices. One of PETA's current campaigns targets the NIH and the National Institute of Mental Health (NIMH) for its funding of primate testing, including "monkey fright" experiments conducted by NIMH scientist Elisabeth Murray. As part of this campaign, PETA employees and members have sought to advocate for the end of primate testing on the NIH's social media pages.

61.     PETA has been impaired in its ability to engage in this expression because Defendants have set automatic filters that hide many of their comments criticizing the government's treatment of animals.

62.     The NIH hid multiple comments about animal testing that PETA employee Evelyn Wagaman attempted to post in the course of her work for PETA. These comments, all offered during the NIH's Facebook Live videos, were marked as "unable to post." On information and belief, Ms. Wagaman was unable to post these comments because they contained keywords that had been preemptively blocked by the NIH.

    a.   On September 24, 2020, Ms. Wagaman was prevented from posting three comments on a Facebook Live video about COVID-19 vaccine research. In effect, these comments thanked Director Collins for his efforts on the COVID-19 vaccine but asked why the NIH continued to funnel money into primate experiments. Ms. Wagaman believed that she was "unable to post" these comments because of their viewpoint, as another comment that did not advocate for the end of animal experimentation was posted successfully.

    b.   On October 8, 2020, Ms. Wagaman again tried to comment on an NIH Facebook Live video about gene editing, but several comments were blocked from being posted publicly, including: "CRISPR can be used for advanced, non-animal experiments. In light of the many non-animal technologies that are developing, how can NIH continue to conduct experiments on macaques and other primates?"

    c.   On May 27, 2021, Ms. Wagaman attempted to post several comments to an NIH Live video featuring Dr. Kizzmekia Corbett, including: "Thank you, Dr. Corbett and Dr. Collins, for your hard work on the COVID vaccines! Why is the NIH still wasting funds on Elisabeth Murray's monkey fright experiments instead of investing more in important clinical research about COVID-19?" Although she did not receive any indication that the comments had been moderated, the comments were hidden from public view and only viewable by Ms. Wagaman and her Facebook friends. A screenshot of one of Ms. Wagaman's attempted comments is below.



63.     Despite the NIH's use of keyword blocking, PETA employees have occasionally been able to advocate for animal rights on NIH posts by modifying the spelling and spacing of certain words. For example, on October 16, 2020, Ms. Wagaman commented on an NIH Facebook Live video about COVID-19 treatment, saying "Francis Collins, thank you for your hard work finding a vaccine for COVID-19. In light of the urgency of devoting resources to find a vaccine and the ineffectiveness of experiments on an1mals, will you please end the fright expts on macaques of Elisabeth Murray?" This comment was not hidden or filtered, and was viewable by the public.

64.     PETA employees wish to continue posting comments about animal testing on the NIH's Facebook page, but the NIH's use of keyword blocking has hampered their ability to advocate on the NIH's Facebook and Instagram pages.

65.     PETA employees also wish to post comments about animal testing on HHS's Facebook page as part of their campaign to stop the funding of primate testing, but like the NIH, HHS engages in keyword blocking. PETA employees who have attempted to post comments containing the word "monkey" have found that the comments were hidden by HHS.

66.     Plaintiff PETA also wishes to engage with and read the comments of other animal rights advocates. Defendants' viewpoint-based keyword blocking prevents PETA from hearing the speech of other animal rights advocates who may be trying to comment on Defendants' social media posts or videos.

*Madeline Krasno*

67.     Plaintiff Madeline Krasno resides in Oakland, California. She is a former animal research lab technician turned animal rights advocate. She operates an Instagram account under the handle @madeline_krasno, and she maintains a Facebook profile under the name Madeline Krasno.

68.     Ms. Krasno has long advocated for the end of animal testing in laboratories. As a student at the University of Wisconsin, Ms. Krasno studied zoology and worked as a student primate caretaker at the Harlow Center for Biological Psychology. Her firsthand experience with primate testing led her to conclude that animal testing is immoral and compelled her to publicly share the details of her experiences. Ms. Krasno contributes to the public discourse on animal testing in part by drawing attention to the NIH's funding of National Primate Research Centers. One way Ms. Krasno brings attention to the NIH's involvement in animal testing is by commenting on the NIH's social media posts.

69.     Ms. Krasno has written several comments to posts on the @nihgov Instagram account and the NIH Facebook page that have been hidden due to her use of blocked keywords. Several of Ms. Krasno's comments posted to the NIH's Instagram and Facebook pages have been hidden, including:

      a.  On April 29, 2021, Ms. Krasno commented on an @nihgov Instagram post about a study on Alzheimer's disease treatment that was conducted on mice. Ms. Krasno wrote, "It's pretty messed up that you block conversation about animal testing." Although Ms. Krasno was able to view the comment when she was logged into her

personal Instagram account, when she logged out and viewed the NIH's post, she could not see her comment. She concluded that her comment had been hidden. A screenshot of Ms. Krasno's view of the comments under the NIH's post and a screenshot of the public's view of the comments to the same post appear below.





b. On May 6, 2021, Ms. Krasno attempted to comment on an NIH Facebook post about Public Service Recognition Week 2021. She wrote: "@National Institutes of Health (NIH), If you actually wanted to extend life and reduce illness and disability, you'd directly put funding in the hands of those who need it now and stop wasting billions of dollars torturing animals in labs throughout the US like @University of Wisconsin-Madison." The comment was hidden from the NIH's public-facing page, and only Ms. Krasno and her Facebook friends could view the comment.

70.    Ms. Krasno wishes to continue posting comments about animal testing on the NIH's Facebook and Instagram pages, but the NIH's continued use of keyword blocking has hampered her ability to advocate on the NIH's social media pages.

71.    Ms. Krasno also wants to comment on HHS's Facebook page, because HHS oversees the NIH and its funding of animal testing. She is hindered in her ability to comment freely on the HHS Facebook Page, however, because HHS blocks comments containing the keyword "monkey."

72.     Ms. Krasno also wishes to engage with and read the comments of other animal rights advocates. Defendants' viewpoint-based keyword blocking prevents her from hearing the speech of other animal rights advocates who may be trying to comment on Defendants' social media posts or videos.

*Ryan Hartkopf*

73.     Plaintiff Ryan Hartkopf resides in Madison, Wisconsin. He is an engineer in the digital health field. He operates an Instagram account under the handle @ryanhartkopf, and he maintains a Facebook profile under the name Ryan Hartkopf.

74.     Mr. Hartkopf's opposition to animal testing stems from 2018. That year, he moved to Madison and started passing the Wisconsin National Primate Research Center ("WNPRC") on his way to work. Mr. Hartkopf began to learn more about the WNPRC through videos on Facebook and PETA campaigns. At one point, he saw a video Ms. Krasno posted describing her past work at the Harlow Center and her goal of shutting down the lab. Mr. Hartkopf reached out to Ms. Krasno to connect and offer his assistance.

75.     Mr. Hartkopf began assisting Ms. Krasno by identifying which of her posts were publicly viewable, and he quickly concluded that the NIH was using keyword blocking to filter or hide posts criticizing the agency's funding of primate testing. Several of Mr. Hartkopf's comments on Instagram were blocked.

    a.  On April 24, 2021, Mr. Hartkopf commented on an April 23, 2021 @nihgov Instagram post about "National DNA Day": "The Wisconsin NPRC is a disgrace. I personally know 2 former employees who were traumatized by their experience as primate caretakers. There is no humane way to keep 1,650 primates in small steel cages for decades without inflicting massive psychological damage. On top of that, the University of Wisconsin has banned any keywords regarding primate testing on their social media pages, meaning any opposition on social media is automatically silenced. They also delete the testimonials of former employees. Why go to all that trouble to silence their own alumni if everything is above-board? We need to reinvest in human-relevant, modern research instead of this barbaric and archaic

practice, which does not yield cures to our most deadly diseases!" After checking the @nihgov post using a different Instagram account and confirming that the comment post was not publicly viewable, Mr. Hartkopf deleted this comment in frustration.

b. On April 29, 2021, Mr. Hartkopf decided to comment again on an @nihgov Instagram post about treatment for antibiotic-resistant infections, raising the same concerns he raised in his previous April 24, 2021 comment. This comment, like his previous one, was hidden. A screenshot of Mr. Hartkopf's view of the comment thread to the @nihgov post and a screenshot of the public's view of the same comment thread appear below.





76.    To confirm that the NIH was intentionally blocking comments with certain keywords from being viewed publicly, Mr. Hartkopf filed Freedom of Information Act ("FOIA") requests with the NIH on April 24, 2021, seeking "a screenshot of all keywords that are blocked" on the NIH's Facebook page and the NIH's Instagram account. A few days later, on April 29, 2021, Mr. Hartkopf received the records responsive to his FOIA request and confirmed that the NIH was engaged in extensive keyword blocking to hide comments relating to animal rights advocacy. *See* Attachment 1 (the NIH response to Mr. Hartkopf's Facebook FOIA request); Attachment 2 (the NIH response to Mr. Hartkopf's Instagram FOIA request).

---

\* In a concurrently filed motion, Plaintiff Madeline Krasno has requested a waiver of her obligation under Local Rule 5.1(c)(1) to provide her home address in the caption of this complaint.

77.     Mr. Hartkopf wishes to continue posting comments about animal testing on the NIH's Facebook and Instagram pages, but the NIH's continued use of keyword blocking has hampered his ability to advocate on those pages.

78.     Mr. Hartkopf also wishes to raise awareness of animal testing by commenting on HHS's Facebook page. He is hindered in his ability to comment freely on the HHS Facebook page, however, because HHS blocks all comments containing the keyword "monkey."

79.     Mr. Hartkopf also wishes to engage with and read the comments of other animal rights advocates. Defendants' viewpoint-based keyword blocking prevents him from hearing the speech of other animal rights advocates who may be trying to comment on Defendants' social media posts or videos.

## Cause of Action

### Violation of the First Amendment of the U.S. Constitution

80.     Defendants' blocking of comments containing words and phrases associated with animal rights advocacy from their social media accounts violates Plaintiffs' clearly established First Amendment rights because it imposes a viewpoint-based burden on their participation in a public forum.

81.     Additionally, Defendants' blocking of comments containing words and phrases associated with animal rights advocacy from their social media accounts violates Plaintiffs' clearly established First Amendment rights because it imposes unjustifiable content-based restrictions on their participation in a public forum.

82.     Defendants' blocking of comments containing words and phrases associated with animal rights advocacy from their social media accounts violates Plaintiffs' clearly established First Amendment rights because it imposes viewpoint-based restrictions on their right to hear.

83.   Additionally, Defendants' blocking of comments containing words and phrases associated with animal rights advocacy from their social media accounts violates Plaintiffs' clearly established First Amendment rights because it imposes unjustifiable content-based restrictions on their right to hear.

### Prayer for Relief

WHEREFORE, Plaintiffs respectfully request that this Court:

1.   Declare that Defendants' viewpoint- and content-based comment blocking from the NIH Instagram and Facebook accounts and HHS Facebook account is unconstitutional;

2.   Enter an injunction requiring Defendants to remove the keyword blocking filters associated with animal rights advocacy described in ¶¶ 57–58, *supra*, and prohibiting Defendants from blocking, hiding, or filtering comments on the basis that they advocate for animal rights or use phrases associated with animal rights advocacy;

3.   Award Plaintiffs their costs, including reasonable attorneys' fees, pursuant to 28 U.S.C. § 2412; and

4.   Grant any additional relief as may be just and proper.

Respectfully submitted,

/s/ Jameel Jaffer
Jameel Jaffer (MI0067)
Katherine Fallow*
Stephanie Krent*
Lyndsey Wajert*
Alex Abdo*
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org
*Counsel for Plaintiffs*

/s/ Caitlin M. Foley

Caitlin M. Foley*
Animal Legal Defense Fund
150 South Wacker Drive, Suite 2400
Chicago, IL 60606
(707) 795-2533 ext. 1043
cfoley@aldf.org

Christopher A. Berry (Bar ID CA00106)
Animal Legal Defense Fund
525 E. Cotati Ave.
Cotati, CA 94931
(707) 795-2533 ext. 1041
cberry@aldf.org

*Counsel for Plaintiffs Madeline Krasno and Nick Hartkopf*

/s/ Asher Smith
Asher Smith*
People for the Ethical Treatment of Animals
1536 16th Street NW
Washington, DC 20036
(202) 483-7382
AsherS@petaf.org

*Counsel for Plaintiff People for the Ethical Treatment of Animals*

*Pro Hac Vice* motion forthcoming

September 10, 2021