## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, MADELINE
KRASNO, and RYAN HARTKOPF,

Plaintiffs,

v.

LAWRENCE A. TABAK, in his official
capacity as Acting Director of the National
Institutes of Health, and XAVIER
BECERRA, in his official capacity as
Secretary of the U.S. Department of Health
and Human Services,

Defendants.

Civil Action No. 21-2380 (BAH)

## JOINT STIPULATION OF FACTS

The parties in the above-captioned matter hereby stipulate to the following facts for the

purposes of this litigation.

### PARTIES

1.      Plaintiff People for the Ethical Treatment of Animals ("PETA") is a nonprofit

animal rights organization based in Norfolk, Virginia. Founded in 1980, PETA is dedicated to

establishing and defending the rights of all animals. PETA's public education and campaign

activities have a particular focus on animal mistreatment in laboratories, the food industry, the

clothing trade, and the entertainment industry, as well as other issues including cruelty to

domesticated animals and animals who are often considered "pests." PETA frequently launches

social media campaigns in order to pressure public and private entities to change their animal

treatment practices. One of PETA's current campaigns targets the National Institutes of Health

(NIH) and the National Institute of Mental Health (NIMH) for its funding of primate testing, including monkey experiments conducted by NIMH scientist Elisabeth Murray. As part of this campaign, PETA employees and members have sought to advocate for the end of primate testing on the NIH's social media pages.

2.      Plaintiff Madeline Krasno, who resides in Oakland, California, is a former animal research technician turned animal rights advocate. She operates an Instagram account under the handle @madeline_krasno, and she maintains a Facebook profile under the name Madeline Krasno. Ms. Krasno has long advocated for the end of animal testing in laboratories. As a student at the University of Wisconsin, Ms. Krasno studied zoology and worked as a student primate caretaker at the Harlow Center for Biological Psychology. Her firsthand experience with primate testing led her to conclude that animal testing is immoral and compelled her to publicly share the details of her experiences. Ms. Krasno seeks to contribute to the public discourse on animal testing in part by drawing attention to the NIH's funding of National Primate Research Centers. One way Ms. Krasno seeks to bring attention to the NIH's involvement in animal testing is by commenting on the NIH's social media posts.

3.      Plaintiff Ryan Hartkopf, who resides in Madison, Wisconsin, is an engineer in the digital health field. He operates an Instagram account under the handle @ryanhartkopf, and he maintains a Facebook profile under the name Ryan Hartkopf. Mr. Hartkopf's opposition to animal testing stems from 2018. That year, he moved to Madison and started passing the Wisconsin National Primate Research Center ("WNPRC") on his way to work. Mr. Hartkopf began to learn more about the WNPRC through videos he found on Facebook and PETA campaigns. At one point, he saw a video Ms. Krasno posted describing her past work at the Harlow Center and her

goal of shutting down the lab. Mr. Hartkopf reached out to Ms. Krasno to connect and offer his assistance.

4.      At the time the Plaintiffs filed the Complaint, Francis S. Collins was the Director of the NIH. On December 20, 2021, Defendant Lawrence A. Tabak became the Acting Director of the NIH. The NIH is a medical research center and is one of the eight health agencies of the Public Health Service. The Public Health Service is part of U.S. Department of Health and Human Services ("HHS"). Defendant Tabak has authority over the NIH policies and practices pertaining to the NIH's social media pages at issue here. The NIH is the primary agency of the federal government charged with performing and supporting biomedical and behavioral research. *See* The National Institutes of Health, *Background and Congressional Issues*, Congressional Research Service Report R41705, https://crsreports.congress.gov/product/pdf/R/R41705 (last updated April 19, 2019). It has major roles in training biomedical researchers and disseminating health information. *Id.* The NIH's mission is "to seek fundamental knowledge about the nature and behavior of living systems and the application of that knowledge to enhance health, lengthen life, and reduce illness and disability." *Id.* (quoting *Mission and Goals*, National Institutes of Health, https://perma.cc/8X68-8YXD).

5.      Defendant Xavier Becerra is the Secretary of HHS. HHS is a cabinet-level department and federal agency that oversees the government's public, social services, medical, and scientific efforts.

## THE FACEBOOK PLATFORM[1]

6.      Facebook is a social media platform operated by Meta. The company states that the Facebook platform is designed to connect users with "friends, family, and communities of people who share [their] interests." The platform allows users to post content, including writings, links, photographs, and videos, for other Facebook users to see. It is the parties' understanding that it is feasible that Internet users without Facebook accounts could see certain user-posted content on a Facebook page, because Facebook initially displays some public content to all internet users before prompting individuals to create an account or sign in. Individuals and organizations who create Facebook accounts can communicate with other users on the platform by sharing others' posts, "liking" those posts, and commenting on or replying to comments attached to a post. Many public officials and government agencies have created Facebook pages to communicate with interested parties.

7.      **Users.** Any individual or organization that has created an account on the platform is a Facebook "user." Individual Facebook users can connect with other users by "friending" them; these connected users are called Facebook "friends." When users post content on the Facebook platform, they have the option of making their posts visible to the public (which may include non-Facebook users to the extent Facebook permits viewing a Facebook page without an account), to their friends only, or to a subset of their friends.

8.      **Pages.** Users who want to create Facebook accounts for "businesses, brands, organizations, [or] public figures" can create Facebook "pages." Facebook pages include the title of the business or organization, and an "About" section where the administrator of the page can

---

[1] The parties agree that the Court may take judicial notice of the information published in Facebook's help center, https://www.facebook.com/help.

provide information concerning the business or organization. Part of the NIH page recently looked like this:



9.      All internet users in the United States can generally access a selection of recent posts from all public Facebook pages before they are required to sign-in or sign-up, but only Facebook users can see all of the previous posts on the page. Facebook users can also "like" a page in order to get updates from that page in their "News Feed"—a personalized, constantly updating stream of content posted on the platform by others.

10.     **Verification.** Public figures, brands, and official organizations can request "verification" of their pages and profiles on Facebook. When it verifies a Facebook page, Facebook confirms that the operators of the page are the authentic representatives of the entity represented in the page. Verified pages feature a blue checkmark next to their page name or profile name.

11.     **Posts.** A Facebook "post" is any combination of text, images, videos, audio, or Internet hyperlinks published by a Facebook user on the user's Facebook page. Users who visit or

follow a Facebook page can see all of the posts published by the administrator of the page. Posts

on the NIH's page include agency-related news updates and public health information. This is a

recent post on the NIH's page.



12. **Facebook Live.** Facebook users can also share content with others by going "Live"

through the Facebook Live feature. Facebook Live allows users or pages to stream video in real-

time for viewing by other users. After they first air, the videos remain viewable on the posting

user's page or profile. Live videos are generally visible to Facebook users and to viewers without

a Facebook account who access the livestream directly through a Uniform Resource Locator

(URL). Page administrators may also choose to broadcast only to a specific subset of their page's

followers.

13. **Comments and comment threads.** Facebook users can respond to others' posts—

including Live videos—by commenting on them. Facebook comments can include the same type

of content as Facebook posts, including text, images, and hyperlinks. Facebook users may also reply to other comments appended to a post or to replies that have been posted by others. The collection of replies and replies-to-replies is sometimes referred to as a "comment thread." Any Facebook user can comment on a post or comment made viewable to the public. Those without a Facebook account cannot comment on any Facebook content they may be able to view.

14. **Likes and reactions.** Users can also "react" to others' posts by clicking the "Like" button and selecting emojis corresponding to "Like," "Love," "Care," "Haha," "Wow," "Sad," and "Angry." When a user reacts to a post, other users will be able to see the user's reaction in a list of reactions on the post. The total number of reactions and shares are listed on each post. This is a recent post from the NIH's Facebook page, displaying some associated comments and reactions.



15.    **Sharing.** In addition to commenting on and reacting to posts, users can also choose to "share" them. "Sharing" a post causes it to appear on an individual user's own Facebook profile page and increases the likelihood that a user's friends will see it in their News Feeds. When users share posts, they can add text that appears above the shared posts. Users can employ this feature to provide commentary on the posts they are sharing.

16.     **Comment filtering and keyword blocking.** Administrators of Facebook pages can limit comments that appear on their posts by using Facebook's opt-in moderation tools, including comment filtering. Page administrators may, for example, filter all comments that contain profanity by turning on Facebook's built-in "profanity filter." Administrators may also input their own lists of words or phrases that they wish to filter from other users' comments on their posts. When a page administrator adds a word to this list, any past or future comments from users containing the word should automatically be hidden from public view. Although a hidden comment remains visible to the user who posted it and to the user's friends, other Facebook users viewing the page are unable to read or engage with the comment. Facebook refers to the practice of hiding comments containing certain keywords from view as "blocking."

17.     Page administrators may also block individual comments either by manually "hiding" them, or by deleting them from the comment threads associated with their posts. When a comment is deleted, it is removed from the page altogether, and neither the Facebook user who posted the comment nor the user's Facebook friends may view it. Manually hidden comments remain visible to the user who posted the comment and that user's friends, but other individuals viewing the page are unable to read or engage with the comment.

18.     Typically, the user whose comment has been hidden or deleted by a page administrator does not receive notice of these moderation actions.

19.     **Banning and blocking.** Page administrators may "ban" or "block" individual users from their pages. Banning a user prevents the user from commenting on or liking any content from the page, but it does not foreclose the user from continuing to access the page and its posts. Blocking a user, by contrast, prevents the user from accessing the page altogether while they are

logged into Facebook: the user is no longer able to view the content posted to the page or even locate the page using Facebook's search function.

20.     **Facebook's Community Standards.** In addition to making comment moderation options available to a page administrator, Facebook also engages in certain content moderation. The Facebook Community Standards outline "what is and isn't allowed on the Facebook app," including what types of content may be demoted, hidden or deleted by Facebook on its own accord. Examples of information that Facebook itself may remove include content that incites or facilitates serious violence, coordinating harm and publicizing crime, hate speech, spam, imagery of dead people, or fraud and deception.[2] Facebook states that it notifies users when their posts or comments have been removed for violating its community standards. *See Transparency Center*, Meta (Jan. 19, 2022), https://perma.cc/B5SV-6B69.

## THE INSTAGRAM PLATFORM[3]

21.     Meta also operates the social media platform Instagram. Instagram is a platform for visual content, allowing users to share photos and videos and respond to posts through likes or comments. The company states that Instagram is designed to "foster a safe and inclusive community where people can express themselves, feel closer to anyone they care about and turn passion into a living." Numerous brands, celebrities, public officials, and public entities have Instagram accounts and post pictures or videos to communicate with interested parties.

22.     **Users.** An Instagram "user" is an individual or organization that has created an account on the platform. Each Instagram user creates a unique username, such as "@nihgov."

---

[2] *See Facebook Community Standards,* Meta, https://perma.cc/UM3D-MSZK. The parties agree that the Court may take judicial notice of the information published as part of these standards.

[3] The parties agree that the Court may take judicial notice of the information published in Instagram's help center, https://help.instagram.com/.

Other Instagram users can locate an account by searching for the account's username on Instagram's website or mobile application to access the user's profile page.

23.    **Profiles.** Each Instagram user has a unique webpage or "profile." Each user's profile displays the associated username as well as other information about the account, including the profile photo associated with the user, the account's followers, and the accounts the user is following. If a user's profile is open for public view, any Instagram user who navigates to the user's profile can view all of the user's posts. A non-Instagram user with internet access may view some posts open to public view and comments on those posts, until Instagram prompts the individual to create an account or log in. If a user's profile is private, only approved followers of the user may view the user's posts. Below is a screenshot of the NIH's Instagram profile page.



24.     **Followers.** Instagram users may "follow" the profiles of other users by clicking on the "Follow" button that appears at the top of an account's profile. Following an account means subscribing to it—the followed account's posts appear in the user's "Instagram feed," a personalized, constantly updating page on the Instagram platform that displays content shared by the accounts that a user follows.

25.     **Posts.** An Instagram post is a discrete piece of content that a user shares to the user's profile page. A post on Instagram can be an image, a video, or a collection of images or videos. When a user shares an image or video, the user can include a text-based caption that will be displayed alongside or underneath the post.

26.     **Instagram Stories.** In addition to standard Instagram posts, users may also share content via the platform's "Instagram Story" feature. The Instagram Story is a slideshow-like presentation that displays all content—images, videos, and text—users share to their Stories. Unlike an Instagram post, content shared to a Story remains visible to other users for only 24 hours after it is shared. Instagram Stories can be accessed by clicking on the profile image of an Instagram user when it is circled by a multi-colored ring—the indicator that the user has posted a story. Although Instagram stories are normally visible for only 24 hours, users can save stories to their profiles indefinitely by making them "highlights." Rather than being accessed by clicking on the profile image, highlights remain saved just below the profile image and are accessible by default to Instagram users. For example, the top of the NIH's profile page recently looked like this, indicating that the NIH had posted at least one Instagram story in the preceding 24 hours and had saved and highlighted previous stories relating to COVID-19 updates, past live events, and NIH news:



27.   **IGTV.** Instagram also permits users to upload long-form video content using a feature called "IGTV." Videos uploaded to this feature are accessible from a user's profile by clicking on a tab labeled "IGTV." Recent content uploaded to the NIH's IGTV page can be seen below.



28.   **Comments and comment threads.** Instagram users can comment on posts and IGTV videos and reply to other comments. The author of a post may also comment or respond to comments in the comment thread. By default, the Instagram platform makes all comments and

replies to posts from a public profile visible to all Instagram users, and the public at large until Instagram requires a log-in to continue viewing.

29.     **Likes.** In addition to commenting on posts, users may "like" posts by clicking on the heart-shaped button next to the image. Liking a post may indicate approval or acknowledgment of the content.

30.     **Comment filtering and hiding.** Instagram provides account holders with a variety of tools to control or moderate the conversations on their posts. Account holders may, for example, use comment filtering and hiding to automatically control the content of the comments on their posts. The "Custom Words and Phrases" function permits account holders to automatically hide all comments containing specified words or phrases. Thus, if an account holder designates the word "testing" as a custom hidden word on the account holder's page, any comment containing that word should automatically be hidden from public view as soon as it is posted. The filtered comment will be visible only to the user who posted it and to the account holder if they choose to "view hidden comments." No other user, including users who follow the comment author, will be able to see, reply to, or engage with the hidden comment.

31.     Account holders may also hide comments that contain any keyword in a list of default keywords created and maintained by Instagram. The "Hide Comments" function is on by default, and automatically hides comments containing common offensive words, phrases, or emojis found in posts reported as violating Instagram's terms of service. Unlike comments filtered due to the inclusion of a word on an account holder's custom hidden words list, comments automatically hidden under this function do not disappear completely for all users. Rather, any user can view these comments by scrolling to the bottom of a post's comments section and clicking on a "view hidden comments" button.

32.     **Restricting comments.** Instagram account holders may also moderate the comments on their posts by "restricting" another user's comments. This option automatically hides all comments posted by a particular user from members of the public, but gives the restricting account holder the option to pre-screen the comments and decide whether to allow certain comments to be seen. This feature allows a given user prior review over each comment that appears on their profile.

33.     **Blocking a user's comments.** Account holders may also "block" other users from commenting on any of their posts by using the platform's "block comments" function. The blocked user's comments and replies are then automatically rendered invisible to all other users. In addition to blocking a user's comments, account holders may block the user from viewing the account holder's profile or any of their posts.

34.     Instagram users are not notified when their comments have been hidden or filtered. Because these comments remain visible to the user making them, users will generally be unaware that their comments are invisible to others.

35.     **Instagram's Community Guidelines.** In addition to making comment moderation options available to an account holder, Instagram itself also engages in certain content moderation. The Instagram Community Guidelines outline "what is and isn't allowed on Instagram," including what types of content may be removed by Instagram of its own accord.[4] Examples of information that Instagram itself may remove include content that incites or facilitates violence, hate speech, and spam.[5] These comments are automatically removed by Instagram and are not viewable by users. Instagram has stated that it notifies users when their posts or comments have been removed

---

[4] *How does Instagram decide what to remove?*, Instagram Help Center, https://perma.cc/6MZJ-PRA5?type=image.

[5] *See Community Guidelines*, Instagram Help Center, https://perma.cc/YC88-XQBH?type=image. The parties agree that the Court may take judicial notice of the Instagram Community Guidelines.

for violating its community standards. *See Transparency Center*, Meta (Jan. 19, 2022), https://perma.cc/B5SV-6B69. In October 2020, Instagram also began to offer a feature that relies on an artificial intelligence algorithm to automatically hide comments similar to others that have been reported as violating its community guidelines. *See Kicking Off National Bullying Prevention Month With New Anti-Bullying Features*, Instagram (Oct. 6, 2020), https://perma.cc/3FLS-DXWQ. The comments hidden via this mechanism can be viewed by any user who chooses to "view hidden comments" at the bottom of a post. *Id.*

## THE NIH'S SOCIAL MEDIA ACCOUNTS

### *The NIH's verified Facebook page*

36.    NIH uses social media accounts, including Facebook, to "communicate and interact with citizens" about agency-related updates and public health news. *Web Policies and Notices*, National Institutes of Health (Jan. 14, 2021), https://perma.cc/BC7R-ZFME. "NIH Facebook pages are managed by NIH staff members who post news and other items of interest to be consumed by the public." *Id.*

37.    The NIH established the Facebook page "@nih.gov" on October 14, 2008. The page is registered as a "Government Organization" page, and the page's profile photo is the NIH logo. The account features a blue checkmark, indicating that Facebook has deemed it an authentic page for the NIH. The page includes links to the official public NIH website, www.nih.gov, and the phone number listed in the "About" section is the phone number for the main operator for the NIH. The "Intro" section on the NIH's Facebook page reads "NIH...Turning Discovery Into Health ®. Read our Privacy Policy: http://www.nih.gov/about/privacy.htm. Visit http://www.nih.gov for more information."

38.     The NIH Facebook page is viewable by the public, meaning that a portion of its page is generally accessible to those with internet access until Facebook requires a log-in. Any member of the public with a Facebook account can view the entirety of the page, including prior posts and comments to those posts. Approximately 565,515 users currently "follow" the page, allowing them to see updates from the NIH in their own Facebook News Feeds. The NIH uses the account to post agency-related information and public health updates, including updates regarding the ongoing COVID-19 pandemic.

39.     Facebook users can comment on the posts, "react" to the NIH's posts through the "reaction" options Facebook offers, and share the NIH's posts to their own Facebook profile pages. Certain NIH Facebook posts garner dozens of comments and replies, and some of them have hundreds of comments and replies. Examples of the NIH's Facebook posts, and comments and replies to those posts, are attached hereto as Exhibits 1–6.

40.     The parties will confer in good faith if either party wishes to submit, with summary judgment briefing, additional posts and comments on the Facebook pages of the NIH and the Plaintiffs. Neither party will unreasonably object to the admissibility of additional posts and comments on the NIH's Facebook page and Plaintiffs' Facebook pages in relation to the claims raised in the Complaint.

### *The NIH's verified Instagram account*

41.     The NIH launched the Instagram account @nihgov on January 23, 2018. In the first post on the account, the NIH urged Instagram users to "Follow us for cool science images, health tips, and a behind-the-scenes look at the nation's top biomedical research institute! #Followus #FirstPost #Health #Wellness #Science #research."



42.     The Instagram page is registered as belonging to a "Government Organization" and the page's profile photo is the NIH logo. The account features a blue checkmark, indicating that it is a verified Instagram account.

43.     The NIH's Instagram page is viewable by the public, meaning that a portion of the page is generally accessible to anyone with Internet access until Instagram requires a log-in. Any Instagram user can see all of the previous posts and comments on the page. The NIH's Instagram page has approximately 206,000 followers.

44.     The NIH uses the account to post content about the agency's work, including interviews with NIH experts and news about numerous NIH health campaigns, and public health updates, including updates on the ongoing COVID-19 pandemic.

45.     Instagram users can comment on or "like" the NIH's posts on the page. Certain posts have received over one hundred comments, including both positive and negative responses.

Examples of NIH's Instagram posts, including comments to those posts, are attached hereto as Exhibits 7–11.

46.     The parties will confer in good faith if either party wishes to submit, with summary judgment briefing, additional posts and comments on the Instagram pages of the NIH and the Plaintiffs. Neither party will unreasonably object to the admissibility of additional posts and comments on the NIH's Instagram page or Plaintiffs' Instagram pages in relation to the claims raised in the Complaint.

### *The NIH's social media comment moderation practices*

47.     Many persons and entities have made comments on posts on the NIH's Facebook and Instagram pages; the NIH believes that some, however, have posted comments that are off-topic because they are unrelated to the topic of the posts. For example, the NIH posted, on October 22, 2021 on its Instagram account, an "immunofluorescence microscopy image of a human retina from Dr. Angela Kruse at Vanderbilt University," with a few concluding notes, such as "#WomenInScience." A copy of this post is attached hereto as Exhibit 12. In response, multiple users—including Plaintiff Ms. Krasno—made a number of comments concerning animals that NIH believes are unrelated to the topic of the post. For example, Ms. Krasno commented: "No longer use T A X $$ to cut vocal cords of d o g s and k I l l them." Other users posted comments that NIH believes are similar, such as "PUPPY KILLERS," and "Sham [sic] on you killers." *Id*. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 13.[6]

48.     Similarly, the NIH made a post on its Instagram account on November 12, 2021 conveying a woman's story concerning her mother's experience with Alzheimer's disease. For

---

[6] As discussed above, comments on public posts may also be viewable by members of the public without Instagram or Facebook accounts, because Meta initially allows anyone with an internet connection to view a selection of recent public posts before prompting the individual to create or log into an account.

example, the woman stated, "if I had to tell anyone [on] this journey, the biggest piece is just preparing yourself emotionally to lose that person a little bit every single day. Because that's what happens. In six months, something else is different about them. And that's extremely challenging." A copy of this post is attached hereto as Exhibit 14. The NIH again received a number of comments concerning animals that NIH believes are unrelated to the post, such as "stopanimalabuse" and "FREE THE BEAGLES!!!!!!" *Id.* A copy of the post with all comments viewable by users is also attached hereto as Exhibit 15.

49.      Another Instagram post by NIH dated September 17, 2021 referenced a "biomedical engineering professor" who "helped develop a portable diagnostic device to detect sickle cell disease in newborns" which could "save lives in remove, underserved areas of the world." A copy of this post is attached hereto as Exhibit 16. Multiple users commented, "#animalabuser." *Id.* One commenter noted: "burn in hell elizabeth #animalabuser." *Id.* Given other comments made in response to the post, the NIH believes the commenter was likely referencing Dr. Elisabeth Murray, an NIH Senior Investigator in the Laboratory of Neuropsychology who has been the subject of some of PETA's advocacy efforts. *See Government Experimenters Frighten Monkeys With Snakes*, PETA (Feb. 24, 2021), https://perma.cc/H86T-2YJ2. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 17.

50.      The NIH made a post on its Facebook page concerning gene therapies for rare diseases. In particular, NIH posted: "#RareDiseases affect about 30 million Americans, but of the approximately 7,000 rare diseases identified, only two heritable diseases currently have [FDA-approved] #GeneTherapies. That's why #NIH . . . teamed up" with other entities "to launch the Bespoke Gene Therapy Consortium." A copy of this post with all comments viewable by users is

attached hereto as Exhibit 18. Again, in response, NIH received a number of comments concerning animals that NIH believes were unrelated to the topic of the post. One commenter noted: "Absolutely disgusted with you. Feeding puppies to hungry sand flies? . . . Idea, lets try it on you instead." *Id.* Another commenter noted, "You deserve a fate in prison. You donate money to create unnecessary suffering, you are part of the murders, you are THE very conspirator." *Id.*

51.    The NIH, like many other public entities both at the federal and state levels,[7] publishes guidelines for commenting on its social media accounts. A copy of the NIH's current, operative comment guidelines is attached hereto as Exhibit 19.

52.    The comment guidelines—which were posted online on March 30, 2015 and minimally updated on March 13, 2019 to include "images and videos" in the guidelines— "encourage" members of the public "to share [their] thoughts and ideas [on] any other website owned or administered by the National Institutes of Health (NIH) where commenting is supported." Ex. 19. However, the guidelines state that those pages "are not intended to serve as public forums." *Id.* The guidelines further state that since the "NIH utilizes moderated blogs, comments submitted for consideration are not immediately visible" and "are reviewed before they can be posted to ensure compliance with the[] guidelines." *Id.* The guidelines impose a number of restrictions on user comments to "encourage respectful and constructive dialogue." *Id.* The guidelines thus prohibit comments that include, among other things, "[v]ulgar, obscene, profane,

---

[7]    *See*, *e.g.*, https://perma.cc/BA5M-AFVJ; https://perma.cc/LA6L-UVSH; https://perma.cc/Q5WV-4PZK; https://perma.cc/3EVX-G75X; https://perma.cc/4F85-8S5C; https://perma.cc/QVC3-KTHH; https://perma.cc/FD5W-2BSE; https://perma.cc/WH6A-W4RK; https://perma.cc/T5WG-FGWC; https://mn.gov/dhs/general-public/policies/social-media.jsp; https://perma.cc/JX4U-6LGZ; https://perma.cc/M3X3-9ZR6; https://perma.cc/L9EM-SBRG; https://perma.cc/W52A-2367; https://perma.cc/VWS3-7P37; https://perma.cc/79RA-4LB4; https://perma.cc/SP2F-Z27U.

threatening, or abusive language," "[d]iscriminatory language," "[e]ndorsements of commercial products," "[r]epetitive posts," "[s]pam," and "[o]ff-topic" content. *Id.*

53.     The NIH's comment moderation policy is located on its official website. When the Complaint was filed, NIH's Facebook and Instagram pages did not directly link to the NIH's comment moderation policy. As of January 7, 2022, URL information for the NIH's comment moderation policy may now be found on its Facebook and Instagram pages. A visitor to the NIH's Facebook page can access the URL for the comment moderation policy by clicking on the "About" tab, and then the "Details about the National Institutes of Health (NIH)." A screenshot can be found below.



A visitor to the NIH's Instagram page can access the URL for the comment moderation policy by viewing the NIH's profile header. A screenshot can be found below.



54.     In its separate "Web Policies and Notices" page, a direct link to which has been available on the NIH's Facebook and Instagram accounts since before the time Plaintiffs filed the Complaint, the NIH has stated that "as a practice, comment moderator policy requires the removal from NIH Facebook pages of any comments that contain spam or are improper, inflammatory, off-topic or offensive." *Web Policies and Notices – Privacy Policy – How NIH.gov Uses Third-Party Web Sites and Applications – Facebook*, National Institutes of Health (Jan. 14, 2021), https://perma.cc/BC7R-ZFME. A visitor to the NIH's website can find this sentence by clicking on "Web Policies and Notices," and then "Privacy Policy," and then "Third-Party Web Sites and Applications," and then "Facebook." A link to the "Web Policies and Notices" page can be found on NIH's Facebook page by clicking on the "About" tab, and then "Privacy and Legal Info." This URL information can also be found on NIH's Instagram page in the header.

55.     The NIH's comment moderation guidelines apply only to NIH's Facebook and Instagram pages at issue here, and other websites administered by NIH. They do not prevent any party from posting any content in other forums, including other forums on Facebook and Instagram. The guidelines would not apply to commenting on Facebook or Instagram pages operated by other NIH Institutes, Centers, or Offices, or PETA. PETA operates its own Facebook and Instagram pages through which it can post comments concerning animal testing. *See PETA*

*(People for the Ethical Treatment of Animals)*, Facebook, https://perma.cc/6EHD-M743; *peta*, Instagram, https://www.instagram.com/peta (last accessed Feb. 9, 2022).

### The NIH's use of keyword filtering on its social media accounts

56.     The NIH, through individuals acting as administrator(s) and/or account manager(s), has enabled the "Profanity Filter" to apply to its Facebook account. Facebook "determines what to hide [through the Profanity Filter] by using the most commonly reported words and phrases marked offensive by the community."[8] Comments filtered through this function remain visible only to the comment's author and their Facebook friends. The NIH can turn this filter off, but Facebook controls what words or phrases are included in the filter.

57.     The NIH, through individuals acting as administrators and/or account managers(s), has enabled the "Hide Comments" filter to apply to NIH's Instagram account. Instagram's "Hide Comments" filter hides comments containing "common offensive words, phrases, or emojis." All Instagram users can see comments hidden by Instagram's "Hide Comments" filter if they click "view hidden comments" at the bottom of a post. While the filter is enabled by default by Instagram, the NIH can turn this filter off. Instagram controls what words or phrases are included in the filter.

58.     The NIH, through individuals acting as administrator(s) and/or account manager(s), uses custom keyword filters on its Facebook and Instagram pages to hide comments containing certain keywords. As of the date Plaintiffs filed the Complaint, the NIH included the following words on its Instagram and Facebook page keyword filter lists. It asserts that these keywords were

---

[8] *See How do I turn the profanity filter on and off for my Facebook Page?*, Facebook Help Center, https://perma.cc/L3WZ-7RTW.

selected to target comments frequently made on NIH's social media pages that the NIH believes

would violate its comment moderation guidelines:

| **Facebook** | **Instagram** |
|:---:|:---:|
| PETA, PETALatino | PETA |
| Suomi,[9] Harlow[10] | #stopanimaltesting |
| Animal(s), animales, animalitos | #stoptesting |
| Cats, gatos | #stoptestingonanimals |
| Chimpanzee(s), chimp(s) | Animal(s) |
| Hamster(s) | Chimpanzee(s), chimps |
| Marmoset(s) | Monkey(s)[11] |
| Monkey(s), monkies | Experiment |
| Mouse, mice | Hurt(ing) |
| Primate(s) | Kill |
| Sex experiments | Stop |
| Cruel, cruelty | Test(ing), testing facility |
| Revolting | Tortur(ing) |
| Torment(ing) | |
| Torture(s), torturing | |

59.     The NIH also uses keyword filters for certain other terms, including profane and

racist terms, names of certain illicit drugs, domains of other websites or applications, and the term

#believemothers. *See* Compl., Attachments 1 & 2. The NIH asserts that these terms are likewise

calculated to capture frequently made comments that violate its comment moderation guidelines.

The NIH also believes that it has the authority to add additional keywords to its keyword filter lists

if they are calculated to capture comments that violate the NIH's comment guidelines.

---

[9] Stephen J. Suomi is currently the Chief of the Laboratory of Comparative Ethology at the Eunice Kennedy Shriver National Institute of Child Health and Human Development. He has conducted extensive research on behavioral development by researching on monkeys and other nonhuman primates. PETA led an extensive public campaign related to Dr. Suomi's work, which involved animal experiments.

[10] Harry Harlow was an American psychologist known for conducting maternal deprivation experiments on monkeys to determine how early environment shapes their behavior. The Harlow Center on Biological Psychology, named for Mr. Harlow, is affiliated with the Wisconsin National Primate Research Center and houses the monkeys and nonhuman primates used in experiments. *Harlow Center for Biological Psychology*, University of Wisconsin Madison, https://perma.cc/N9B7-RENQ. After Dr. Harlow died in 1981, PETA campaigned against the NIH's continuation of his work and frequently mentions Dr. Harlow in its advocacy against animal testing. *Psychological Torture Experiments at NIH Must Stop*, PETA, https://perma.cc/956S-ZKQS.

[11] The NIH's Instagram filter list also includes two emojis depicting monkeys and an emoji with an expletive face.

60.     On December 3, 2021, the NIH removed "PETA" and "PETALatino" from its list of blocked keywords on Facebook and removed "PETA" from its list of filtered keywords on Instagram. On December 7, 2021, the NIH also removed "#stopanimaltesting," "#stoptesting," and "#stoptestingonanimals" from its list of filtered keywords on Instagram. All other terms listed in the preceding paragraphs remain blocked.

61.     The NIH believes that it has the authority to manually review any and all comments before and after they are posted to the NIH's social media accounts. However, in practice, only comments containing the NIH's filtered keywords or from Facebook or Instagram's own filters are automatically hidden from users' public view. Prior to the filing of Plaintiffs' Complaint, the NIH engaged in limited efforts to manually hide comments that it believed violated its comment moderation guidelines after they were posted, and these efforts became especially limited due to the resource constraints of the COVID-19 pandemic. As such, the NIH principally relied upon its keyword filters to moderate comments that the NIH asserts violate its comment moderation guidelines. If the NIH had the resources to manually moderate its social media accounts on a more consistent basis, it would have done so. Once Plaintiffs' Complaint was filed, the NIH paused its efforts to manually hide comments consistent with its comment moderation guidelines. The NIH intends to resume manual comment moderation following a resolution of the parties' summary judgment motions, if consistent with the Court's order resolving those motions.

### PLAINTIFFS' COMMENTS ON THE NIH'S SOCIAL MEDIA PAGES

#### *PETA*

62.     Certain comments made by multiple PETA employees in response to the NIH's Facebook Live videos and posts—and which contained one or more terms on NIH's Facebook keyword filter list—did not appear on the NIH's Facebook page.

63.    On September 24, 2020, PETA employee Evelyn Wagaman was prevented from posting three comments on a Facebook Live video on the NIH's Facebook page about COVID-19 vaccine research. One read, "Francis Collins, we appreciate all your hard work to search for a COVID vaccine, but why is NIH still wasting money on cruel and ineffective monkey fright experiments?" Ms. Wagaman was unable to post these comments at all. Ms. Wagaman's comment contained the words "cruel" and "monkey," which are on the NIH's Facebook keyword filter list. She saw that the comment had not been posted because it was bordered by a red box, and text below the comment read "Unable to post comment. Try again." A copy of Ms. Wagaman's attempted comments is attached hereto as Exhibit 20. A copy of the Live video post with all comments viewable by users is also attached hereto as Exhibit 21.

64.    On October 8, 2020, Ms. Wagaman again tried to comment on an NIH Facebook Live video about gene editing, but several of her comments were not published, including: "Congratulations, Dr. Doudna! Francis Collins, please end NIH's fright experiments on primates;" and "CRISPR can be used for advanced, non-animal experiments. In light of the many non-animal technologies that are developing, how can NIH continue to conduct experiments on macaques and other primates?" Ms. Wagaman's comments contain the word "primates," which is on the NIH's Facebook keyword filter list. She saw that the comments had not been posted because they were bordered by a red box, and text below the comments read "Unable to post comment. Try again." A copy of Ms. Wagaman's attempted comments is attached hereto as Exhibit 22. A copy of the Live video post with all comments viewable by users is also attached hereto as Exhibit 23.

65.    On May 27, 2021, Ms. Wagaman attempted to post several comments on an NIH Live video featuring Dr. Kizzmekia Corbett, including: "Thank you, Dr. Corbett and Dr. Collins, for your hard work on the COVID vaccines! Why is the NIH still wasting funds on Elisabeth

Murray's monkey fright experiments instead of investing more in important clinical research about COVID-19?" This comment contained the word "monkey," which is on the NIH's Facebook keyword filter list. The comments were hidden from public view and were only viewable by Ms. Wagaman and her Facebook friends. A copy of Ms. Wagaman's comments is attached hereto as Exhibit 24. A copy of the Live video post with all comments viewable by users is also attached hereto as Exhibit 25.

66.    On June 4, 2021, PETA employee Brittny Hopwood, using a pseudonymous account, posted a series of comments to an NIH Facebook post about social deprivation and adoption. Ms. Hopwood posted comments containing the following words: "monkey," "cruel," "PETA," "TORTURE," "TORTURING," "TORMENT," "ANIMALS," "NON-ANIMAL," "primates," "tests," "fake spider," "fake snake," "fright," "experiments," "vacuum," and "burn." The comments containing the words "monkey," "cruel," "PETA, "TORTURE," "TORTURING," "TORMENT," "ANIMALS," and "NON-ANIMALS" were all hidden from users' public view. With the exception of the word "non-animals," these words were all on the NIH's Facebook keyword filter list at the time these comments were posted. "PETA" was removed from the NIH's Facebook keyword filter list as of December 3, 2021. A copy of Ms. Hopwood's comments is attached hereto as Exhibit 26. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 27.

67.    On July 2, 2021, Ms. Hopwood posted a series of one-word comments to an NIH Facebook post about cancer research. Ms. Hopwood posted the following words: "experiments," "fright," "fake snake," "fake spider," "tests," "cruel," "primates," "primate," "non-animal," "animals," "torment," "torture," "PETA," "monkeys," and "monkey." The comments containing the words "cruel," "primates," "primate," "non-animal," "animals," "torment," "torture," "PETA,"

"monkeys," and "monkey" were all hidden from users' public view. With the exception of the word "non-animal," these words were all on the NIH's Facebook keyword filter list at the time of these comments. "PETA" was removed from the NIH's Facebook keyword filter list on December 3, 2021. A copy of Ms. Hopwood's comments is attached hereto as Exhibit 28. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 29.

68.     PETA employees have occasionally advocated for animal rights in comments posted to the NIH's Facebook page by modifying the spelling of certain words or by replacing blocked words with words conveying similar meanings. For example, on October 16, 2020, Ms. Wagaman wrote comments on an NIH Facebook Live video about COVID-19 treatment, including: "Francis Collins, thank you for your hard work finding a vaccine for COVID-19. In light of the urgency of devoting resources to find a vaccine and the ineffectiveness of experiments on an1mals, will you please end the fright expts on macaques of Elisabeth Murray?" These comments were not hidden or filtered, and were viewable by Facebook users. A copy of the post with all comments viewable by users is attached hereto as Exhibit 30.

69.     PETA employees wish to continue posting comments about animal testing on the NIH's Facebook page that may contain terms subject to the NIH's Facebook keyword filters.

70.     Plaintiff PETA also wishes to engage with and read the comments of other animal rights advocates on the NIH's Facebook page. PETA, by and through several of its employees, follows the NIH's Facebook page.

71.     PETA has posted about the NIH on its own social media accounts. For example, on September 19, 2021, PETA made an Instagram post about NIMH scientist Elisabeth Murray's experiments on monkeys, which tags the NIH's Instagram account and asks its supporters to take action by "telling @nihgov to end this." A screenshot of the post looks like this:



As another example, PETA has written Instagram posts criticizing the NIH for its funding of research involving experiments on dogs. For example, PETA made an Instagram post on November 9, 2021 on this topic, and tagged the NIH's Instagram account:



*Madeline Krasno*

72.     On April 29, 2021, Ms. Krasno commented on an NIH Instagram post about a study on Alzheimer's disease treatment that was conducted on mice. Ms. Krasno wrote, "It's pretty messed up that you block conversation about animal testing." This comment contained the words "animal" and "testing," which are on the NIH's Instagram keyword filter list. It was hidden from public view. A copy of Ms. Krasno's comment is attached hereto as Exhibit 31. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 32.

73.     On May 3, 2021, Ms. Krasno commented on an NIH Instagram post of a cell infected with COVID-19, writing "It's time we had an open conversation about all the animal testing you fund. What a waste of life and resources." This comment contained the words "animal" and "testing," which are on the NIH's Instagram keyword filter list. It was hidden from public view. A copy of Ms. Krasno's comment is attached hereto as Exhibit 33. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 34.

74.     On May 5, 2021, Ms. Krasno commented on an NIH Instagram post about Public Service Recognition Week 2021, saying "If you're wanted to actually extend life and reduce illness and disability, you'd directly put funding in the hands of those who need it now and stop wasting billions of dollars torturing animals in labs throughout the US like @uwmadison." This post contained the words "torturing" and "animals," which are on the NIH's Instagram keyword filter list. It was hidden from public view. A copy of Ms. Krasno's comment is attached hereto as Exhibit 35. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 36.

75.     On May 6, 2021, Ms. Krasno posted substantially the same comment on a similar NIH Facebook post about Public Service Recognition Week 2021. She wrote: "@National Institutes of Health (NIH), If you actually wanted to extend life and reduce illness and disability,

you'd directly put funding in the hands of those who need it now and stop wasting billions of dollars torturing animals in labs throughout the US like @University of Wisconsin-Madison." The comment includes the words "torturing" and "animals," which are on the NIH's Facebook keyword filter list. The comment was hidden from the NIH's Facebook page, and only Ms. Krasno and her Facebook friends could view the comment. A copy of Ms. Krasno's comment is attached hereto as Exhibit 37. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 38.

76.     On May 29, 2021, Ms. Krasno commented on an NIH Instagram post about diversity in science. She wrote: "How about the victims of 'science'? Going to highlight them too? Why are you still funneling billions of dollars into animal testing? Its archaic, unsuccessful, and cruel. @nihgov." The comment contained the words "animal" and "testing," which are on the NIH's Instagram keyword filter list, and was hidden. A copy of Ms. Krasno's comment is attached hereto as Exhibit 39. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 40.

77.     On June 13, 2021, Ms. Krasno commented on the NIH's Facebook page, writing: "I was diagnosed with PTSD after working at @University of Wisconsin-Madison's Harlow Primate Lab which receives funding from you, the @National Institutes of Health (NIH), to torture animals in the name of science. Its despicable that you continue to harm animals and call it progress when so many people are without the means to access mental healthcare, general healthcare, and medication that already exists." The comment contained the words "torture," "animals," and "Harlow," which are on the NIH's Facebook keyword filter list. It was hidden from public view, although Ms. Krasno and her Facebook friends could view the comment. A copy of Ms. Krasno's

comment is attached hereto as Exhibit 41. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 42.

78.     Ms. Krasno has occasionally advocated for animal rights in comments replying to the NIH's Instagram posts by modifying the spelling and spacing of certain words. For example, on April 29, 2021, she commented, "Ok let me try again. It's pretty messed up that you block any conversation about a n I m a l t e s t I n g." This comment was not hidden from view. *See* Ex. 32.

79.     Ms. Krasno wishes to engage with and read the comments of other animal rights advocates on Defendants' social media pages. She follows the NIH on Instagram and Facebook.

### *Ryan Hartkopf*

80.     On April 24, 2021, Mr. Hartkopf commented on an April 23, 2021 @nihgov Instagram post about "National DNA Day" by stating, "The Wisconsin NPRC is a disgrace. I personally know 2 former employees who were traumatized by their experience as primate caretakers. There is no humane way to keep 1,650 primates in small steel cages for decades without inflicting massive psychological damage. On top of that, the University of Wisconsin has banned any keywords regarding primate testing on their social media pages, meaning any opposition on social media is automatically silenced. They also delete the testimonials of former employees. Why go to all that trouble to silence their own alumni if everything is above-board? We need to reinvest in human-relevant, modern research instead of this barbaric and archaic practice, which does not yield cures to our most deadly diseases!" This comment contained the word "testing," which is on the NIH's Instagram keyword filter list. After checking the post using a different Instagram account and seeing the comment post was not publicly viewable, Mr. Hartkopf deleted this comment. A copy of the post with all comments viewable by users is attached as Exhibit 43.

81.     Mr. Hartkopf then wrote a series of one-word comments on an NIH Instagram post, dated January 28, 2021. Mr. Hartkopf posted: "test," "monkeys," "experiments," "peta," "experimenting," "torture," and "testing." All of these terms, except "experiments" and "experimenting," were on the NIH's Instagram keyword filter list at the time Mr. Hartkopf posted the comments. However, "PETA" was removed from NIH's Instagram keyword filter list on December 3, 2021. None of Mr. Hartkopf's comments were publicly viewable, except that the comments containing the words "experiments" and "experimenting" could be viewed by an Instagram user who selected "view hidden comments" on the NIH's Instagram post. A copy of Mr. Hartkopf's comments immediately after he posted them is attached hereto as Exhibit 44. Mr. Hartkopf later deleted these comments. A copy of the post with all comments viewable by users is attached as Exhibit 45.

82.     Mr. Hartkopf next wrote a series of one-word comments to an NIH Facebook post on IVF conception. Mr. Hartkopf wrote, "peta," "primate," "primates," "monkey," "monkeys," "torture," "torturing," "tortures." All of these comments contained terms on NIH's Facebook keyword filter list at the time he posted the comments. However, "PETA" was removed from NIH's Facebook keyword filter list on December 3, 2021. Mr. Hartkopf's comments were hidden from public view, and were only visible to Mr. Hartkopf and his Facebook friends. A copy of Mr. Hartkopf's comments is attached hereto as Exhibit 46. A copy of the post with all comments viewable by users is attached hereto as Exhibit 47.

83.     On April 29, 2021, Mr. Hartkopf posted substantially the same comment he wrote on April 24, 2021 to an NIH Instagram post about treatment for antibiotic-resistant infections. He commented, "The Wisconsin NPRC is a disgrace. I personally know 2 former employees who were traumatized by their experience as primate caretakers. There is no humane way to keep 1,650

primates in small steel cages for decades without inflicting massive psychological damage. On top of that, the University of Wisconsin has banned any keywords regarding primate testing on their social media pages, meaning any discourse on social media is automatically silenced. They also delete the testimonials of former employees. Why go to all that trouble to silence their own alumni if everything is above-board? We need to reinvest in human-relevant, modern research instead of this barbaric and archaic practice, which does not yield cures to our most deadly diseases!" This comment, which contained a word on NIH's Instagram keyword filter list ("testing"), was also hidden. A copy of Mr. Hartkopf's comments is attached hereto as Exhibit 48. A copy of the post with all comments viewable by users is attached hereto as Exhibit 49.

84.     To confirm that the NIH was preventing comments with certain keywords from being viewed, Mr. Hartkopf filed Freedom of Information Act ("FOIA") requests with the NIH on April 24, 2021, seeking "a screenshot of all keywords that are blocked" on the NIH's Facebook page and the NIH's Instagram account. On April 29, 2021, Mr. Hartkopf received the records responsive to his FOIA request and confirmed that the NIH had blocked several keywords associated with animal testing from appearing in comments on its Facebook and Instagram pages.

85.     Mr. Hartkopf has occasionally advocated for animal rights in comments by modifying the spelling and spacing of certain words. For example, on June 17, 2021, he commented on an NIH Facebook post, "it's ironic that this Facebook page is full of spam and porn links, but the admin only uses keyword blocking to hide comments about testing on a n i m a l s." This comment remains publicly viewable by Facebook users, and a copy of the post with all comments viewable by users is attached hereto as Exhibit 50.

86.     Mr. Hartkopf wishes to engage with and read the comments of other animal rights advocates on Defendants' social media pages. He follows the NIH on Instagram and Facebook.

**THE PARTIES' INTERESTS IN SPEECH ON THE NIH'S SOCIAL MEDIA PAGES**

87.     The NIH asserts that it uses Facebook and Instagram to fulfill its congressional mandate to disseminate health information by communicating important public health information, being the voice of factual information in a world of misinformation, and engaging the public for educational purposes about public health. The NIH believes that off-topic and inflammatory comments undermine its goals in operating its social media pages. The NIH believes that permitting any and all comments on its social media pages, regardless of content, would clutter those pages (and any live events) and ultimately dissuade interested citizens from visiting the pages and retrieving helpful public health information. The NIH also believes that comments of this nature disrupt NIH's goals of social media use—e.g., disseminating factual information about a topic—and disrupt NIH's live question and answer events. The NIH has received complaints about off-topic animal rights comments on its social media pages. For example, on a November 16, 2021 Facebook post on COVID anti-viral pills, a Facebook user commented "STOP YOUR CRUEL TESTING ON ANIMALS" and another user responded "TROLL.  THIS COMMENT HAS NOTHING TO DO WITH THIS NEW ANTIVIRAL DRUG." A copy of this comment is attached hereto as Exhibit 51. A copy of the post with all comments viewable by users is also attached hereto as Exhibit 52. On October 3, 2014, NIH held a Twitter chat on the topic of brain health. A commenter stated "#NIHChat Cannot follow chat among distraction>" Someone replied "Good @NIH can stop abusing monkeys if they want protests to end. @peta." Another person replied to the second commenter "No, not good. Your bombardment of a Twitter chat was disrespectful to other participants and harassment of host. #rules." A copy of this tweet, and its replies, are attached hereto as Exhibit 53. Another user commented "@NIH mentioned research about retina issues and Alzheimer's, but I missed those tweets due to @peta — important for my family. #NIHchat." A copy of this tweet is attached hereto as Exhibit 54. A copy of the all tweets from the NIH Twitter

chat event on October 3, 2014, using the hashtag related to the event, #NIHChat, is attached hereto as Exhibit 55. The NIH has also received complaints about comments on its social media pages relating to certain other topics, such as complaints regarding comments discussing the COVID-19 vaccines.

88.     PETA asserts that it uses social media advocacy to raise public awareness of animal testing practices and of the government's funding of animal testing. PETA also asserts that it uses social media advocacy to engage with supporters and other people who express interest in animal rights issues. PETA believes that discussing the ethical implications of animal testing and the NIH's responsibility as a funder of animal testing are relevant topics of discussion in response to NIH messaging. PETA employees believe that commenting directly on the NIH's social media pages is a particularly important form of animal rights advocacy because, in their view, it allows them to speak to individuals who are interested in scientific research and news, but who may not be aware of the NIH's role in the continuation of animal testing. PETA employees also believe that commenting on the NIH's social media pages, in addition to other types of campaigning, is important because, in their view, social media commenting can demonstrate to the NIH the size and passion of the animal rights movement. In the past, PETA has led many social media campaigns that it believes have changed animal testing practices. For example, in 2015, PETA launched an extensive campaign, including the use of social media commenting, to advocate for the closure of Dr. Steven Suomi's laboratory due to his maternal deprivation experiments on monkeys. In December 2015, the NIH announced that it was phasing out funding for Dr. Suomi's work, and stated that it was for financial reasons. *See* David Grimm, *Decision to End Monkey Experiments Based on Finances, Not Animal Rights, NIH Says*, Science (Dec. 14, 2015), https://perma.cc/3D6G-979N. PETA employees believe that the NIH's use of keyword blocking

burdens their ability to communicate on the NIH's Facebook page and to engage the public in this way, because the NIH has blocked numerous words that PETA believes are central to its mission. Although PETA employees have occasionally been able to post comments that evade the NIH's keyword filters, they find this process burdensome, time-consuming, and less effective.

89.     As a former animal care technician at an NIH-funded primate research laboratory, Ms. Krasno asserts that she uses social media advocacy to educate the public about what she considers to be the exploitation of animals in research, to raise awareness about the mental health issues often experienced by animal lab workers, and to advocate for a reallocation of funds in the hope that taxpayer dollars currently funding animal testing would instead be used to make health care more accessible and affordable to those who need them. She believes that biomedical ethics, including the ethical implications of animal testing, and the NIH's financial responsibility are relevant topics of discussion in response to the NIH's messaging. She believes that commenting directly on the NIH's social media pages is an important form of animal rights advocacy because she believes that the NIH's supporters and followers should understand how animals, like the primates Ms. Krasno cared for, are treated in laboratories that are directly funded by the NIH, should understand the impact animal testing has on workers, and should understand how ineffective she believes animal testing actually is. Ms. Krasno believes that community members should have a say in how their tax dollars are spent and that the NIH's keyword blocking prevents those discussions from occurring. She believes that the NIH's use of keyword blocking burdens her ability to communicate on the NIH's Instagram and Facebook pages, and asserts that she finds evading the NIH's filters burdensome and difficult, as she asserts that she does not always know which words will trigger blocking.

90.     Mr. Hartkopf asserts that he uses social media advocacy to raise awareness of the animal abuse by both public and private institutions, and to pressure those institutions to change their policies. He believes that it is vital to raise awareness among those not currently involved in the animal rights movement, as well as those who have some understanding of the animal rights movement but who may not be aware of specific institutions' animal testing practices. Mr. Hartkopf also believes that social media advocacy can signal to potential whistleblowers that they have allies and supporters. He believes that commenting directly on the NIH's social media pages is an important form of animal rights advocacy because, in his view, social media is a powerful platform for citizens to talk about issues with a large number of people who have a mutual interest in scientific research and the NIH. He believes that discussing the NIH's involvement in animal testing is a relevant and important response to news about NIH's research. He believes that the NIH's use of keyword blocking burdens his ability to communicate on the NIH's Instagram and Facebook pages because, in his view, the agency has blocked numerous words related to animal rights advocacy. Although he has occasionally been able to evade the NIH's keyword filters, he asserts that he finds this method of attempting to evade NIH's filters burdensome and difficult.

Dated: February 11, 2022                      Respectfully submitted,

                                              _/s/ Jameel Jaffer_____

BRIAN M. BOYNTON                              Jameel Jaffer (MI0067)
Acting Assistant Attorney General             Katherine Fallow, *pro hac vice*
                                              Stephanie Krent, *pro hac vice*
ERIC BECKENHAUER                              Alyssa Morones*
Assistant Director, Federal Programs Branch    Knight First Amendment Institute
                                                at Columbia University
 _/s/ Kuntal Cholera_                          475 Riverside Drive, Suite 302
KUNTAL CHOLERA                                New York, NY 10115
                                              (646) 745-8500
                                              jameel.jaffer@knightcolumbia.org
                                              *Counsel for Plaintiffs*

Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
Kuntal.Cholera@usdoj.gov

*Attorneys for Defendants*

   /s/ Caitlin M. Foley
─────────────────────────────
Caitlin M. Foley, *pro hac vice*
Animal Legal Defense Fund
150 South Wacker Drive, Suite 2400
Chicago, IL 60606
(707) 795-2533 ext. 1043
cfoley@aldf.org

Christopher A. Berry (Bar ID CA00106)
Animal Legal Defense Fund
525 E. Cotati Ave.
Cotati, CA 94931
(707) 795-2533 ext. 1041
cberry@aldf.org

*Counsel for Plaintiffs Madeline Krasno and
   Ryan Hartkopf*

   /s/ Asher Smith
─────────────────────────────
Asher Smith, *pro hac vice*
People for the Ethical Treatment of Animals
1536 16th Street NW
Washington, DC 20036
(202) 483-7382
AsherS@petaf.org

*Counsel for Plaintiff People for the Ethical
   Treatment of Animals*

*\*Not yet admitted to practice law*