**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, MADELINE KRASNO, and RYAN HARTKOPF,<br><br>        Plaintiffs,<br><br>   v.<br><br>LAWRENCE A. TABAK, in his official capacity as Acting Director of the National Institutes of Health, and XAVIER BECERRA, in his official capacity as Secretary of the U.S. Department of Health and Human Services,<br><br>        Defendants. | Civil Action No. 21-2380 (BAH) |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**</u>

## Table of Contents

Table of Authorities ...................................................................................................... iii

Introduction ................................................................................................................... 1

Statement of Facts ......................................................................................................... 3

    I.      The NIH's Facebook page and Instagram account ........................................... 3

          A.      The NIH's Facebook page .................................................................... 3

          B.      The NIH's Instagram account ............................................................... 6

    II.     The NIH's use of keyword blocking to suppress animal advocacy ................... 8

          A.      Facebook and Instagram's filtering and blocking options ................... 8

          B.      The NIH's use of Facebook's and Instagram's keyword blocking features .............................................................................................. 10

          C.      The NIH's comment moderation policies and practices ................... 12

    III.    The NIH's suppression of Plaintiffs' speech on the NIH Facebook Page and Instagram Account ................................................................................ 13

          A.      Plaintiffs' use of social media to advocate against animal testing ................. 13

          B.      The NIH's blocking of Plaintiffs' speech from its social media accounts ......................................................................................... 15

Standard of Review ..................................................................................................... 20

Argument ..................................................................................................................... 21

    I.      The comment threads on the NIH Facebook Page and Instagram Account are designated public forums under the First Amendment ................................ 21

          A.      Overview of public forum doctrine ................................................... 21

          B.      The comment threads are designated public forums. ...................... 23

    II.     The NIH's keyword blocking violates the First Amendment. ...................... 28

          A.      The NIH's keyword blocking unconstitutionally discriminates on the basis of viewpoint. ..................................................................... 28

          B.      The NIH's keyword blocking is also an unconstitutional content-based restriction on speech in a public forum. ........................................ 33

C.   The NIH's keyword blocking would violate the First Amendment even if the comment threads were considered limited forums or nonpublic forums. ......................................................................................................... 39

Conclusion ..................................................................................................................... 40

# Table of Authorities

**Cases**

*Act Now to Stop War and End Racism Coal. v. District of Columbia*, 846 F.3d 391
(D.C. Cir. 2017) ..................................................................................................33

\**Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 898 F. Supp. 2d
73 (D.D.C. 2012) .................................................................................34, 36, 37, 39

*Archdiocese of Wash. v. Wash. Metro Area Transit Auth.*, 897 F.3d 314 (D.C. Cir.
2018)...............................................................................................................26, 40

*Boardley v. U.S. Dep't of Interior*, 615 F.3d 508 (D.C. Cir. 2010)................................38

*Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786 (2011) ...........................................37, 38

*Bryant v. Gates*, 532 F.3d 888 (D.C. Cir. 2008).......................................................23

*Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530
(1980) ..............................................................................................................36

\**Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) .............21, 22, 23, 39

*Czosnyka v. Gardiner*, No. 21-cv-3240, 2022 WL 407651 (N.D Ill. Feb. 10, 2022)...................27

\**Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) ................................................passim

*Faison v. Jones*, 440 F. Supp. 3d 1123 (E.D. Cal. 2020) ...........................................27

*Felts v. Reed*, 504 F. Supp. 3d 978 (E.D. Mo. 2020) ...........................................24, 28

*Garnier v. Poway Unified Sch. Dist.*, No. 17-cv-2215-W (JLB), 2019 WL
4736208 (S.D. Cal. Sep. 26, 2019)..........................................................................27

*Hall & Assocs. v. Env't Prot. Agency*, 956 F.3d 621 (D.C. Cir. 2020) .........................20

*Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015)........................................................21

*Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001) ............................................35

*Hyman v. Kirksey*, No. 3:18-cv-230-DPM, 2019 WL 2323864 (E.D. Ark. May 30,
2019)...............................................................................................................28

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019) ..........................................................30, 31

\**Kimsey v. City of Sammamish*, No. C21-1264 MJP, 2021 WL 5447913 (W.D.
Wash. Nov. 22, 2021)..........................................................................................passim

*Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019), *vacated as moot sub nom. Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220 (Mem.) (2021)......................................................2, 23, 26, 27

*Leuthy v. LePage*, No. 1:17-cv-00296-JAW, 2018 WL 4134628 (D. Me. Aug. 29, 2018)..............................................................................................................................28

*Mahoney v. Babbit*, 105 F.3d 1452 (D.C. Cir. 1997) ....................................................37

*Matal v. Tam*, 137 S. Ct. 1744 (2017) .....................................................................22, 31

*McCullen v. Coakley*, 573 U.S. 464 (2014)...................................................................22

*Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018)...................................................40

*Morgan v. Bevin*, 298 F. Supp. 3d 1003 (E.D. Ky. 2018) .............................................27

*One Wisc. Now v. Kremer*, 354 F. Supp. 3d 940 (W.D. Wisc. 2019) ....................24, 27

*Packingham v. North Carolina*, 137 S. Ct. 173 (2017)................................................24

*Paulsen v. Cty. of Nassau*, 925 F.2d 65 (2d Cir. 1991) ................................................27

*Perry Educ. Ass'n. v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ............21, 22

*PETA v. Gittens*, 215 F. Supp. 2d 120 (D.D.C. 2002)..............................................30, 33

*Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92 (1972)...................................28

*Price v. City of N.Y.*, No. 15 Civ. 5871 (KPF), 2018 WL 3117507 (S.D.N.Y. June 25, 2018)..........................................................................................................................28

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992) ...........................................22, 30

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) ...................................................36

*Robinson v. Hunt Cty., Tex.*, 921 F.3d 440 (5th Cir. 2019)..........................................27

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995)...........................passim

*Scarborough v. Frederick Cty. Sch. Bd.*, 517 F. Supp. 3d 569 (W.D. Va. 2021) ........27

*Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975)..................................................21

*Stewart v. D.C. Armory Bd.*, 863 F.2d 1013 (D.C. Cir. 1988)) ......................23, 26, 35

*Tanner v. Ziegenhorn*, No. 4:17-cv-780-DPM, 2021 WL 4502080 (E.D. Ark. Sep. 30, 2021)..........................................................................................................................27

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015)............................22

*West v. Shea*, 500 F. Supp. 3d 1079 (C.D. Cal. 2020).................................................................28

*Windom v. Harshbarger*, 396 F. Supp. 3d 675 (N.D.W. Va. 2019)..............................................28

*Zukerman v. U.S. Postal Serv.*, 961 F.3d 431 (D.C. Cir. 2020) ........................................21, 22, 28

*Zukerman v. U.S. Postal Serv.*, No. 15-cv-2131 (CRC), 2021 WL 4355426
    (D.D.C. 2021) ......................................................................................................................33

## Other Authorities

*About Protecting your Business on Instagram*, Instagram Help Center,
    https://perma.cc/XN5T-TVUN?type=image ...........................................................................39

*Community Guidelines*, Instagram Help Center, https://perma.cc/YC88-XQBH?
    type=image ............................................................................................................................24

*Facebook Community Standards*, Meta, https://perma.cc/UM3D-MSZK ....................................24

*How do I adjust who can comment on my public posts on Facebook?*, Facebook
    Help Center, https://perma.cc/R4EF-WSC4.........................................................................25

*How do I turn comments on or off for my Instagram posts?*, Instagram Help
    Center, https://perma.cc/B5GL-KHSB?type=image ..............................................................25

*NIH Comment Guidelines*, Nat'l Institutes of Health (Mar. 13, 2019),
    https://perma.cc/W9A9-2CP9 ..............................................................................................12

*Web Policies and Notices – Privacy Policy – How NIH.gov Uses Third-Party Web
    Sites and Applications – Facebook*, Nat'l Institutes of Health (Jan. 14, 2021),
    https://perma.cc/BC7R-ZFME .............................................................................................13

## Rules

Fed. R. Civ. P. 56(a) .....................................................................................................................20

**Introduction**

This case involves a government agency's patently unconstitutional practice of surreptititously censoring  speech it does not like—speech that is critical of the agency—in public forums. The National Institutes of Health ("NIH") uses its Facebook and Instagram accounts to communicate and interact with members of the public, and in turn, members of the public use the public commenting features associated with those accounts to share their views with one another and with the NIH. Facebook and Instagram users have posted comments concerning a wide range of important and often controversial topics—including the veracity of the NIH's scientific claims, the persistence of racism in the medical community, and the relationship between government health agencies and pharmaceutical companies. Users who posted comments about the role of animal testing in scientific research, however, found their comments persistently hidden from public view and themselves excluded from the debate. This was no accident. A Freedom of Information Act request filed by Plaintiff Ryan Hartkopf forced the NIH to reveal for the first time that it has created custom keyword blocking lists on both Facebook and Instagram. The agency's keyword blocking has been used to hide comments containing any of two dozen words and phrases closely associated with animal advocacy—words like "PETA," "torture," "hurt," "monkey," and "primate"—and to this day still hides comments containing almost all of these words and phrases. This viewpoint- and content-based keyword blocking is unconstitutional.

Plaintiffs are entitled to summary judgment. There is no genuine issue of material fact here. Instead, the parties' joint stipulation includes the undisputed facts necessary to demonstrate that the NIH's keyword blocking violates the First Amendment because it discriminates on the basis of viewpoint and is an unjustified content-based restriction on speech in a public forum.

The NIH's keyword blocking violates the prohibition against viewpoint-based exclusion of speech in a public forum. The NIH created public forums when it opened public pages on Facebook and Instagram—two of the most popular social media platforms—and used those pages to communicate and interact with members of the public, and to facilitate public expression in the comment threads associated with each post. The NIH's practice of suppressing speech that advocates against the NIH's continued funding of animal testing violates the First Amendment. This is the case even if NIH employees—or other users—find such speech, in their own view, to be distasteful, annoying, or irrelevant. The First Amendment precludes government actors from censoring speech in a public forum because of the viewpoint it espouses. *See, e.g.*, *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019), *vacated as moot sub nom. Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220 (Mem.) (2021); *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019).

This keyword blocking would be unconstitutional even if it were not viewpoint-based. The NIH's keyword blocking is not an evenhanded content moderation practice—like, for example, a content-neutral policy designed to prevent spam or reduce repetitive posts. Instead, the agency singles out and suppresses comments relating to animal advocacy. This kind of content-based discrimination is presumptively unconstitutional, and the NIH cannot overcome the presumption here—first, because it cannot point to any compelling government interest that could support the suppression of animal advocacy; second, because its woefully over- and under-inclusive keyword blocking is not narrowly tailored to *any* interest it might assert; and third, because keyword blocking is far more restrictive than other alternatives available to the NIH. Finally, the NIH's keyword blocking is so unreasonable that it would be unconstitutional even if the Court conceives of the comment threads at issue as limited public forums or nonpublic forums.

For these reasons and those below, the Court should grant Plaintiffs' motion for summary judgment.

## Statement of Facts

### I. The NIH's Facebook page and Instagram account

The NIH is the primary agency of the federal government charged with performing and supporting biomedical and behavioral research. Stip. ¶ 4, ECF No. 28.[1] It has major roles in training biomedical researchers and disseminating health information. *Id.* Since 2008, the NIH has operated social media accounts, including a Facebook and an Instagram account, as a way to "communicate and interact with citizens." *Id.* ¶¶ 36–37.

#### A. The NIH's Facebook page

The NIH established its official Facebook "page" on October 14, 2008. *Id.* ¶ 37.[2] The "@nih.gov" page (the "NIH Facebook Page") is registered as a "Government Organization" page, and the page's profile photo is the NIH logo. *Id.* The "Intro" section on the NIH Facebook Page reads "NIH...Turning Discovery Into Health ®. Read our Privacy Policy: http://www.nih.gov/about/privacy.htm. Visit http://www.nih.gov for more information." *Id.*

The NIH Facebook Page is generally accessible to anyone with internet access, although to see the entirety of the page, an individual needs to have a Facebook account. *Id.* ¶ 38.[3] Any

---

[1] Defendants in this case are Lawrence A. Tabak, Acting Director of the NIH, and Xavier Becerra, Secretary of the U.S. Department of Health and Human Services ("HHS"). They are sued in their official capacities for their managerial authority over the NIH's practices. *See* Stip. ¶¶ 4–5. The instant motion addresses only the NIH's use of keyword blocking on its social media pages, and not any practices of the HHS on its social media pages. *See* ECF No. 29.

[2] A Facebook "page" is an account used by "businesses, brands, organizations, [or] public figures." *Id.* ¶ 8.

[3] All internet users in the United States can generally access a selection of recent posts from all public Facebook pages before they are required to sign-in or sign-up. *Id.* ¶ 9.

Facebook user can view the entirety of the NIH Facebook Page, including prior posts and comments that other users have made responding to those posts. *Id.*[4] As of February 2022, approximately 565,515 Facebook users "followed" the NIH Facebook Page, allowing them to see updates from the NIH in their own Facebook News Feeds. *Id.*

The Facebook platform allows users like the NIH to post content, including writings, links, photographs, and videos, for other Facebook users to see. *Id.* ¶ 6. A Facebook "post" is any combination of text, images, videos, audio, or Internet hyperlinks published by a Facebook user on the user's Facebook page. *Id.* ¶ 11. Facebook users can also share content with others by going "Live" through the Facebook Live feature, which allows page operators to stream video in real-time for viewing by other users. *Id.* ¶ 12. The NIH uses the NIH Facebook Page to post agency-related information and public health updates and to host Live videos with NIH employees and researchers. *Id* ¶¶ 36, 62.

Facebook users can respond to others' posts—including Live videos—by commenting on them. *Id.* ¶ 13. Comments can include the same type of content as Facebook posts, including text, images, and hyperlinks. *Id.* Facebook users may also reply to other comments appended to a post or to replies that have been posted by others. *Id.* The collection of replies and replies-to-replies is sometimes referred to as a "comment thread." *Id.* Any Facebook user can comment on a post or comment made viewable to the public. *Id.* Users can also "react" to others' posts by clicking the "Like" button and selecting emojis corresponding to "Like," "Love," "Care," "Haha," "Wow," "Sad," and "Angry." *Id.* ¶ 14.

---

[4] Any individual or organization that has created an account on the platform is a Facebook "user." *Id.* ¶ 7.

Members of the public with Facebook accounts regularly use the NIH Facebook Page's comment feature to respond to the NIH's posts and to communicate with other users about the NIH's policies and practices. *Id.* ¶ 39 & Exs. 1–6, ECF Nos. 28-1 to -6. NIH Facebook Page posts frequently garner dozens of comments and replies to those comments, and many of them have hundreds of comments and replies. *Id.* Below is an example of a post to the NIH Facebook Page and three of the many comments and replies appended to the post:



*See* Ex. 1.

5

### B.        The NIH's Instagram account

The NIH launched the Instagram account @nihgov (the "NIH Instagram Account") on January 23, 2018. Stip. ¶ 41. In the first post on the account, the NIH urged Instagram users to "Follow us for cool science images, health tips, and a behind-the-scenes look at the nation's top biomedical research institute! #Followus #FirstPost #Health #Wellness #Science #research." *Id.*; *see also* Stip. Ex. 7, ECF No. 28-7. The NIH Instagram Account is registered as belonging to a "Government Organization" and the page's profile photo is the NIH logo. Stip. ¶ 42.

The NIH Instagram Account is viewable by the public, meaning that a portion of the page is generally accessible to anyone with Internet access until Instagram requires a log-in. *Id.* ¶ 43.[5] Any Instagram user can see all of the previous posts, along with associated comments and replies, on the account page. *Id.*[6] As of February 2022, the NIH Instagram Account had approximately 206,000 followers. *Id.*

Instagram is a platform for visual content, allowing users to share photos and videos and respond to posts through likes or comments. *Id.* ¶ 21. An Instagram post is a discrete piece of content that a user shares to the user's profile page. *Id.* ¶ 25. A post on Instagram can be an image, a video, or a collection of images or videos. *Id.* When a user shares an image or video, the user can include a text-based caption that will be displayed alongside or underneath the post. *Id.* The NIH uses its account to post content about the agency's work, including interviews with NIH experts and news about numerous NIH health campaigns, and public health updates. *Id.* ¶ 44.

---

[5] As with Facebook, all internet users in the United States can generally access a selection of recent posts from all public Instagram accounts before they are required to sign-in or sign-up. *Id.* ¶ 23.

[6] Any individual or organization that has created an account on the platform is an Instagram "user." *Id.* ¶ 22.

Instagram users can comment on posts and reply to other comments. *Id.* ¶ 28. The author of a post may also comment or respond to comments in the comment thread. *Id.* In addition to commenting on posts, users may "like" posts by clicking on the heart-shaped button next to the image. *Id.* ¶ 29.

As with the NIH Facebook Page, members of the public with Instagram accounts regularly use the NIH Instagram Account's comment feature to respond to the NIH's posts and to communicate with other users about the NIH's policies and practices. *Id.* ¶ 45 & Exs. 7–11, ECF Nos. 28-7 to -11. Some of the NIH's posts to its Instagram Account have received over one hundred comments, including both positive and negative responses. Stip. ¶ 45. Below is an example of a post to the NIH Instagram Account and some of the comments and replies appended to the post:



*See* Ex. 7.

II.     **The NIH's use of keyword blocking to suppress animal advocacy**

The NIH has chosen to use optional keyword blocking features offered by both Facebook and Instagram to prevent comments containing certain words associated with animal testing from appearing publicly on the NIH Facebook Page and Instagram Account.

A.     **Facebook and Instagram's filtering and blocking options**

1.     **Facebook**

Administrators of Facebook pages can restrict comments that appear on their posts by using Facebook's opt-in moderation tools, including keyword blocking. Stip. ¶ 16. Page administrators may, for example, prevent comments that contain profanity from appearing on the page by turning on Facebook's built-in "profanity filter." *Id.* Administrators may also choose their own lists of words or phrases that they wish to restrict from appearing in comments posted on their page. *Id.* When a page administrator adds a word to this list, any past or future comments containing the word will automatically be hidden from public view. *Id.* Although a hidden comment remains visible to the user who posted it and to the user's Facebook "friends,"[7] other Facebook users viewing the page are unable to read or engage with the comment. *Id.* Facebook refers to the practice of hiding comments containing certain keywords from view as "blocking." *Id.*

Page administrators may also block individual comments either by manually "hiding" them, or by deleting them from the comment threads associated with their posts. *Id.* ¶ 17. Manually hidden comments remain visible to the user who posted the comment and that user's friends, but other individuals viewing the page are unable to read or engage with the comment. *Id.* Deleted comments are removed from the page altogether, and neither the Facebook user who posted the

---

[7] Individual Facebook users can connect with other users by "friending" them; these connected users are called Facebook "friends." *Id.* ¶ 7.

8

comment nor the user's Facebook friends may view it. *Id.* Typically, the user whose comment has been hidden or deleted by a page administrator does not receive notice of these moderation actions. *Id.* ¶ 18.

In addition to making customizable comment moderation options available to a page administrator, Facebook itself also engages in certain content moderation on a platform-wide basis. *Id.* ¶ 20. The Facebook Community Standards outline the types of content that may be demoted, hidden, or deleted by Facebook on its own accord. *Id.* Examples of information that Facebook itself may remove include content that incites or facilitates serious violence, coordinating harm and publicizing crime, hate speech, spam, imagery of dead people, or fraud and deception. *Id.* Facebook notifies users when their posts or comments have been removed for violating its community standards. *Id.*

### 2.    Instagram

Instagram also allows account holders to use keyword blocking to automatically control the content of the comments on their posts. *Id.* ¶ 30. Instagram's "Custom Words and Phrases" function permits account holders to automatically hide all comments containing specified words or phrases. *Id.* Thus, if an account holder designates the word "testing" as a custom hidden word on the account holder's page, any comment containing that word should automatically be hidden from public view as soon as it is posted. *Id.* The hidden comment will be visible only to the user who posted it and to the account holder if they choose to "view hidden comments." *Id.* No other user, including users who follow the comment's author, will be able to see, reply to, or engage with the hidden comment. *Id.*

Account holders may also hide comments that contain any keyword in a list of default keywords created and maintained by Instagram. *Id.* ¶ 31. The "Hide Comments" function is on by

default, and automatically hides comments containing common offensive words, phrases, or emojis found in posts flagged by Instagram as violating its terms of service. *Id.* Unlike comments filtered under the "Custom Words and Phrases" function, comments automatically hidden under the "Hide Comments" function do not disappear completely for all users. *Id.* Rather, any user can view these comments by scrolling to the bottom of a post's comments section and clicking on a "view hidden comments" button. *Id.* Instagram users are not notified when their comments have been hidden or filtered. *Id.* ¶ 34. Because these comments remain visible to the user making them, users will generally be unaware that their comments are invisible to others. *Id.*

Instagram itself also engages in certain content moderation. The Instagram Community Guidelines outline the types of content that may be removed by Instagram of its own accord. *Id.* ¶ 35. Examples of information that Instagram itself may remove include content that incites or facilitates violence, hate speech, and spam. *Id.* These comments are automatically removed by Instagram and are not viewable by users. *Id.* Instagram notifies users when their posts or comments have been removed for violating its community standards. *Id.*

### B.    The NIH's use of Facebook's and Instagram's keyword blocking features

The NIH has used the social media platforms' optional filtering features to block comments containing words associated with animal rights advocates and their criticism of the NIH's funding of animal testing. The NIH had never publicly stated that it used keyword blocking to hide animal advocacy, but on April 29, 2021, in response to a Freedom of Information Act ("FOIA") request filed by Plaintiff Ryan Hartkopf, the NIH provided lists of blocked keywords on the NIH Facebook Page and Instagram Account, which included the following words and phrases:

| **Facebook** | **Instagram** |
|:---:|:---:|
| PETA, PETALatino | PETA |
| Suomi,[8] Harlow[9] | #stopanimaltesting |
| Animal(s), animales, animalitos | #stoptesting |
| Cats, gatos | #stoptestingonanimals |
| Chimpanzee(s), chimp(s) | Animal(s) |
| Hamster(s) | Chimpanzee(s), chimps |
| Marmoset(s) | Monkey(s)[10] |
| Monkey(s), monkies | Experiment |
| Mouse, mice | Hurt(ing) |
| Primate(s) | Kill |
| Sex experiments | Stop |
| Cruel, cruelty | Test(ing), testing facility |
| Revolting | Tortur(ing) |
| Torment(ing) | |
| Torture(s), torturing | |

*Id.* ¶ 58. As a result of the NIH's use of the platforms' keyword blocking features, any user who attempts to post a comment containing any prohibited words to the NIH Facebook Page or the NIH Instagram Account will have their comments automatically hidden from public view. *See id.* ¶¶ 16, 30.

The NIH also uses keyword blocking to automatically hide comments containing certain profane and racist terms, names of certain illicit drugs, domains of other websites or applications,

---

[8] Stephen J. Suomi is currently the Chief of the Laboratory of Comparative Ethology at the Eunice Kennedy Shriver National Institute of Child Health and Human Development. *Id.* ¶ 58 n.9. He has conducted extensive research on behavioral development by researching on monkeys and other nonhuman primates. *Id.* PETA led an extensive public campaign related to Dr. Suomi's work, which involved animal experiments. *Id.*

[9] Harry Harlow was an American psychologist known for conducting maternal deprivation experiments on monkeys to determine how early environment shapes their behavior. *Id.* ¶ 58 n.10. The Harlow Center on Biological Psychology, named for Mr. Harlow, is affiliated with the Wisconsin National Primate Research Center and houses the monkeys and nonhuman primates used in experiments. *Id.* After Dr. Harlow died in 1981, PETA campaigned against the NIH's continuation of his work and frequently mentions Dr. Harlow in its advocacy against animal testing. *Id.*

[10] The NIH's listed of blocked keywords on Instagram also includes two emojis depicting monkeys and an emoji with an expletive face. *Id.* ¶ 58 n.11.

and the term #believemothers. *Id.* ¶ 59; Compl. Attachs. 1 & 2, ECF Nos. 1-1 to -2. The NIH has also activated Facebook's and Instagram's optional profanity filters. Stip. ¶¶ 56–57.

On December 3, 2021, after this lawsuit was filed, and while the parties were drafting the joint stipulation of facts, the NIH removed "PETA" and "PETALatino" from its list of blocked keywords on Facebook, and removed "PETA" from its list of blocked keywords on Instagram. *Id.* ¶ 60. On December 7, 2021, the NIH also removed "#stopanimaltesting," "#stoptesting," and "#stoptestingonanimals" from its list of blocked keywords on Instagram. *Id.* All other terms listed on the NIH's April 29, 2021 FOIA response remain blocked. *Id.*; Compl. Attachs. 1 & 2.

### C.    The NIH's comment moderation policies and practices

Since March 30, 2015, the NIH has published guidelines on its official website for commenting on its social media accounts. Stip. ¶¶ 51–52 & Ex. 19, ECF No. 28-19; *see also NIH Comment Guidelines*, Nat'l Institutes of Health (Mar. 13, 2019), https://perma.cc/W9A9-2CP9. The comment guidelines "encourage" members of the public "to share [their] thoughts and ideas" on any NIH-administered social media account or website "where commenting is supported." Ex. 19. The NIH asserts in its guidelines that its social media accounts and websites "are not intended to serve as public forums." *Id.* Seeking to "encourage respectful and constructive dialogue," the guidelines prohibit comments that include, among other things, "[v]ulgar, obscene, profane, threatening, or abusive language," "[d]iscriminatory language," "[e]ndorsements of commercial products," "[r]epetitive posts," "[s]pam," and "[o]ff-topic" content. *Id.*

At the time the Complaint was filed, the NIH Facebook Page and Instagram Account did not link to the NIH's comment guidelines. Stip. ¶ 53. The NIH changed its practice after this litigation began, and as of January 7, 2022, the NIH Facebook Page and the NIH Instagram Account provide links to the guidelines. *Id.* The NIH Facebook Page and Instagram Account also

12

provide links to a separate "Web Policies and Notices" page, in which the NIH states that "as a practice, comment moderator policy requires the removal from NIH Facebook pages of any comments that contain spam or are improper, inflammatory, off-topic or offensive." *Id.* ¶ 54; *see also Web Policies and Notices – Privacy Policy – How NIH.gov Uses Third-Party Web Sites and Applications – Facebook*, Nat'l Institutes of Health (Jan. 14, 2021), https://perma.cc/BC7R-ZFME.

Keyword blocking is the NIH's principal form of content moderation. Stip. ¶ 61. The NIH does not manually review comments before they are posted, and it engages in only limited efforts to hide or delete comments after they have been posted. *Id.* In other words, if a comment contains a blocked keyword, it will automatically be hidden from public view. *Id.* ¶¶ 16, 30. All other comments are almost never hidden or deleted. *Id.* ¶ 61.

## III.   The NIH's suppression of Plaintiffs' speech on the NIH Facebook Page and Instagram Account

### A.   Plaintiffs' use of social media to advocate against animal testing

Plaintiff People for the Ethical Treatment of Animals, Inc. ("PETA") is a nonprofit dedicated to establishing and defending the rights of all animals. *Id.* ¶ 1. PETA frequently launches social media campaigns in order to raise awareness of animal testing practices and of the government's funding of animal testing. *Id.* ¶ 88. One of PETA's current campaigns focuses on the NIH and the National Institute of Mental Health (NIMH) for its funding of primate testing, including monkey experiments conducted by NIMH scientist Elisabeth Murray. *Id.* ¶ 1. As part of this campaign, PETA employees and members have sought to advocate on the NIH's social media pages for the end of primate testing. *Id.* Commenting directly on the NIH Facebook Page and Instagram Account allows PETA to reach new audiences who may be unaware of the NIH's role in the continuation of animal testing and to demonstrate the size and passion of the animal rights

movement. *Id*. ¶ 88. Many PETA employees and members follow the NIH's social media pages and frequently attempt to engage with users in the comments section of the NIH Facebook Page and Instagram Account. *Id.* ¶¶ 70, 88.

Plaintiff Madeline Krasno, who resides in Oakland, California, is a former animal research technician turned animal rights advocate. *Id.* ¶ 2. As a student at the University of Wisconsin, Ms. Krasno studied zoology and worked as a student primate caretaker at the Harlow Center for Biological Psychology. *Id.* Her firsthand experience with primate testing led her to conclude that animal testing is immoral and compelled her to publicly share the details of her experiences. *Id.* Ms. Krasno seeks to contribute to the public discourse on animal testing in part by drawing attention to the NIH's funding of National Primate Research Centers. *Id.* One way Ms. Krasno seeks to bring attention to the NIH's involvement in animal testing is through social media advocacy: she maintains an Instagram account and a Facebook profile and frequently comments on the NIH Facebook Page and Instagram Account  to advocate against animal testing. *Id* ¶¶ 2, 89. Ms. Krasno believes it is vital that the NIH's supporters and followers understand how animals, like the primates she cared for, are treated in laboratories directly funded by the NIH. *Id*. ¶ 89. She also shares her views about the limited effectiveness of animal testing, and the many other research endeavors the NIH could support if it did not fund animal testing. *Id*.

Plaintiff Ryan Hartkopf, who resides in Madison, Wisconsin, is an engineer in the digital health field. *Id.* ¶ 3. He operates an Instagram account under the handle @ryanhartkopf, and he maintains a Facebook profile under the name Ryan Hartkopf. *Id.* Mr. Hartkopf's opposition to animal testing stems from 2018, when he moved to Madison and started passing the Wisconsin National Primate Research Center ("WNPRC") on his way to work. *Id.* Mr. Hartkopf began to learn more about the WNPRC through videos he found on Facebook and PETA campaigns. *Id.*

After viewing a post that Ms. Krasno made on Facebook describing her past work at the Harlow Center and her goal of shutting down the lab, Mr. Hartkopf reached out to Ms. Krasno to connect and offer his assistance. *Id.* Since then, he has begun commenting on the NIH Facebook Page and Instagram Account to engage with others who have a mutual interest in scientific research about animal testing, and to signal to potential whistleblowers that activists would support them if they decided to speak out. *Id.* ¶ 90.

**B.      The NIH's blocking of Plaintiffs' speech from its social media accounts**

**1.      PETA**

Between September 24, 2020 and May 27, 2021, PETA employee Evelyn Wagaman tried to participate in discussion in comment threads on the NIH Facebook Page, but was largely prevented from doing so. *Id.* ¶¶ 63–65. As detailed below, many of Ms. Wagaman's comments contained the words "cruel," "monkey," "primates," and "animal"—all of which are on the NIH's list of blocked keywords on Facebook:

- On September 24, 2020, Ms. Wagaman was prevented from posting three comments on a Facebook Live video on the NIH Facebook Page about COVID-19 vaccine research. One read, "Francis Collins, we appreciate all your hard work to search for a COVID vaccine, but why is NIH still wasting money on cruel and ineffective monkey fright experiments*?*" *Id.* ¶ 63 & Ex. 20, ECF No. 28-20.

- On October 8, 2020, Ms. Wagaman was prevented from posting several comments on an NIH Facebook Live video about gene editing, including: "Congratulations, Dr. Doudna! Francis Collins, please end NIH's fright experiments on primates;" and "CRISPR can be used for advanced, non-animal experiments. In light of the many non-animal technologies that are developing, how can NIH continue to conduct experiments on macaques and other primates?" Stip. ¶ 64 & Ex. 22, ECF No. 28-22.

- On May 27, 2021, Ms. Wagaman posted several comments on an NIH Facebook Live video featuring Dr. Kizzmekia Corbett, including: "Thank you, Dr. Corbett and Dr. Collins, for your hard work on the COVID vaccines! Why is the NIH still wasting funds on Elisabeth Murray's monkey fright experiments instead of investing more in important clinical research

about COVID-19?" Stip. ¶ 65 & Ex. 24, ECF No. 28-24. Although they were posted, the comments were hidden from public view. *Id.*; *compare* Ex. 24, *with* Stip. Ex. 25, ECF No. 28-25.

Ms. Wagaman did not receive any explanation for why her comments were blocked. Stip. ¶¶ 63–65. Another PETA employee, Brittny Hopwood, began to post a series of comments to NIH Facebook Page posts to understand whether the NIH was blocking words associated with PETA and its animal testing advocacy. *Id.* ¶ 66 & Ex. 26, ECF No. 28-26, ¶ 67 & Ex. 28, No. 28-28. Most of Ms. Hopwood's comments, including those containing words like "PETA," "TORTURE," and "torment," were hidden from public view. *Id.*; *compare* Ex. 26, *and* Ex. 28, *with* Stip. Ex. 27, ECF No. 28-27, *and id.* Ex. 29, ECF No. 28-29.

PETA employees have occasionally advocated for animal rights in comments posted to the NIH Facebook Page by modifying the spelling of certain words or by replacing blocked words with words conveying similar meanings, although they find doing so makes their comments less effective. *Id.* ¶¶ 68, 88. For example, on October 16, 2020, Ms. Wagaman wrote comments on an NIH Facebook Live video about COVID-19 treatment, including: "Francis Collins, thank you for your hard work finding a vaccine for COVID-19. In light of the urgency of devoting resources to find a vaccine and the ineffectiveness of experiments on an1mals, will you please end the fright expts on macaques of Elisabeth Murray?" *Id.* ¶ 68 & Ex. 30, at *5 (Evelyn Wagaman's comment), ECF No. 28-30. These comments were not hidden or filtered, and were viewable by Facebook users. *Id.*

As a result of the NIH's use of keywords to deter speech related to animal research from appearing on its social media accounts, PETA is restricted in its ability to express its views, using a natural choice of words, about animal testing in comments on the NIH Facebook Page. *Id.* ¶ 88. PETA's interest in engaging with and reading the comments of other animal rights advocates on the NIH Facebook Page is also burdened by the NIH's use of keyword blocking. *Id.*

2.      **Madeline Krasno**

Ms. Krasno also had her comments to the NIH Facebook Page and Instagram Account

hidden from public view because the comments contained the words "animal(s)," "testing,"

"torturing," "torture," and "Harlow"—words the NIH has chosen to block:

- On April 29, 2021, Ms. Krasno commented on an NIH Instagram post about a study on Alzheimer's disease treatment that was conducted on mice. Ms. Krasno wrote, "It's pretty messed up that you block conversation about animal testing." Stip. ¶ 72 & Ex. 31, ECF No. 28-31. This comment was hidden from public view. *Id.*; *compare* Ex. 31, *with* Stip. Ex. 32, ECF No. 28-32.

- On May 3, 2021, Ms. Krasno commented on an NIH Instagram post showing a cell infected with COVID-19, writing, "It's time we had an open conversation about all the animal testing you fund. What a waste of life and resources." Stip. ¶ 73 & Ex. 33, ECF No. 28-33. This comment was hidden from public view. *Id.*; *compare* Ex. 33, *with* Stip. Ex. 34, ECF No. 28-34.

- On May 5, 2021, Ms. Krasno commented on an NIH Instagram post about Public Service Recognition Week 2021, saying, "If you're wanted to actually extend life and reduce illness and disability, you'd directly put funding in the hands of those who need it now and stop wasting billions of dollars torturing animals in labs throughout the US like @uwmadison." Stip. ¶ 74 & Ex. 35, ECF No. 28-35. This comment was hidden from public view. *Id.*; *compare* Ex. 35, *with* Stip. Ex. 36, ECF No. 28-36.

- On May 6, 2021, Ms. Krasno posted substantially the same comment on a similar NIH Facebook post about Public Service Recognition Week 2021. Stip. ¶ 75. She wrote, "@National Institutes of Health (NIH), If you actually wanted to extend life and reduce illness and disability, you'd directly put funding in the hands of those who need it now and stop wasting billions of dollars torturing animals in labs throughout the US like @University of Wisconsin-Madison." *Id.* & Ex. 37, ECF No. 28-37. This comment was hidden from public view. *Id.*; *compare* Ex. 37, *with* Stip. Ex. 38, ECF No. 28-38.

- On May 29, 2021, Ms. Krasno commented on an NIH Instagram post about diversity in science. Stip. ¶ 76. She wrote, "How about the victims of 'science'? Going to highlight them too? Why are you still funneling billions of dollars into animal testing? Its archaic, unsuccessful, and cruel. @nihgov." *Id.* & Ex. 39, ECF No. 28-39.  This comment was hidden from public view. *Id.*; *compare* Ex. 39, *with* Stip. Ex. 40, ECF No. 28-40.

- On June 13, 2021, Ms. Krasno commented on the NIH Facebook Page, writing, "I was diagnosed with PTSD after working at @University of Wisconsin-Madison's Harlow Primate Lab which receives funding from you, the @National Institutes of Health (NIH), to torture animals in the name of science. Its despicable that you continue to harm animals and call it progress when so many people are without the means to access mental healthcare, general healthcare, and medication that already exists." Stip. ¶ 77 & Ex. 41, ECF No. 28-41. This comment was hidden from public view. *Id.*; *compare* Ex. 41, *with* Stip. Ex. 42, ECF No. 28-42.

Ms. Krasno has occasionally advocated for animal rights in comments on the NIH Instagram Account by modifying the spelling and spacing of certain words, although she finds doing so difficult and burdensome. Stip. ¶¶ 78, 89. For example, on April 29, 2021, she commented, "Ok let me try again. It's pretty messed up that you block any conversation about a n I m a l t e s t I n g." *See* Ex. 32, at *3 (madeline_krasno's comment). This comment was not hidden from view. *Id.*; *see also* Ex. 42, at *3 (Madeline Krasno's comment) (same).

As a result of the NIH's use of keywords to deter speech related to animal research from appearing on its social media accounts, Ms. Krasno is restricted in her ability to express her views, using a natural choice of words, about animal testing in comments on the NIH Facebook Page and NIH Instagram Account. Stip. ¶ 89. Ms. Krasno follows the NIH on Instagram and Facebook. *Id.* ¶ 79. Her interest in engaging with and reading the comments of other animal rights advocates on the NIH's social media accounts is also burdened by the NIH's use of keyword blocking. *Id.* ¶¶ 79, 89.

### 3. Ryan Hartkopf

Mr. Hartkopf also had his comments to the NIH Facebook Page and Instagram Account hidden from public view because they contained words on the NIH's blocked keywords lists:

- On April 24, 2021, Mr. Hartkopf commented on an April 23, 2021 @nihgov Instagram post about "National DNA Day" by stating, "The Wisconsin NPRC is a disgrace. I personally know 2 former employees who were traumatized by their experience as primate caretakers. There is no humane

way to keep 1,650 primates in small steel cages for decades without inflicting massive psychological damage. On top of that, the University of Wisconsin has banned any keywords regarding primate testing on their social media pages, meaning any opposition on social media is automatically silenced. They also delete the testimonials of former employees. Why go to all that trouble to silence their own alumni if everything is above-board? We need to reinvest in human-relevant, modern research instead of this barbaric and archaic practice, which does not yield cures to our most deadly diseases!" *Id.* ¶ 80. After checking the post using a different Instagram account and seeing that the comment was not publicly viewable, Mr. Hartkopf deleted this comment. *Id.*

- Mr. Hartkopf also attempted to write a series of one-word comments on an NIH Instagram post dated January 28, 2021. *Id.* ¶ 81. Mr. Hartkopf commented, "test," "monkeys," "experiments," "peta," "experimenting," "torture," and "testing." *Id.* & Ex. 44, ECF No. 28-44. All of these comments were hidden, except for the terms "experiments" and "experimenting," which could only be accessed by a user who selected "view hidden comments" for the post. *Id.*; *compare* Ex. 44, *with* Stip. Ex. 45, ECF No. 28-45.

- Mr. Hartkopf also attempted to post a series of one-word comments to an NIH Facebook post on IVF conception. Stip. ¶ 82. Mr. Hartkopf wrote, "peta," "primate," "primates," "monkey," "monkeys," "torture," "torturing," "tortures." *Id.* ¶ 82 & Ex. 46, ECF No. 28-46. All of these comments were hidden from public view. *Id.*; *compare* Ex. 46, *with* Stip. Ex. 47, ECF No. 28-47.

- On April 29, 2021, Mr. Hartkopf wrote a comment to an NIH Instagram post about treatment for antibiotic-resistant infections. Stip. ¶ 83. He commented, "The Wisconsin NPRC is a disgrace. I personally know 2 former employees who were traumatized by their experience as primate caretakers. There is no humane way to keep 1,650 primates in small steel cages for decades without inflicting massive psychological damage. On top of that, the University of Wisconsin has banned any keywords regarding primate testing on their social media pages, meaning any discourse on social media is automatically silenced. They also delete the testimonials of former employees. Why go to all that trouble to silence their own alumni if everything is above-board? We need to reinvest in human-relevant, modern research instead of this barbaric and archaic practice, which does not yield cures to our most deadly diseases!" *Id.* & Ex. 48, ECF No. 28-48. This comment was hidden from public view. *Id.*; *compare* Ex. 48, *with* Stip. Ex. 49, ECF No. 28-49.

To confirm that the NIH was preventing comments with certain keywords from being viewed, Mr. Hartkopf filed a FOIA request with the NIH on April 24, 2021, seeking "a screenshot

19

of all keywords that are blocked" on the NIH Facebook Page and Instagram Account. Stip. ¶ 84. On April 29, 2021, Mr. Hartkopf received the records responsive to his FOIA request and confirmed that the NIH had blocked several keywords associated with animal testing from appearing in comments on its Facebook Page and Instagram Account. *Id.*

Mr. Hartkopf has occasionally advocated for animal rights in comments by modifying the spelling and spacing of certain words, although he finds that process burdensome. *Id.* ¶¶ 85, 90. For example, on June 17, 2021, he commented on an NIH Facebook post, "it's ironic that this Facebook page is full of spam and porn links, but the admin only uses keyword blocking to hide comments about testing on a n I m a l s." *Id.* ¶ 85 & Ex. 50, at *2 (Ryan Hartkopf's comment), ECF No. 28-50. This comment remains publicly viewable by Facebook users. *Id.*

As a result of the NIH's use of keywords to deter speech related to animal testing from appearing on its social media accounts, Mr. Hartkopf is restricted in his ability to express his views, using a natural choice of words, about animal testing in comments on the NIH Facebook Page and NIH Instagram Account. Stip. ¶ 90. Mr. Hartkopf follows the NIH on Instagram and Facebook. *Id.* ¶ 86. His interest in engaging with and reading the comments of other animal rights advocates on the NIH's social media accounts is also burdened by the NIH's use of keyword blocking. *Id.* ¶¶ 86, 90.

## Standard of Review

Summary judgment is appropriate where a moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Motions for summary judgment are analyzed in the light most favorable to the non-moving party. *See Hall & Assocs. v. Env't Prot. Agency*, 956 F.3d 621, 630 (D.C. Cir. 2020).

## Argument

**I.**     **The comment threads on the NIH Facebook Page and Instagram Account are designated public forums under the First Amendment.**

The comment threads of the NIH Facebook Page and Instagram Account are public forums designated "for the robust exercise of First Amendment activity by the general public." *Hodge v. Talkin*, 799 F.3d 1145, 1161 (D.C. Cir. 2015). The NIH has chosen to open a public Facebook page and an Instagram account—social media accounts that are unquestionably compatible with expressive activity. Its posts are open to the public, as are its comment threads—the NIH allows any Facebook or Instagram user to comment on any post. Apart from its keyword blocking, targeted primarily at Plaintiffs and others who advocate for an end to animal testing, the comment threads are generally open to public discourse on any subject, in any manner. These comment threads are therefore designated public forums.

### A.     Overview of public forum doctrine

A public forum is established when the government makes space that it owns or operates available for speech by members of the public. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555 (1975); *see also Davison*, 912 F.3d at 683 ("[T]he Supreme Court and lower courts have held that private property, whether tangible or intangible, constituted a public forum when, for example, the government retained substantial control over the property under regulation or by contract."). The forum may be physical, or it may be "metaphysical," *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995), such as a "channel of communication," *Cornelius*, 473 U.S. at 802, or a funding stream, *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46–47 (1983).

Public forum analysis generally "divides government property into three categories." *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 447 (D.C. Cir. 2020) (quoting *Initiative &*

*Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1070 (D.C. Cir. 2012)). First, traditional public forums, which include sidewalks and parks, are forums that have been used "immemorially . . . for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). Second, the government can create a public forum by "designation of a place or channel of communication for use by the public at large for assembly and speech." *Cornelius*, 473 U.S. at 802. Limited public forums, a subset of designated public forums, are spaces the government has opened for expressive activity "for certain groups or for the discussion of certain topics." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (quoting *Rosenberger*, 515 U.S. at 829). Finally, nonpublic forums exist "[w]here the government is acting as a proprietor, managing its internal operations." *Id.* (quoting *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678–79 (1992)).

The level of scrutiny applicable to speech restrictions in public forums depends on the type of forum the government has created. *Zukerman*, 961 F.3d at 447 (citing *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 364 (D.C. Cir. 2018)). Speech restrictions that discriminate based on viewpoint are unconstitutional in any type of forum, including nonpublic ones. *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017); *Rosenberger*, 515 U.S. at 829. For both traditional public forums and designated public forums, speech regulations that discriminate based on content are subject to strict scrutiny. *McCullen v. Coakley*, 573 U.S. 464, 478 (2014); *Perry Educ. Ass'n*, 460 U.S. at 45. In limited public forums and nonpublic forums, content-based speech restrictions must be viewpoint-neutral and "reasonable in light of the purposes served by the forum." *Cornelius*, 473 U.S. at 806.

**B.**     **The comment threads are designated public forums.**

To determine whether the government has created a designated public forum, courts in the D.C. Circuit look to "the nature of the property, its compatibility with expressive activity, and the *consistent* policy and practice of the government." *Bryant v. Gates*, 532 F.3d 888, 896 (D.C. Cir. 2008) (quoting *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1016–17 (D.C. Cir. 1988)). An examination of those factors in this case demonstrates that the NIH has intentionally opened the comment threads on its Facebook Page and Instagram Account to wide-ranging speech by members of the general public, thereby creating designated public forums.

First, the "nature of the property" at issue is the interactive component of the NIH Facebook Page and Instagram Account—that is, the comment threads. As the Supreme Court has explained, when "limited access is sought . . . cases have taken a . . . tailored approach to ascertaining the perimeters of a forum within the confines of the government property." *Cornelius*, 473 U.S. at 801 (defining the relevant forum as the combined federal campaign charity drive rather than the federal workplace). Plaintiffs here do not assert that the NIH's social media accounts are public forums in their entirety—to the contrary, the NIH's own posts are plainly government speech. The Court's analysis must therefore focus not on the social media accounts as a whole but on the comment threads in particular. *See Davison*, 912 F.3d at 687 (distinguishing between the "interactive component" of a Facebook page and the account holder's "curation of and posts to" the Facebook page, which "amount to government speech"); *see also Knight First Amendment Inst.*, 928 F.3d at 234 (referring to the "interactive space" of the president's Twitter account).

Second, the comment threads are plainly compatible with expressive activity. As the Supreme Court explained in *Packingham v. North Carolina*, social media "offers relatively unlimited, low-cost capacity" for "a wide array of protected First Amendment activity on topics

as diverse as human thought." 137 S. Ct. 1730, 1735–36 (2017) (cleaned up). Meta, the parent company of Facebook and Instagram, holds both platforms out as sites of expressive activity for members of the public. *See Facebook Community Standards*, Meta, https://perma.cc/UM3D-MSZK (explaining that Facebook is "a service for more than 2 billion people to freely express themselves"); *Community Guidelines*, Instagram Help Center, https://perma.cc/YC88-XQBH?type=image (explaining that Instagram is "an authentic and safe place for inspiration and expression").[11] For this reason, numerous courts have concluded that government-run social media pages are compatible with expressive activity. *See Davison*, 912 F.3d at 682 ("The Chair's Facebook Page also is 'compatib[le] with expressive activity.'" (quoting *Cornelius*, 473 U.S. at 802)); *Felts v. Reed*, 504 F. Supp. 3d 978, 986 (E.D. Mo. 2020) ("Twitter accounts are compatible with expressive activity because they are interactive and constitutents use these accounts to engage with their representatives."); *One Wisc. Now v. Kremer*, 354 F. Supp. 3d 940, 953 (W.D. Wisc. 2019) (same).

Third, NIH's "consistent policy and practice" of making the comment threads on the NIH Facebook Page and Instagram Account available for speech by members of the public—without restriction as to speaker or subject matter—demonstrates that NIH has intentionally designated them as public forums. The NIH did not open social media pages on Instagram and Facebook by accident. Rather, the NIH intentionally uses social media "to communicate and interact with citizens." Stip. ¶ 36. It regularly posts on both platforms on a wide array of topics of interest to the public, from COVID-19 treatment to maternal mortality to family care to research into new medical treatments. *See, e.g.*, Ex. 1; Ex. 2; Ex. 27; Ex. 32. Its posts are public, meaning that any

---

[11] The parties agree that the Court may take judicial notice of Facebook's Community Standards and Instagram's Community Guidelines. *See* Stip. ¶¶ 21 n.2, 35 n.5.

member of the public can view recent posts, and any Facebook or Instagram user can view all of the NIH's posts, regardless of whether they "follow" the pages. Stip. ¶¶ 38, 43. And the NIH has allowed anyone with a Facebook or Instagram account to comment on its posts, *see id.* ¶¶ 9, 28, 38, 43, forgoing the option of disabling the comments features—an option that would allow the NIH to use its social media accounts as one-way channels for its own message, *see How do I adjust who can comment on my public posts on Facebook?*, Facebook Help Center, https://perma.cc/R4EF-WSC4; *How do I turn comments on or off for my Instagram posts?*, Instagram Help Center, https://perma.cc/B5GL-KHSB?type=image.[12]

Members of the public do, in practice, use the commenting feature extensively, speaking on a wide array of topics in the comment threads. Comments on the NIH's pages frequently address, for example, medical research and COVID-19. *E.g.*, Ex. 25 at *2 (Amritha Maharaj Soorujlall's comment) ("What are the side effects of pfizer first dose."). Some comments raise issues of biomedical ethics. *E.g.*, *id.* Ex. 43 at *6 (prettynpixels's comment) ("Because of the racial prejudices that initially prevented her acknowledgement, it is important to educate people and create more awareness about the story of Ms. [Henrietta] Lacks, her relationship to HeLa cells, and the contributions and benefits of HeLa cells to medical research."); *id.* Ex. 52 at *11 (Dulcy Morais's comment), ECF No. 28-52 ("Check FDA board of directors and count how many names you can connect to NIH and pharma cartel . . . ."). Other comments discuss politics. *E.g.*, Ex. 21 at *9 (Buffi Wright's comment) ("Can't trust any of these government agencies under

---

[12] The Court may take judicial notice of information contained in Facebook's and Instagram's help centers. Stip. ¶¶ 4 n.1, 10 n.3. As the Facebook help center article makes clear, page administrators can effectively disable comments by modifying their settings so that only Facebook "Profiles and Pages" tagged in a post may comment on the post, and then refraining from tagging any Profiles or Pages in the post. *See How do I adjust who can comment on my public posts on Facebook?*, Facebook Help Center, https://perma.cc/R4EF-WSC4.

Trump.[]Sold to the highest bidder and corrupt Republican cultists"). And there are more still that address users' concerns or views on totally different topics. *E.g.*, Ex. 5 at *3 (Kathy Hart's comment) ("BRING BACK CHRIS CUOMO…OR…#boycottcnn"); Ex. 38 at *7 (Jennifer Yate's comment), ECF No. 28-38 ("You are so friendly, pret[t]y."). Many comments garner replies, and replies to replies, allowing users to express their differences and engage in conversation. *E.g.*, Ex. 1 at *6–8 (discussing administration of COVID-19 vaccine to pregnant people); Ex. 21 at *3–5 (discussing effectiveness of masks in limiting the spread of COVID-19).

This type of exchange, between diverse groups of speakers on any and every topic of interest, is the hallmark of a public forum. *See, e.g.*, *Knight First Amendment Inst.*, 928 F.3d at 237; *Kimsey v. City of Sammamish*, No. C21-1264 MJP, 2021 WL 5447913, at *4 (W.D. Wash. Nov. 22, 2021) ("The comment section is akin to a traditional public forum where access is 'unfettered' and 'indiscriminate.'" (quotation omitted)).

The NIH's bald assertion in its comment guidelines that its social media accounts "are not intended to serve as public forums," Ex. 19, does not change the analysis.[13] As the D.C. Circuit has emphasized, the government's own description of the forum—as designated, limited, or nonpublic—is not dispositive if "consistently contradicted by practice." *Stewart*, 863 F.2d at 1021; *id.* at 1016 (noting that the determination of whether the government has intentionally opened a

---

[13] It is not even clear that the NIH's comment guidelines should be understood as a statement of policy with respect to the NIH Facebook Page and Instagram Account at all. Prior to the filing of this lawsuit, the comment guidelines were nowhere linked to or referenced on those pages. Stip. ¶ 53; *see Archdiocese of Wash. v. Wash. Metro Area Transit Auth.*, 897 F.3d 314, 324 (D.C. Cir. 2018) (explaining that "subject matter regulations" must be set out "prospectively and categorically"). Although the government linked to a "privacy policy," which in turn included a sentence advising commenters that "spam" or "improper, inflammatory, off-topic or offensive" speech could be removed, Stip. ¶ 54, this standard does not reflect what the NIH asserts was its operative comment guideline policy at the time, Stip. ¶ 51. That policy does not prohibit "improper," "inflammatory," or "offensive" speech. *See* Ex. 19.

space it controls for speech is "a matter to be inferred from a number of factors"); *see also Paulsen v. Cty. of Nassau*, 925 F.2d 65, 69–71 (2d Cir. 1991) (affirming decision that Nassau Coliseum was public forum despite county's assertion that it "did not mean to permit noncommercial speech on Coliseum grounds"). Here, the undisputed facts in the record demonstrate that despite the NIH's statement in its guidelines, its actual practices—choosing to use its social media accounts in order to "communicate and interact with citizens," Stip. ¶ 36, electing to open its comment threads up to the public, and allowing commenters to speak on any topic (other than the ones foreclosed by the practice of keyword blocking)—evince an intent to create a designated public forum.

Indeed, nearly every court to have addressed the question has concluded that the interactive components of government-run social media accounts are public forums for purposes of the First Amendment. *See Knight First Amendment Inst.*, 928 F.3d at 237; *Davison*, 912 F.3d at 687; *Kimsey*, 2021 WL 5447913, at *4; *Tanner v. Ziegenhorn*, No. 4:17-cv-780-DPM, 2021 WL 4502080, at *2 (E.D. Ark. Sep. 30, 2021); *Faison v. Jones*, 440 F. Supp. 3d 1123, 1135 (E.D. Cal. 2020); *One Wisc. Now*, 354 F. Supp. 3d at 955; *Garnier v. Poway Unified Sch. Dist.*, No. 17-cv-2215-W (JLB), 2019 WL 4736208, at *10–11 (S.D. Cal. Sep. 26, 2019); *cf. Robinson v. Hunt Cty., Tex.*, 921 F.3d 440, 448 (5th Cir. 2019) (assuming the Facebook page in question was a limited or designated public forum); *but see Morgan v. Bevin*, 298 F. Supp. 3d 1003, 1010 (E.D. Ky. 2018) (denying motion for preliminary injunction based on likelihood that public official's Twitter and Facebook pages were not susceptible to forum analysis).[14] For the same reasons, the Court should conclude that the NIH Facebook Page and Instagram Account are public forums.

---

[14] Greater still is the number of courts that have adopted this reasoning in the course of rejecting motions to dismiss by government actors. *See Czosnyka v. Gardiner*, No. 21-cv-3240, 2022 WL 407651, at *3 (N.D Ill. Feb. 10, 2022) (concluding that "plaintiffs have sufficiently alleged that Alderman Gardiner's Facebook Page is a public forum"); *Scarborough v. Frederick Cty. Sch. Bd.*, 517 F. Supp. 3d 569, 577 (W.D. Va. 2021) (concluding that a Facebook page for a public school

**II.     The NIH's keyword blocking violates the First Amendment.**

**A.     The NIH's keyword blocking unconstitutionally discriminates on the basis of viewpoint.**

Viewpoint discrimination is unlawful in any forum. *See, e.g.*, *Rosenberger*, 515 U.S. at 828 ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."); *Zukerman*, 961 F.3d at 446. The "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972).

Blatantly ignoring this fundamental precept, the NIH has used keyword blocking on its Facebook Page and Instagram Account to "single[] out a subset of messages for disfavor," in violation of the First Amendment. *Zukerman*, 961 F.3d at 446 (citing *Matal*, 137 S. Ct. at 1766) (internal citations omitted). Its keyword blocking suppresses comments that advocate against animal testing and against the NIH's continued funding of animal research. This practice burdens the right of animal advocates like Plaintiffs to speak in public forums, as well as their right to hear others speak. It is axiomatic viewpoint-based censorship.

---

"easily clear[ed] the public-forum threshold for a social media platform"); *Felts*, 504 F. Supp. 3d at 986 ("Plaintiff alleges facts that show [defendant's] Twitter account bears the hallmarks of a public forum."); *West v. Shea*, 500 F. Supp. 3d 1079, 1085 (C.D. Cal. 2020) ("Plaintiff alleges sufficient facts to make it plausible that Defendant's Profile was a public forum."); *Windom v. Harshbarger*, 396 F. Supp. 3d 675, 683 (N.D.W. Va. 2019) ("Taking [plaintiff's] factual allegations as true, he has successfully pled that [defendant] opened up his Facebook page as a public forum for expressive activity."); *Hyman v. Kirksey*, No. 3:18-cv-230-DPM, 2019 WL 2323864, at *2 (E.D. Ark. May 30, 2019) (explaining that the interactive components of the police department's Facebook page were not government speech and were "therefore subject to some form of constitutional scrutiny"); *Leuthy v. LePage*, No. 1:17-cv-00296-JAW, 2018 WL 4134628, at *13–15 (D. Me. Aug. 29, 2018) (concluding plaintiffs stated a claim based on social media blocking on governor's Facebook page); *Price v. City of N.Y.*, No. 15 Civ. 5871 (KPF), 2018 WL 3117507, at *15 (S.D.N.Y. June 25, 2018) (explaining that "the City's official Twitter pages share many characteristics of public forums").

There is no question that the keywords selected by the NIH target a particular viewpoint. At the time Plaintiffs filed the Complaint, the NIH suppressed all comments containing the terms "PETA," "PETALatino," "#stopanimaltesting," "#stoptesting," and "#stoptestingonanimals." Stip. ¶ 58. As discussed above, PETA is one of the foremost animal-rights organizations internationally, and it often runs social media campaigns urging its members and followers to petition government leaders to stop animal testing, or urging them to cease specific projects or experiments being run by the government. *Id.* ¶ 1; *see also supra* Statement of Facts III.A. The phrases "#stopanimaltesting," "#stoptesting," and "#stoptestingonanimals" are equally direct in their expression of a particular anti-animal testing perspective. Stip. ¶ 58. By blocking these phrases, the NIH chose "for disfavor" words and phrases that expressed disagreement with the NIH's professed stance on animal testing. Indeed, after the Complaint was filed, the NIH apparently recognized the plainly viewpoint-discriminatory nature of these keywords, and removed these five terms from their list of blocked keywords in December 2021. *See* Stip. ¶ 60.

The remaining words blocked by the NIH on Facebook and Instagram are similarly designed to suppress animal advocates' viewpoints by blocking words closely associated with their efforts to urge the NIH to stop animal testing. For example, the blocked words "Suomi" and "Harlow" refer to prominent scientists who relied on animal experiments in the course of their research; PETA has led public anti-animal testing campaigns relating to their work. Stip. ¶ 58 nn.9–10. The other words the NIH targets are also strongly associated with animal testing advocacy, including "primate(s)," "animal(s)," "test(ing)," and "torture." *Id.* ¶ 58. These words are frequently used in comments criticizing the NIH's funding of animal testing. For example, in the course of her animal advocacy, Ms. Krasno has urged the NIH to have "an open conversation about all the *animal testing* you fund," *id*. ¶ 73 & Ex. 33 (emphasis added), and has tried to call attention

to the "*Harlow Primate* Lab which receives funding from you, the @National Institutes of Health (NIH), to *torture animals* in the name of science," Stip. ¶ 77 & Ex. 41 (emphasis added).

Any suggestion that the NIH has simply closed off its comment threads to a subject matter, rather than a viewpoint, would be misplaced. The NIH has blocked specific words and phrases closely associated with opposition to animal testing; it does not similarly block other animal-related terms. While commenters are not permitted to include words like "monkey" or "primates" in their posts, the NIH does not hide comments when they use other terms, like "livestock," "donors," "samples," "models," or "subjects," even those these terms could refer to the same animals in more objectifying language. Nor does the NIH hide comments when they refer to other animals. For example, words like "scorpion," "guinea pig," and "sheep," along with other animal terms, appear throughout the NIH's Facebook and Instagram comments sections. *See, e.g.*, Ex. 1 at \*12 (comments of Justin Nance and Manny A Marino), \*14–15 (comments of Jose Lopez and Daniel Mullin). In other words, members of the public opposed to vaccines can complain "[w]e are not lab rats," *id*. at \*9 (Jenna Silverayne Hart's comment), while someone asking the NIH to stop "tormenting" lab rats would be censored, Stip. ¶ 58. The NIH's keyword blocking, then, suppresses animal advocacy and not animal-related content generally. It therefore targets a "prohibited perspective, not [a] general subject matter," and so is unconstitutional. *Rosenberg*, 515 U.S. at 831; *see also R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 394 (1992) ("Selectivity of this sort creates the possibility that the city is seeking to handicap the expression of particular ideas.").

In a public forum, viewpoint discrimination by the government is rarely, if ever, justifiable. *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (explaining that a "finding of viewpoint bias end[s] the matter"); *PETA v. Gittens*, 215 F. Supp. 2d 120, 134 & n.41 (D.D.C. 2002) (explaining

that because viewpoint discrimination is unconstitutional in a public or limited public forum, a court need not consider the motives of the government censor). And the NIH's attempts to explain away its plainly viewpoint-discriminatory practice as merely an incidental product of enforcing its guidelines are unconvincing.

First, the NIH has asserted that its guidelines allow it to hide "inflammatory" comments, Stip. ¶¶ 54, 87, but that distinction is itself viewpoint-discriminatory. *See Matal*, 137 S. Ct. at 1763 (holding that federal trademark law prohibiting "offensive" speech was unconstitutional viewpoint discrimination because "[g]iving offense is a viewpoint"); *Iancu*, 139 S. Ct. at 2299.[15]

Second, the NIH's claim that it uses the list of blocked keywords to prevent people from posting "off-topic" comments, Stip. ¶¶ 47, 54, 87, is implausible. The NIH prevents all comments containing the blocked keywords from appearing in the comment threads, regardless of whether those comments are actually off-topic. Plaintiffs' own experience demonstrates that the NIH suppresses on- and off-topic animal advocacy alike. On May 27, 2021, Ms. Wagaman, an employee of PETA, watched a Facebook Live interview between Dr. Collins and Dr. Kizzmekia Corbett on "her research & the development of the mRNA COVID-19 vaccines." Stip. ¶ 65 & Ex. 25 at *20 (NIH's comment). Ms. Wagaman attempted to participate in the discussion, asking, "Why is the NIH still wasting funds on Elisabeth Murray's monkey fright experiments instead of investing more in important clinical research about COVID-19?" *See* Ex. 24 at *2 (Evelyn Wagaman's comment). Her comment pertained to Dr. Corbett's and Dr. Collins's discussion, but it was hidden nevertheless. *Id.* Similarly, Ms. Krasno responded to an NIH Facebook post about

---

[15] As a factual matter, the NIH's "current, operative" version of its comment guidelines, Stip. ¶ 51, do not actually ban "inflammatory" speech, Ex. 19. But to the extent the NIH seeks to justify its keyword blocking as designed to prevent "inflammatory" comments, the result is the same: suppressing speech because it may inflame others is unconstitutional.

the identification of brain cells that may be linked to post-traumatic stress disorder and anxiety disorders, speaking candidly about how working in an animal research lab affected her mental health. She wrote:

> I was diagnosed with PTSD after working at @University of Wisconsin-Madison's Harlow Primate Lab which receives funding from you, the @National Institutes of Health (NIH), to torture animals in the name of science. Its despicable that you continue to harm animals and call it progress when so many people are without the means to access mental healthcare, general healthcare, and medication that already exists.

Stip. ¶ 77 & Ex. 41. Because her comment contained the words "animal," "torture," and "primate," it was hidden, despite the fact that her discussion of her diagnosis pertained to the NIH's post. *Id.*

It is clear, then, that the NIH is not actually suppressing Plaintiffs' comments because those comments violate its guidelines. It is suppressing comments containing the blocked keywords because they are associated with advocacy on behalf of animals, regardless of whether they pertain to the NIH's own messaging.

The agency's treatment of other forms of so-called "off-topic" comments further demonstrates that it is discriminating against animal advocacy, not consistently ensuring that comments remain "on-topic." The NIH does not routinely remove, much less suppress in advance, comments that violate its off-topic rule but that do not contain the blocked keywords. For example, on an NIH Facebook post from July 3, 2021, about research on social deprivation among adopted children, one commenter wrote: "HI, does anyone know where I can make the Janssen Johnson&Johnson vaccine?" Ex. 27 at *2 (Paul Frizerul Din Liverpool's comment). This is one among many COVID-19-related or vaccine-related comments that users published in response to posts addressing unrelated topics. *See* Ex. 6 at *3 (Arshad Ali's comment). Off-topic comments on a variety of other subjects also appear in the NIH's Facebook and Instagram comments sections. On an Instagram post describing how scientists map protein structures, for example, one user

commented to promote their public health nonprofit. *See* Ex. 10 at *2 (communityhealthed's comment). Another raised concerns about alleged human trafficking conspiracies in Hawaii. *Id.* (saveourchildrennow's comment). On a different Instagram post recognizing public service recognition week, a user asked the NIH why it didn't promote "an Alkaline diet and lifestyle," advising then-Director Francis Collins that "for the head of national institute of health you don't look like the healthiest person." Ex. 36 at *3 (terpinserbian's comment). Finally, commenting on a Facebook post about the persistence of fearful memories, one user asserted that the "magnet challenge is real." *See* Ex. 42 at *3 (Norma Hostetler's comment).

By censoring only animal advocacy, and not all unrelated or off-topic speech, the NIH commits unconstitutional viewpoint discrimination. *See Zukerman v. U.S. Postal Serv.*, No. 15-cv-2131 (CRC), 2021 WL 4355426, at *11 (D.D.C. 2021) (rejecting Postal Service's claim that it applied viewpoint-neutral guidelines prohibiting "political content" when it allowed citizens to make custom stamps featuring the Supreme Court case *Obergefell v. Hodges* but disallowed custom stamps featuring *Citizens United v. FEC*); *see also PETA v. Gittens*, 215 F. Supp. 2d at 134 ("[I]nconsistent treatment of messages which are similarly noncompliant . . . is inherently unreasonable and unacceptable discrimination under the First Amendment, regardless of whether the [government] believes it is not viewpoint related.").

**B.**     **The NIH's keyword blocking is also an unconstitutional content-based restriction on speech in a public forum.**

The NIH's keyword blocking would constitute unconstitutional content-based discrimination even if it were not viewpoint-based. Strict scrutiny applies to the NIH's keyword blocking because the NIH has singled out specific topics for disfavored treatment within an otherwise open public forum. *See, e.g.*, *Act Now to Stop War and End Racism Coal. v. District of Columbia*, 846 F.3d 391, 403, 406 (D.C. Cir. 2017) (explaining that content-based restrictions are

those that distinguish kinds of speech "based on their particular communicative content," due to a risk "that government is favoring particular viewpoints or subjects"). To survive strict scrutiny, the NIH must demonstrate that it has a compelling interest in suppressing the keywords from the forum, that its use of keyword blocking is narrowly tailored to serve that compelling interest, and that no less restrictive alternatives exist to further its interest. *See, e.g.*, *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 898 F. Supp. 2d 73, 80–81 (D.D.C. 2012). The NIH's use of content-based keywords flounders at every step.

### 1.     The NIH's keyword blocking is subject to strict scrutiny.

As a threshold matter, the NIH's keyword blocking is subject to strict scrutiny because the comment threads are open designated public forums. It is true that government entities may constitutionally limit forums for use by "for certain groups or for the discussion of certain topics," *Walker*, 576 U.S. at 215, so long as those limitations are viewpoint-neutral and reasonable in light of the purpose of the forum, *Rosenberger*, 515 U.S. at 829. Here, however, the undisputed facts make clear that the NIH has not restricted the comment threads at issue. The NIH has instead opened the comment threads for essentially indiscriminate expression by members of the public, excluding only speech relating to animal advocacy. *See supra* Part I.B.

Any attempt by the NIH to rely on its comment guidelines as evidence it has created a limited public forum "for the discussion of certain topics" would fail. The NIH's actual practice in operating the Facebook Page and Instagram Account is wholly unlike the policy outlined in those guidelines. To name a few examples:

- The guidelines prohibit "off-topic" speech, Ex. 19, but as discussed at length above, the NIH does not limit off-topic speech unless that speech concerns animal advocacy. *See supra* Part II.A.

- The guidelines prohibit images and external links. *See* Ex. 19. Images and external links, however, abound in the comments sections of the NIH's

social media pages. *E.g.*, Ex. 4 at *3 (comments of Erica Alice, Peter Roy, and Margaret Ann Wheeler), *6 (Peter Roy's comment), *8 (Dorothy Stoneinouye's comment), *14 (Sa'adi Nasim's comment), *15 (Zuckforprison Bykowski's comment), *16 (comments of Lawrence Powe and Gul Sanya), *17 (Qudell Richards's comment), *18 (Kaoutar Imani's comment), *19 (comments of Margaret Ann Wheeler and Gul Sanya), *20 (JJ Alexander's comment), *22 (Peter Roy's comment), *23 (Laurel R. Ybarra's comment), *26 (William Webb's comment), *30 (Matt Rob's comment), *34 (Brandy Lucore Swayze's comment), *35 (Derek Antal's comment).

- The guidelines also prohibit comments that contain commercial endorsements, *see* Ex. 19, but these too may be found on numerous comment threads. *See, e.g.*, Ex. 1 at *9 (William Clement's comment); Ex. 11 at *5 (araijelson1's comment); Stip. Ex. 13 at *3 (shiela_ffrey12's comment), ECF No. 28-13; Ex. 42 at *2 (Ebi Isaiah's comment).

- The guidelines advise users that "all comments are reviewed before they can be posted." *See* Ex. 19. But the NIH admitted in the course of this litigation that it does not engage in this type of review. Stip. ¶ 61.

To the extent the NIH's comment guidelines are applied, then, they are applied not to confine the forum to particular topics of the NIH's choosing, but to allow the agency to selectively block speech it disfavors. Faced with evidence of similarly underenforced commenting rules, the Western District of Washington concluded that the government had not limited the scope of the forum. *See Kimsey*, 2021 WL 5447913, at *4 ("The lack of consistent application of the off-topic rule here weighs heavily in favor of finding a designated forum because an unevenly enforced rule is no policy at all for the purposes of public forum analysis." (internal citations omitted)); *see also Hopper v. City of Pasco*, 241 F.3d 1067, 1076 (9th Cir. 2001) ("[C]onsistency in application is the hallmark of any policy designed to preserve the non-public status of a forum.").

*Stewart v. D.C. Armory Board* is particularly instructive on this point. There, the D.C. Circuit concluded that a plaintiff plausibly alleged that a private stadium operated by the Armory Board was a public forum. 863 F.2d at 1018–19. Although the Board had removed the plaintiffs' religious banners, the Court explained that the stadium was otherwise a "large open space,

dedicated to boisterous recreational activity," and that in operating the stadium, the Armory Board had "a practice—if not a policy—of allowing various types of first amendment activity to take place at RFK stadium during games." *Id.* And the Court took pains to explain the distinction between unconstitutional speech restrictions in a designated public forum and speech restrictions that limit the openness of the forum itself. "[T]he very fact that the government *has* restricted speech in the manner challenged," it held, "does *not* of its own weight demonstrate that the government did not intend to designate a public forum." *Id.* at 1017. For the same reasons, regardless of the text of the comment guidelines, the comment threads on the NIH Facebook Page and Instagram Account function as open designated public forums. The NIH's keyword blocking must therefore be evaluated under strict scrutiny.

### 2.      The NIH's keyword blocking fails strict scrutiny.

As the Supreme Court has repeatedly held, while viewpoint discrimination is a "blatant" and "egregious" type of content discrimination, *Rosenberger*, 515 U.S. at 828, "the First Amendment's hostility to content-based regulation extends . . . to prohibition of public discussion of an entire topic," *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980). Content-based restrictions in designated public forums are therefore presumptively unconstitutional. *See Reed v. Town of Gilbert*, *Ariz.*, 576 U.S. 155, 163 (2015). To survive strict scrutiny, the NIH must demonstrate that its keyword blocking: (1) "serves compelling state interests," *id.*; (2) is "narrowly tailored to that end," *id.* at 171; and (3) is "the least restrictive means of serving [its] compelling interest," *Am. Freedom Def. Initiative*, 898 F. Supp. 2d at 83. The NIH's use of keyword blocking in this case fails all three prongs of the strict scrutiny analysis.

First, the NIH has no compelling interest in preventing individuals from using the blocked keywords in its designated public forums. As discussed above, the government has no legitimate,

much less compelling, interest in restricting speech it considers "inflammatory." *See supra* Part II.A; *see also Am. Freedom Def. Initiative*, 898 F. Supp. 2d at 83 ("The First Amendment protects obnoxious and offensive speech; some might say that the Amendment's protections are needed more strongly for such speech than otherwise.").

Nor is the NIH's interest in preventing distraction from its preferred public health messaging, Stip. ¶ 87, compelling. In *Mahoney v. Babbit*, the government attempted to prohibit anti-abortion advocates from unfurling banners along an inauguration parade route, arguing that the demonstrators and their banners "would constitute a physical intrusion into another event for the purpose of interjecting [their] own convictions or beliefs." 105 F.3d 1452, 1458 (D.C. Cir. 1997) (cleaned up). The D.C. Circuit dismissed that argument, holding that the government's "goal . . . hardly constitutes a compelling state interest, or, in the face of the First Amendment, any legitimate state interest at all." *Id.*; *see also Kimsey*, 2021 WL 5447913, at *5 ("[T]he avoidance of distraction and dilution of public safety messages does not appear to be a compelling government interest."). So too, here—in the face of the First Amendment, the NIH's desire to prevent distraction is no "legitimate state interest" at all.

Second, even if its purported interests were compelling, a ban on the use of animal advocacy-related words is not narrowly tailored to these interests. The NIH's list of blocked keywords is radically underinclusive and overinclusive, and thus by definition not narrowly tailored. *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802, 804 (2011).

To begin, the NIH's keyword blocking practice is underinclusive, raising "serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802; *see also Reed*, 576 U.S. at 171–72 (a speech restriction is not "narrowly tailored to further a compelling government interest" when it

is "hopelessly underinclusive"). Here, if the NIH's interest is in preventing distraction from its own posts, all comments by users "ha[ve] effectively the same minimal distractive and dilutive effect," *Kimsey*, 2021 WL 5447913, at *5, but its keyword blocking targets only animal advocacy. If the NIH's interest is to limit distraction from "on-topic" comments, its keyword blocking leaves undisturbed scores of comments that are off-topic. *See supra* Part II.A (collecting examples). The same is true for potentially inflammatory or strongly worded speech. For example, the NIH has not hidden or deleted comments calling others "deplorable," *see* Ex. 3, at *3 (Derosnec Niaga's comment), "clown[s]," Ex. 25 at *27 (Jennifer Mullen's comment), "slave[s]," *id.* (Calico Jack's comment), "Anti-Vaxx 'Medical Free-Dumb' Troll[s]," Ex. 52 at *24 (Peter Roy's comment), or "damn Karen[s]," Ex. 21 at *3 (Lori Koetzner's comment).

This underinclusiveness "is alone enough to defeat" the NIH's keyword blocking, *Brown*, 564 U.S. at 802, but equally troubling is its overbreadth. Where government censorship is "substantially broader than necessary to achieve the government's interest," it obviously cannot survive narrow tailoring. *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 524 (D.C. Cir. 2010) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989)) (striking down a content-neutral permitting regime as not narrowly tailored to the government's interest in protecting the national parks, their tranquility, and their visitors); *see also Brown*, 564 U.S. at 804 (a law prohibiting the sale of violent video games to minors without parental consent was overinclusive because it applied to minors whose parents did not care whether they purchased such games). As discussed above, the NIH has restrained all speech containing any of two dozen words, regardless of the comment's relevance to the thread or its likelihood of inflaming others *See supra* Part II.A. This is obviously—and fatally—overbroad. The government simply cannot show the necessary fit

between any interest that could support suppressing off-topic or inflammatory speech, on the one hand, and its choice to hide all comments using the blocked keywords on the other.

Third, the NIH's use of keyword blocking fails strict scrutiny because the NIH has ignored the availability of less restrictive alternatives. *See Am. Freedom Def. Initiative*, 898 F. Supp. 2d at 83 (granting preliminary injunction because agency's refusal to run advertisement was not the least restrictive means of serving its interests); *cf. Reed*, 576 U.S. at 173 ("The Town has ample content-netural options available to resolve problems with safety and aesthetics."). The NIH could actively respond to comments on Facebook and Instagram, encouraging users to remain civil, answering questions, or correcting incorrect information. On Instagram, the NIH could "pin" comments it considers particularly worthy. *See About Protecting your Business on Instagram*, Instagram Help Center, https://perma.cc/XN5T-TVUN?type=image. On either platform, the NIH could manually enforce rate limits to ensure a single user does not "spam" a post with repetitive comments. The NIH could also ask users to focus comments on the topic being discussed in a post without enforcing a categorical prohibition on words and phrases associated with animal advocacy. But what the agency may not do is open a forum for communication and interaction by the general public and then suppress protected speech related to animal advocacy. For these reasons, the NIH's keyword blocking is an unconstitutional content-based restriction on speech.

### C.   The NIH's keyword blocking would violate the First Amendment even if the comment threads were considered limited forums or nonpublic forums.

Even in limited or nonpublic forums, a court must satisfy itself that restrictions on speech are "reasonable in light of the purpose served by the forum" and viewpoint-neutral. *Cornelius*, 473 U.S. at 806. The NIH's keyword blocking is neither.

First, the NIH's keyword blocking practice fails even if the comment threads are considered limited or nonpublic forums for the fundamental reason, detailed above, that they

discriminate based on viewpoint. *See supra* Part II.A. Viewpoint discrimination is unconstitutional in any forum. *Rosenberger*, 515 U.S. at 829.

Second, the NIH's keyword blocking is not reasonable in light of the purpose served by the NIH Facebook Page and Instagram Account. The Supreme Court has explained that, in order to show that a speech restriction is "reasonable," the government must show that its restraint furthers a "permissible objective" and contains "objective, workable standards" that are "capable of reasoned application." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1886, 1891–92 (2018). At the outset, the government's asserted interests are plainly impermissible. *See supra* Part II.B.2. And far from being "objective" or "workable," the government's prohibitions on off-topic and inflammatory speech are underinclusive, overinclusive, and susceptible to biased and discriminatory application, as the record demonstrates. *See supra* Parts II.A, II.B.1 (describing the NIH's inconsistent enforcement of its guidelines); *see also Mansky*, 138 S. Ct. at 1891 (courts should consider whether "unfair or inconsistent enforcement" makes the speech restrictions unreasonable); *Archdiocese of Wash.*, 897 F.3d at 330 (explaining that "a challenged regulation may be unreasonable, regardless of the reasons for its adoption, if it is inconsistently enforced"). The differential treatment of speech within these forums is not the type of inconsistency that reflects "close calls on borderline or fanciful cases." *Mansky*, 138 S. Ct. at 1891. These are inconsistencies that undermine the government's very premise for regulating speech in the first instance. They are so pervasive that, even if the NIH had a legitimate objective for regulating speech, its rules could not stand.

## Conclusion

For the reasons stated above, the Court should grant Plaintiffs' motion for summary judgment.

Date: April 1, 2022                              Respectfully submitted,

                                                 /s/ Stephanie Krent
                                                 _____
                                                 Stephanie Krent, *pro hac vice*
                                                 Alyssa Morones*
                                                 Katherine Fallow, *pro hac vice*
                                                 Jameel Jaffer
                                                 Knight First Amendment Institute
                                                   at Columbia University
                                                 475 Riverside Drive, Suite 302
                                                 New York, NY 10115
                                                 (646) 745-8500
                                                 stephanie.krent@knightcolumbia.org

                                                 *Counsel for Plaintiffs*

                                                 /s/ Caitlin M. Foley
                                                 _____
                                                 Caitlin M. Foley, *pro hac vice*
                                                 Animal Legal Defense Fund
                                                 150 South Wacker Drive, Suite 2400
                                                 Chicago, IL 60606
                                                 (707) 795-2533 ext. 1043
                                                 cfoley@aldf.org

                                                 Christopher A. Berry (Bar ID CA00106)
                                                 Animal Legal Defense Fund
                                                 525 E. Cotati Ave.
                                                 Cotati, CA 94931
                                                 (707) 795-2533 ext. 1041
                                                 cberry@aldf.org

                                                 *Counsel for Plaintiffs Madeline Krasno and
                                                   Ryan Hartkopf*

                                                 /s/ Asher Smith
                                                 _____
                                                 Asher Smith, *pro hac vice*
                                                 People for the Ethical Treatment of Animals
                                                 1536 16th Street NW
                                                 Washington, DC 20036
                                                 (202) 483-7382
                                                 AsherS@petaf.org

                                                 *Counsel for Plaintiff People for the Ethical
                                                   Treatment of Animals*

41

*Not yet admitted to practice law