**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **People for the Ethical Treatment of Animals, Madeline Krasno, and Ryan Hartkopf,**<br><br>            Plaintiffs,<br><br>     v.<br><br>**Lawrence A. Tabak, in his official capacity as Director of the National Institutes of Health, and Xavier Becerra, in his official capacity as Secretary of the U.S. Department of Health and Human Services,**<br><br>           Defendants. | Civil Action No. 21-cv-2380 (BAH) |

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 4

STANDARD OF REVIEW .............................................................................................. 10

ARGUMENT ................................................................................................................ 10

   I.   The comment threads on NIH's Facebook and Instagram Pages are nonpublic forums ... 12

      A.  The restrictions NIH has placed on the Pages confirm that it did not intend them to be public forums ........................................................................................................ 13

      B.  Plaintiffs fail to show that NIH clearly intended the Pages to be public forums. .......... 18

   II.  The relevant keyword filters are both viewpoint neutral and reasonable ......................... 25

      A.  The relevant keyword filters do not discriminate based on viewpoint ......................... 25

      B.  The relevant keyword filters are reasonable ................................................................. 30

CONCLUSION .............................................................................................................. 33

## TABLE OF AUTHORITIES

**Cases**

*Air Transp. Ass'n of Am. v. Lenkin*,
   899 F.2d 1265 (D.C. Cir. 1990) ................................................................ 10

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*,
   901 F.3d 356 (D.C. Cir. 2018) .......................................................... 14, 22

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
   897 F.3d 314 (D.C. Cir. 2018) ....................................................... *passim*

*Ark. Educ. Television Comm'n v. Forbes*,
   523 U.S. 666 (1998) ........................................................................ 13, 21

*Arrington v. United States*,
   473 F.3d 329 (D.C. Cir. 2006) ................................................................ 10

*Bryant v. Gates*,
   532 F.3d 888 (D.C. Cir. 2008) ....................................................... *passim*

*Charudattan v. Darnell*,
   834 F. App'x 477 (11th Cir. 2020) ........................................................ 17

*Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*,
   561 U.S. 661 (2010) ................................................................................ 11

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
   473 U.S. 788 (1985) ....................................................................... *passim*

*Davison v. Plowman*,
   247 F. Supp. 3d 767 (E.D. Va. 2017),
   *aff'd*, 715 F. App'x 298 (4th Cir. 2018) .......................................... 17, 30

*Davison v. Randall*,
   912 F.3d 666 (4th Cir. 2019) ........................................................... 23, 24

*Faison v. Jones*,
   440 F. Supp. 3d 1123 (E.D. Cal. 2020) ................................................ 24

*Garnier v. Poway Unified Sch. Dist.*,
   No. 17-CV-2215-W (JLB), 2019 WL 4736208 (S.D. Cal. Sept. 26, 2019) ............................ 24

*Greer v. Spock*,
   424 U.S. 828 (1976) ................................................................................ 23

*Hazelwood Sch. Dist. v. Kuhlmeier,*
  484 U.S. 260 (1988) ............................................................................................ 12, 13, 21

*Int'l Soc. For Krishna Consciousness, Inc. v. Lee,*
  505 U.S. 672 (1992) ........................................................................................................ 23

*Kimsey v. City of Sammamish,*
  No. C21-1264 MJP, 2021 WL 5447913 (W.D. Wash. Nov. 22, 2021) ........................... 24, 25

*Knight First Amendment Institute at Columbia University v. Trump,*
  928 F.3d 226 (2d Cir. 2019) ............................................................................................ 23

*Madsen v. Women's Health Center,*
  512 U.S. 753 (1994) ................................................................................................... 27, 28

*Minnesota Voters Alliance v. Mansky,*
  138 S. Ct. 1876 (2018) .................................................................................................... 33

*Oberwetter v. Hilliard,*
  639 F.3d 545 (D.C. Cir. 2011) ........................................................................................ 23

*One Wis. Now v. Kremer,*
  354 F. Supp. 3d 940 (W.D. Wis. 2019) ........................................................................... 24

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,*
  460 U.S. 37 (1983) ................................................................................................. *passim*

*Pulphus v. Ayers,*
  249 F. Supp. 3d 238 (D.D.C. 2017) ................................................................................ 10

*Ridley v. Mass. Bay Transp. Auth.,*
  390 F.3d 65 (1st Cir. 2004) ...................................................................................... 13, 18

*Stewart v. District of Columbia Armory Board.,*
  863 F.2d 1013 (D.C. Cir. 1988) ...................................................................................... 20

*United States v. Am. Libr. Ass'n, Inc.,*
  539 U.S. 194 (2003) .............................................................................................. *passim*

*United States v. Kokinda,*
  497 U.S. 720 (1990) .............................................................................................. *passim*

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
  576 U.S. 200 (2015) ....................................................................................................... 15

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ....................................................................................................... 28

iii

*White v. Fraternal Order of Police*,
    909 F.2d 512 (D.C. Cir. 1990) ............................................................................................. 10

## INTRODUCTION

This case is about whether government entities can moderate their social media pages to prevent those pages from being overrun with off-topic content. Plaintiffs, People for the Ethical Treatment of Animals and two individuals, contend that the First Amendment gives them—and anyone else—the right to commandeer the National Institutes of Health's social media pages and use them as platforms for speech on any issue they choose, including animal testing. But the First Amendment does not guarantee unfettered speech about any topic on property owned or controlled by the government. On the contrary, agencies may reasonably moderate their social media pages, consistent with their purposes, and prevent users from inundating those pages with extraneous comments better suited for other forums.

The National Institutes of Health ("NIH") created Facebook and Instagram pages (the "Pages") to share public-health information and agency-related news. Those who visit the Pages may view and learn from NIH's posts, and may leave comments on those posts. However, to ensure that comments remain civil and relevant to its posts, NIH—like many other federal and state agencies with social media pages—released guidelines governing the types of comments permitted on the Pages (the "Guidelines"). The Guidelines make clear, at the outset, that the Pages "are not intended to serve as public forums." The Guidelines go on to expressly prohibit off-topic comments, spam and repetitive comments, profanity and threatening language, and commercial endorsements, among other things.

Because NIH lacks the resources to manually review each and every comment to ensure that it complies with the Guidelines, the agency relies on keyword filtering, a tool on both Facebook and Instagram that automatically hides comments containing terms selected by the host of the relevant page. NIH selected filters that are calculated to capture comments that recurrently

1

violate the Guidelines. Those filters include, for example, various profanities, the names of illicit drugs, and certain commercial website addresses. NIH also adopted several filters to address the alarming number of repetitive, off-topic, and often threatening comments regarding animal testing found on the Pages. Those disruptive comments violate the Guidelines, so NIH adopted broad keywords filters such as "animal" and "testing." Importantly, those filters would capture not only comments criticizing animal testing, but also those defending it—*e.g.*, a comment stating that "animal testing saves lives" would be captured by the filters.

Plaintiffs claim that NIH's animal testing filters violate the First Amendment, arguing that the Pages are "designated public forums" and that the filters at issue are thus subject to strict scrutiny. That is mistaken. Binding precedent makes clear that the Pages are nonpublic forums, and thus that the relevant filters need only be viewpoint neutral and reasonable, as they are.

Contrary to Plaintiffs' suggestion, designated public forums are created only when the government makes an *affirmative choice* to open a forum up to discussion on *any* topic. The government's intent to do so must be *clear*. Thus, the government does not create a designated public forum simply by permitting certain types of speech, but not others, in a government-run forum. Both the Supreme Court and D.C. Circuit therefore have found certain government-controlled television broadcasts, newspapers, and sidewalks to be nonpublic forums because, although they permitted some speech, the restrictions in place made clear that the government did not intend for them to be public forums. Under this standard, the Pages are nonpublic forums. NIH's Guidelines not only state that the Pages are not intended to be public forums, but expressly restrict the types of speech allowed on the Pages, and NIH uses keyword filters to consistently hide comments that violate the Guidelines. This confirms that NIH did not intend for the Pages to be open to discussion on just any topic, much less do so clearly. And even if this were a closer call,

2

the Supreme Court has cautioned that courts must err against finding a forum to be public, lest the government have to close the forum altogether, rather than continue to host it as an unrestricted public forum—thus limiting avenues for expression.

Because the Pages are nonpublic forums, the relevant keyword filters need only be viewpoint neutral and reasonable. A restriction discriminates based on viewpoint only if the government intends for it to suppress one viewpoint and elevate another. That is not the case here. To begin with, nothing in the Guidelines purports to bar speech by particular speakers or on particular viewpoints; they are entirely neutral. Likewise, NIH selected keyword filters—including the animal testing filters—with the purpose of targeting comments that violate the Guidelines, regardless of viewpoints expressed therein. Indeed, the animal testing filters—which cover general words like "animal" and "testing"—would apply to both comments that defend animal testing and those that criticize it. And Plaintiffs do not claim that they have been prevented from speaking while others espousing a different viewpoint on animal testing have been allowed to do so—a hallmark of viewpoint discrimination that is absent here.

In arguing otherwise, Plaintiffs claim that NIH's filters target words used more often by those who criticize animal testing than by those who defend it, burdening them more than others. Even if that were true, it would not show that NIH chose filters with the *purpose* of suppressing a particular viewpoint. At most, it would suggest that NIH adopted filters with the purpose of targeting recurring comments that violate the Guidelines, and certain of those filters happen to cover terms used by those who criticize animal testing. If NIH were made aware of other terms found in recurring, impermissible comments *defending* animal testing, NIH may well adopt filters for those terms as well. In any event, there is no sound basis for the assertion that NIH's filters target words used by only one side of the animal testing debate. And it defies common sense: one

3

would expect those defending animal testing to use terms like "animal" and "testing" as well. Put simply, Plaintiffs have failed to show that NIH adopted the filters because it wanted to undermine their viewpoint, and elevate the viewpoint of those who defend animal testing. And their attempted reliance on keywords that NIH previously used, such as "PETA" and "#stoptesting," cannot rescue their claim—those keywords were similarly directed at off-topic content, not a particular viewpoint, and in any event NIH has since deleted them, as Plaintiffs acknowledge.

Finally, the filters at issue are reasonable. They provide a cost-effective means of moderating comments that continually violate the Guidelines. The Pages are flooded with off-topic, repetitive comments on animal testing that disrupt productive dialogue. NIH lacks the resources to manually identify and take action against all comments that violate the Guidelines, and the filters provide a practical alternative. While Plaintiffs complain that the filters are overinclusive and underinclusive, capturing some comments that do not violate the Guidelines, and missing others that do, the Supreme Court has made clear that a restriction need not be perfectly tailored to be reasonable. And there are many other avenues through which Plaintiffs can engage in their preferred speech, including their own Facebook and Instagram pages—which have about 1.5 million and 1.4 million followers, respectively (compared to about 565,000 and 212,000 for NIH's). In light of the circumstances, the filters at issue are a reasonable way to help moderate the Pages in accordance with the Guidelines, and are fully consistent with the First Amendment.

The Court should deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment.

## BACKGROUND

1.      Facebook and Instagram are social media platforms that allow individuals and organizations to create customized pages through which they may "post" content viewable by other

social media users. *See* Stip. ¶¶ 7-8, 11, 22-23, 25. Users may, in turn, leave "comments" on posts that, if allowed by the page hosts, may be seen by other users that access those pages. *See* Stip. ¶¶ 11, 13, 25, 28. Both Facebook and Instagram allow page hosts to exercise significant control over the content on their pages, including over comments left on those pages. *See* Stip. ¶¶ 16, 30; Facebook Help Center, https://www.facebook.com/help/1206330326045914 (accessed April 15, 2022) (a "page" is managed by one or more "[a]dmin[s]" who have "full control" over the "content on the [p]age"); Instagram Help Center, https://help.instagram.com/116024195217477/?helpref=hc_fnav (accessed April 15, 2022) (Instagram users "have control over" the "comment[s] on [their] posts"). Page hosts on both platforms, for example, can manually delete individual comments left on their pages. *See* Facebook Help Center, https://www.facebook.com/help/105443102880679 (accessed April 15, 2022); Instagram Help Center, https://help.instagram.com/289098941190483 (accessed April 15, 2022). Facebook page hosts can also "hide" individual comments so that, although they remain on the page, they are not publicly viewable. *See* Stip. ¶ 17. Additionally, Facebook and Instagram both provide for an automatic keyword filter tool which "permits [page hosts] to automatically hide," from public view, "all comments containing specified words or phrases" selected by the page hosts. Stip. ¶¶ 30; *see also id.* ¶ 16.

Further, Facebook and Instagram themselves also restrict the content allowed on their respective platforms. Both have created rules prohibiting certain content in posts and comments, and they may penalize users who violate those rules by disabling their accounts or deleting the impermissible content. *See* Facebook Community Standards, https://transparency.fb.com/policies/community-standards/?source=https%3A%2F%2Fwww.facebook.com%2Fcommunitystandards (accessed April 15, 2022) (prohibiting certain content on Facebook,

including certain "[m]isinformation" and "[i]nauthentic behavior"); Instagram Community Guidelines, https://help.instagram.com/477434105621119 (accessed April 15, 2022) (prohibiting certain content on Instagram, including certain forms of "misinformation," and noting that violations "may result in deleted content, disabled accounts, or other restrictions").

2.     NIH created social media pages on Facebook and Instagram (the "Pages") "to communicate and interact with citizens about agency-related updates and public health news." Stip. ¶ 36 (internal quotation marks omitted). Through these Pages, NIH frequently makes "posts" containing vital health information, including COVID-19 related information. *See* Stip. ¶¶ 11, 22. However, "to encourage respectful and constructive dialogue," and ensure that comments left on the Pages are "relevant to the specific topic[s]" of NIH's posts, NIH published guidelines (the "Guidelines") governing the types of comments permitted on the Pages. Ex. 19 at 3. The Guidelines make clear that NIH's social media pages "are not intended to serve as public forums." Ex. 19 at 2. They prohibit, among other things, (i) "[o]ff-topic posts," (ii) "[r]epetitive posts" and "[s]pam," (iii) "profane, threatening, or abusive language," and (iv) "[e]ndorsements of commercial products."[1] Ex. 19 at 2. The Guidelines are analogous to—and in some cases, nearly identical to—social media policies adopted by several federal agencies (*e.g.*, the Environmental Protection Agency, Department of Commerce, Department of Labor, Department of Agriculture)

---

[1] Plaintiffs argue that "[i]t is not . . . clear that the NIH's comment guidelines should be understood as a statement of policy with respect to the" Pages. Pls.' MSJ at 26 n.13. Plaintiffs' argument is puzzling given that the parties stipulated that the Guidelines "apply . . . to NIH's Facebook and Instagram pages at issue here." Stip. ¶ 55; *see also id*. ¶ 51 (referencing the exhibit containing the Guidelines, and stating that it represents "NIH's current, operative comment guidelines"). Further, during the relevant time period, those Guidelines were "located on [NIH's] official website," *id*. ¶ 53, bore the title "NIH Comment Guidelines," and were located on a page titled "Social Media & Outreach," Ex. 19.

and several state agencies (*e.g.*, agencies in Alaska, Colorado, Iowa, Minnesota, North Dakota, Oklahoma, Oregon, Washington). *See* Stip. ¶ 51 n.7.

3.      NIH has taken, and continues to take, measures to hide comments on the Pages that violate the Guidelines. NIH has manually identified and hidden certain impermissible comments on the Pages, but because it lacks the resources to manually review each of the thousands of comments on the Pages, *see* Stip. ¶¶ 39, 45, 61, it also uses keyword filters that "are . . . calculated to capture frequently made comments that violate" the Guidelines," *id*. ¶ 59. NIH uses filters for, among other things, "profane and racist terms, names of certain illicit drugs," and "domains of other websites or applications." *Id*. ¶ 59; *see also* Compl. Attachs. 1, 2.

NIH has also adopted filters to address the alarming number of repetitive and off-topic comments on animal testing found on the Pages. Indeed, for many NIH posts that have nothing to do with animal testing, those comments make up the lion's share of the comment thread. For example, below is an NIH Instagram post about a woman and her mother's battle with Alzheimer's that directs readers to caregiving resources:



Ex. 15. Below is an excerpt of the comment thread for this post:



Ex. 15. The full thread contains more comments concerning animal testing. *See id*.

Below are additional examples of users bombarding the Pages' comment threads with extraneous comments on animal testing:

- NIH made an Instagram post displaying a picture of a human retina with the caption, "#immunofluorescence microscopy image of a human retina from Dr. Angela Kruse at Vanderbilt University." Ex. 13. This post received a torrent of comments relating to animal testing such as "Save the Beagles!!!," "#animalcruelty," "#nuremberg2," "MURDERER!!! GO TO HELL!!!," "You should have your head put in those cages," "they should have their vocal cords surgically removed . . . while beagle puppies watch," and "BURN IN HELL." Ex. 13.

- NIH made an Instagram post about a "portable diagnostic device to detect sickle cell disease in newborns." Ex. 17. The comment "#animalabuser" was made dozens of times in the comment thread. Ex. 17. Other comments included "shut down the primate labs!" and "burn in hell."

- NIH made a Facebook post about multiple organizations launching an initiative to research gene therapies for rare diseases. *See* Ex. 18. Virtually every comment in response was about animal testing. These included comments such as "Beagle torturers!" and "Feeding puppies to hungry sand flies? . . . lets try it on you instead." Ex. 18.

These are only a handful of examples of how pervasive—and often threatening—animal testing comments have become on the Pages.[2]

To help address this issue, and re-focus the comment thread discussions on NIH's posts, NIH adopted additional filters such as "animal," "testing," and "experiment." Compl. Attachs. 1, 2. Thus any post containing these terms—even one stating that "animal testing is safe and humane"—would automatically be hidden.

Furthermore, NIH's list of filtered terms is not static. NIH may expand its filter list if it is made aware of other terms used in frequently made, impermissible comments. *See* Stip. ¶ 59.

4.     The Plaintiffs include an organization, People for the Ethical Treatment of Animals ("PETA"), and two individuals who have accounts with Facebook and Instagram through which they post content on animal testing. PETA "has posted about NIH on its own social media pages," Stip. ¶ 71, and the individuals Plaintiffs may likewise do the same, subject only to the restrictions imposed by the social media platforms themselves.

Certain members of PETA, and the two individual Plaintiffs, have also sought to leave comments that include filtered terms on NIH's Pages, and those comments were hidden from public view. Plaintiffs thus brought suit, and now move for summary judgment, claiming that NIH violated the First Amendment by hiding certain of their comments through the use of keyword filters. Plaintiffs argue that the Pages are designated public forums,[3] and that the animal testing filters must, but cannot, satisfy strict scrutiny. Defendants now cross-move for summary judgment.

---

[2] NIH has appended additional examples of NIH posts that have received a flurry of off-topic comments concerning animal testing. *See* Exs. A & B. These exhibits contain a number of comments referring to "NPRCs," which NIH understands to be an acronym for "National Primate Research Centers."

[3] Plaintiffs assert that the relevant "forums" here are the comment threads on NIH's Facebook and Instagram pages. *See* Pls.' MSJ at 23. Assuming the term "comment threads" includes the original NIH posts to which the comments are made in response, NIH does not object to this definition.

## STANDARD OF REVIEW

"[S]ummary judgment must be awarded where (1) there is no genuine issue of material fact and (2) such judgment is required as a matter of law." *White v. Fraternal Order of Police*, 909 F.2d 512, 516 (D.C. Cir. 1990). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006).[4] "To defeat a motion for summary judgment the movant must do more than simply show that there is some metaphysical doubt as to the material facts." *Air Transp. Ass'n of Am. v. Lenkin*, 899 F.2d 1265, 1267 (D.C. Cir. 1990).

## ARGUMENT

The animal testing filters that NIH uses to help moderate the Pages are lawful under the First Amendment. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985). To determine whether a person has a First Amendment right to engage in certain speech on particular government-controlled property, the Court must conduct a "forum analysis." *Id.* at 800. The Court must first "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Id.* at 797. There are "three types of for[ums]: the traditional public forum, the public forum created by government designation, and the nonpublic forum."[5] *Id.* at 802.

---

For purposes of brevity, NIH will use the term "Pages" and the phrase "comment threads on NIH's Facebook and Instagram pages" interchangeably.

[4] Internal quotation marks and citations are omitted through this brief, unless otherwise stated.

[5] Courts sometimes refer to "limited public forums," which are effectively the same as nonpublic forums. *See Pulphus v. Ayers*, 249 F. Supp. 3d 238, 247 (D.D.C. 2017) ("The Supreme Court . . . seems to use the term non-public forum and limited public forum interchangeably"); *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679

"Restrictions on speech in a public forum"—whether a traditional public forum or a designated public forum—are subject to strict scrutiny, but "[r]estrictions on speech in a nonpublic forum . . . are subject to a much less stringent test: they must only be reasonable [in light of the forum's purpose] and not an effort to suppress expression merely because public officials oppose the speaker's view." *Bryant v. Gates*, 532 F.3d 888, 895 (D.C. Cir. 2008). "Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 49 (1983).

Plaintiffs do not argue that the Pages are traditional public forums, and for good reason: a traditional public forum—like a public street or sidewalk—is one that has "*immemorially* been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ.*, 460 U.S. at 45 (1983) (emphasis added). "[T]raditional public forum status" does not "extend[] beyond its historic confines." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 205-06 (2003). The Pages—all of which were created within the last few years—obviously have not "immemorially been" devoted to open public discussion. "Internet access" in general "did not exist until quite recently," and is thus not "a 'traditional' . . . public forum." *Id.*

Plaintiffs' theory here—that the Pages are instead designated public forums—is no more persuasive. A designated public forum is created only when the government makes an affirmative choice to open a forum up to discussion on any topic, and its intent to do so is clear. Here, multiple indicia confirm that NIH did not clearly intend for the Pages to be public forums. The Pages are

---

n.11 (2010) (in "limited public forums," a "governmental entity may impose restrictions on speech that are reasonable and viewpoint-neutral").

thus nonpublic forums, and because the filters at issue are viewpoint neutral and reasonable, they are fully consistent with the First Amendment.

**I.  The comment threads on NIH's Facebook and Instagram Pages are nonpublic forums.**

The Pages do not satisfy the strict conditions necessary to be considered designated public forums. Government-run forums "may be deemed to be [designated] public forums only if" the government "opened those [forums] for indiscriminate use by the general public." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988); *see also Bryant*, 532 F.3d at 895 ("[T]he government may designate . . . a public forum by making it generally available for expressive use."). "To create such a [designated public forum], the government must make an *affirmative choice* to open up its property for use as a public forum." *Am. Libr.*, 539 U.S. at 206 (emphasis added). "[I]n cases in which [the Supreme Court] found public forums to have been created," it found that the evidence "demonstrate[d] the *clear intent* to create a public forum." *Hazelwood*, 484 U.S. at 270 (emphasis added); *see also Bryant*, 532 F.3d at 895 ("The touchstone for determining whether the Government has designated a forum public is its intent in establishing and maintaining that forum."). "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802; *see also Perry*, 460 U.S. at 49 n.9 ("the mere fact that an instrumentality is used for the communication of ideas does not make a public forum").

Further, courts must err against finding that a government-run forum is a designated public forum. A broad application of the designated public forum test—one that renders forums public without a strong showing of government intent—"could have sweeping implications for what speech a government may be compelled to allow once it allows any at all, even forcing a choice between opening non-public forums to almost any private speech or to none." *Archdiocese of*

*Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 325 (D.C. Cir. 2018). This would not only discourage governments from creating new forums for speech, but could also cause governments to shut down pre-existing forums if they were found to be public forums. *See Archdiocese*, 897 F.3d at 337 (Wilkins, J. concurring) ("Without reasonable control over the content of private speech in nonpublic forums, government may elect to close a forum entirely rather than deal with the administrative burden or floodgate consequences of accepting private speech without effective subject-matter restrictions."). Thus, a presumption against finding government-run forums to be public forums "*furthers* First Amendment interests" by "encourag[ing] the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 680 (1998) (emphasis added); *see also Archdiocese*, 897 F.3d at 324 ("Far from undermining First Amendment values, the Court has understood the latitude afforded the government in regulating a non-public forum to promote these values. The non-public forum preserves some speech where there is no constitutional obligation to do so.").

### A. The restrictions NIH has placed on the Pages confirm that it did not intend them to be public forums.

Here, NIH did not make an "affirmative choice" to open the Pages up to public discussion on any topic. NIH indicated that the purpose of the Pages is to share public health and agency-related news with interested citizens. *See supra* at 6. Although the Pages permit certain comments, NIH never stated that the Pages were open "for indiscriminate use by the general public," *Hazelwood*, 484 U.S. at 267, and Plaintiffs do not allege otherwise. In fact, NIH stated the precise opposite: that "website[s] . . . administered by [NIH] where commenting is supported . . . *are not intended to serve as public forums.*" Ex. 19 (the Guidelines); *see also Ridley v. Mass. Bay Transp.*

13

*Auth.*, 390 F.3d 65, 77 (1st Cir. 2004) (the government's "present characterization" of "a forum" cannot be "disregarded" in the public forum analysis).

Additionally, "Government restrictions on . . . content . . . are relevant to ascertaining the Government's intent as to the nature of the forum created." *Cornelius*, 473 U.S. at 799; *see also Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 364 (D.C. Cir. 2018) ("a designated public forum is a nontraditional public space the Government has opened to speech without restriction; a nonpublic forum is a nontraditional public space the Government has opened to speech with restrictions"). Here, NIH imposed stringent restrictions on the types of comments that users may post on the Pages. For example, as noted above, NIH published guidelines that "prohibit[]" various types of comments, including off-topic comments, repetitive comments, comments that endorse commercial products or solicit funds, and comments that contain links to external sites. *See* Ex. 19; *supra* at 6-7. Further, NIH has taken steps to enforce these Guidelines. Although NIH lacks sufficient resources to review each comment on the Pages to ensure that it complies with the Guidelines, the agency has attempted to manually hide impermissible comments where possible.[6] *See supra* at 7. NIH also uses the keyword filtering tool which automatically and consistently hides *all* comments containing filtered terms. *See supra* at 7-9. Thus, as a matter of practice, many types of comments are not permitted to remain on the Pages. This type of "selective access"—allowing certain types comments, but not others—"does not create a public forum." *Cornelius*, 473 U.S. at 804.

---

[6] Although NIH "paused its efforts to manually hide comments" in a manner consistent with its Guidelines once this lawsuit was filed, it "intends to resume manual comment moderation following a resolution of the parties' summary judgment motion, if consistent with the Court's order resolving those motions." Stip. ¶ 61.

Relatedly, NIH reserves the right "to manually review any and all comments before and after they are posted to the" Pages. Stip. ¶ 61. It thus retains final authority over whether any particular comment can remain on the Pages, which itself is evidence that the Pages are not public forums. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 216 (2015) (the "exercise[]" of "final authority over" speech "militates against a determination that" the government intended to "create[] a public forum"). Thus, the restrictions imposed on the Pages confirm that NIH did not intend for them to be public forums.

This case is similar to *Bryant v. Gates*, where the D.C. Circuit found that a section of a Department of Defense ("DOD") newspaper—one that allowed for submissions from citizens— was not a public forum. 532 F.3d 888 (D.C. Cir. 2008). There, the DOD, using an independent publisher, printed a newspaper for DOD personnel that included "DOD news and features," and also allowed for submissions from citizens, but only with "the approval of the DOD." *Id.* at 891-92. The plaintiff submitted, for publication in the "advertisement" section of the newspaper, a number of comments critical of U.S. military policy, including its conduct during the Iraq War. *Id.* at 892. The DOD, however, "declined to publish" those comments, noting that they violated DOD's rule that its "publications . . . shall not contain," among other things, "advertisements . . . which advocate a particular position on a political issue" or "on any proposed DOD policy." *Id.* at 892. The plaintiff brought suit, arguing that the advertisement section of the DOD's newspaper was a public forum, and that the DOD's decision not to publish his criticisms of U.S. military policy in that forum violated his First Amendment rights.

Even though the DOD's newspaper invited interested citizens to submit comments for publication, the D.C. Circuit found it "clear" that "the relevant forum" was "nonpublic." *Id.* at 896. The court noted that the DOD's newspaper was "intended" to serve "as a 'conduit' for the flow of

information" to "service members," and that there was no indication that the DOD "intended to open the forum for general expressive use" or for comments "like [the plaintiff's]." *Id.* at 896-97. The court also stressed that the DOD had a policy of "exclud[ing] such [comments]" from its newspaper, undermining any inference that any part of the newspaper was intended to serve as a public forum. *Id.* The court thus found that the relevant forum was nonpublic, and that any restrictions thereon were therefore subject only to the deferential "reasonableness" standard. *See id.* at 897. The same reasoning applies here: (i) NIH, like the DOD, set up forums (Pages) to principally serve as a "conduit for the flow of" agency-related and public health news to interested parties, and there is no indication that NIH "intended to open [those pages] for general expressive use," and (ii) NIH has a "policy and practice" of "exclud[ing]" comments over impermissible topics, thus undermining any inference that the Pages were intended to serve as public forums.

*Archdiocese of Washington v. Washington Metropolitan Area Transit Authority* ("*WMATA*") is similarly instructive. 897 F.3d 314 (D.C. Cir. 2018). There, the government *had* created a designated public forum, but then converted it into a nonpublic forum by simply imposing a subject-matter restriction on it. *Id.* at 319. Specifically, to raise funds, WMATA sold "commercial advertising space" on its transit units, and "[u]ntil 2015," it "had accepted most issue-oriented advertisements, including political, religious, and advocacy ads." *Id.* at 318-19. Incidentally, this even included "ads by [PETA] with graphic images of animal cruelty." *Id.* at 319. WMATA, however, "reconsider[ed] its approach as a result of near-monthly complaints . . . about its advertisements." *Id.* Thus, in 2015, WMATA "decided to narrow the subjects that it would accept in WMATA advertising space," and concluded that it would no longer display "issue-oriented ads, including political, religious and advocacy ads." *Id.* at 319-20. The plaintiff wished to "purchase space" for a religious ad on WMATA buses, and thus brought suit claiming, among

other things, that WMATA had to accept its religious ad because "WMATA's advertising space" was a designated public forum. *Id.* at 321-23. The D.C. Circuit rejected this theory, noting that although WMATA previously "treated its advertising space as an open forum," it then chose to disallow ads over "certain subjects," thus "plainly evinc[ing] its intent" to "convert[] [its advertising space] into a non-public forum." *Id.* at 323. If WMATA's subject-matter restriction—which, again, excluded PETA's animal rights advocacy—was sufficient to render its advertisement space a nonpublic forum, then the restrictions on the Pages here are sufficient to render those nonpublic forums as well.

Further, other courts have found that analogous social media pages of other government units are not public forums. For example, in *Davison v. Plowman*, the plaintiff asserted a First Amendment claim against a County Attorney who deleted, from his official Facebook page, a comment the plaintiff posted about alleged perjury by a government official. 247 F. Supp. 3d 767, 771-75 (E.D. Va. 2017), *aff'd*, 715 F. App'x 298 (4th Cir. 2018). The court rejected this claim, in part, because the page was not an unrestricted public forum. The court noted that the County Attorney, like NIH, (i) set up a Facebook page for "[t]he purpose" of "present[ing] matters of public interest," and (ii) also "reserv[ed]" the "right to remove comments" that violated its rules, including comments "deemed clearly off topic." *Id.* at 776. Similarly, in *Charudattan v. Darnell*, the Eleventh Circuit concluded that a Sheriff's official Facebook page was not an unrestricted public forum because he had a "policy preclud[ing] [certain types of] comments," including those "that are clearly off the intended topic of discussion." 834 F. App'x 477, 480 (11th Cir. 2020).

The Pages therefore are nonpublic forums. NIH has made no "affirmative choice" to open the Pages to discussion on any topic whatsoever, and indeed, has done the precise opposite. But even if this were a closer call, once more, courts must err against finding government-run forums

17

to be public, lest government defendants "elect to close [their] forum[s] entirely rather than deal with the administrative burden or floodgate consequences of accepting private speech without effective subject-matter restrictions." *Archdiocese*, 897 F.3d at 337 (Wilkins, J. concurring). Indeed, if the Pages here were found to be public forums, NIH would have to decide whether it would be worthwhile to continue operating them without restrictions that would limit the cascade of off-topic, repetitive comments. NIH might ultimately do as Plaintiffs suggest: "disable[] the comments features" and "use its social media accounts as one-way channels for its own message," Pls.' MSJ at 25, at the expense of the on-topic speech that the Pages currently facilitate.

### B. Plaintiffs fail to show that NIH clearly intended the Pages to be public forums.

Plaintiffs' arguments that the Pages are designated public forums are at odds with relevant precedent, and otherwise fail to show that NIH *clearly intended* for the Pages to be open to discussion on any topic.

1.      Plaintiffs first argue that the restrictions placed on the Pages do not suggest that the Pages are nonpublic because NIH does not take action against all off-topic posts. *See* Pls.' MSJ at 34-35. But imperfect enforcement of the Guidelines does not transform the Pages into public forums, particularly given the resource constraints that prevent NIH from reviewing *all* comments. The review and enforcement activities that NIH *is* able to conduct are more than sufficient to show that NIH did not intend for the Pages to be public forums open to any and all speech. Again, NIH's keyword filters consistently hide several categories of impermissible comments. And NIH has engaged, and intends to again engage, in manual comment moderation efforts to the extent resources permit. *See* Stip. ¶ 61. These consistent practices demonstrate that NIH did not make an "affirmative choice to open up" the Pages "for use as . . . public forum[s]." *Am. Libr.*, 539 U.S. at 206; *see also Ridley*, 390 F.3d at 78 (even "erratic enforcement of a policy does not itself defeat

18

the government's intent not to create a public forum," so a showing of "imperfect[]" enforcement does "not . . . create a designated public forum").

*American Library* is instructive. There, the Supreme Court considered a federal statute requiring certain public libraries to install, on their public computers, internet filters that block certain pornographic websites. *See Am. Libr.*, 539 U.S. at 201. The district court had invalidated the law based, in part, on its conclusion that internet access on a public library computer was a "designated public forum." *Id.* at 202. It reasoned that "a library . . . does not review every Web site that it makes available," and so libraries must have "less discretion in deciding which Internet materials to make available." *Id.* at 207-08. The Supreme Court disagreed, noting that "[a] library's failure to make judgments about all material it furnishes from the Web does not somehow taint the judgments it does make." *Id.* at 208. The Court thus found that the relevant forum was nonpublic and the law at issue was not subject to "heightened scrutiny." *Id.* Here, as in *American Library*, NIH's "failure to" review "all the material" on the Pages and hide all impermissible comments does not tarnish the significance of the enforcement actions "it does [t]ake."

Additionally, concluding that a forum is necessarily public where, as here, an agency lacks the resources to more aggressively police impermissible comments would have perverse consequences. Given the ease by which parties may post comments on social media sites, it is unlikely that any agency could review and clear all comments on its social media pages. If those pages, as a result, were considered public forums and thus subject to no content limitations, agencies may disable the comment function on their pages altogether. *See supra* at 12-13. Accordingly, the enforcement actions NIH has taken on the Pages confirm that NIH intended for them to be nonpublic, regardless of whether NIH is able to take action against all impermissible comments.

Plaintiffs suggest that *Stewart v. District of Columbia Armory Board* stands for the proposition that content restrictions on a forum do not show that the forum is nonpublic, *see* Pls.' MSJ at 35-36 (citing 863 F.2d 1013 (D.C. Cir. 1988)). Plaintiffs are wrong. In fact, a critical issue in *Stewart* was that it was unclear whether (and to what extent) there was a content restriction on the forum. The plaintiffs there brought a First Amendment claim because they were stopped from hanging religious banners in a government-owned football stadium. *See id.* at 1014-15. The D.C. Circuit held that the district court could not resolve, on the pleadings, whether the stadium was a public forum, in part "because of conceded uncertainty about the" stadium's "banner policies." *Id.* at 1020; *see id.* 331-32 (noting that it was unclear whether there was an actual banner policy during the relevant time period, and that "[t]he dimensions of" any "policy are further complicated" because of conflicting accounts of what the policy may have been). The Court thus held that a developed "factual record" was necessary. *Id.* at 1018. Here, by contrast, NIH's position relies on undisputed restrictions on the Pages—the Guidelines and the keyword filters that help implement them.

Plaintiffs rely on a passage in *Stewart* stating that "the very fact that the government has restricted speech *in the manner challenged* in a forum case does not of its own weight demonstrate that the government did not intend to designate a public forum." *Id.* at 1017 (emphasis added). But the court was merely stating that the discrete act of preventing the plaintiff from speaking in the forum—the conduct "challenged" in the case—does not, in itself, constitute a "restriction" that shows the forum is nonpublic. Rather, there must have been a general, pre-existing restriction on content in the forum. *See id.* at 1021 ("Resolving the dimensions of the policy, *as a general matter and not merely as applied to these [plaintiffs]*, is crucial to the threshold question of whether or not [the stadium] is a public forum." (emphasis added)); *id.* at 1020 ("What has been . . .

represented as 'policy' cannot be simply *ex post* justification for the [government's] decision selectively to exclude [the plaintiff's speech].""). This is consistent with Supreme Court and subsequent D.C. Circuit precedent. *See supra* at 14-17. Here, of course, Plaintiffs' comments were not hidden on an *ad hoc* basis, but pursuant to general, pre-existing restrictions. Those restrictions confirm that NIH did not intend to open the Pages to "indiscriminate use by the general public." *Hazelwood*, 484 U.S. at 267.

2.      Plaintiffs other attempts to show that the Pages are designated public forums largely relying on reasoning that the Supreme Court and D.C. Circuit have already rejected. For example, Plaintiffs argue that the Pages are "compatible" with expressive activity. Pls.' MSJ at 23-24. But "the mere fact that an instrumentality" can be "used for the communication of ideas does not make a public forum." *Perry*, 460 U.S. at 49 n.9. Rather, the government must make an "affirmative choice" to open the forum to "*indiscriminate use*." *Supra* at 12. Thus, the Supreme Court and D.C. Circuit have repeatedly found forums to be nonpublic even though they are clearly compatible with expressive activity: the public television broadcast in *Arkansas*, 523 U.S. at 681; the public sidewalk in *United States v. Kokinda*, 497 U.S. 720, 730 (1990); the mail system in *Perry*, 460 U.S. at 48; the school newspaper in *Hazelwood*, 484 U.S. at 270; and the military newspaper in *Bryant*, 532 F.3d at 897, to name a few.

True, in *Cornelius*, the Supreme Court noted that the forum analysis "may . . . examine[] the nature of the property and its compatibility with expressive activity." 473 U.S. at 802. But it was making a narrower point: if a forum's purpose is incompatible with expression, that is strong evidence that the forum is nonpublic. *See id.* at 803 (the Court will not find "that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity"). But the Supreme Court never stated the inverse: that if a forum *is* compatible with

expression, that is strong evidence the forum is necessarily *public*. Indeed, the latter point cannot be true given that a nonpublic forum, by definition, is one that permits—and is thus compatible with—certain expressive activity. *See*, *e.g.*, *id.* at 806 (a "nonpublic forum" may allow for certain speech "based on subject matter"); *Perry*, 460 U.S. at 49 (a "nonpublic forum is" one that allows certain speech "on the basis of subject matter"); *Am. Freedom,* 901 F.3d at 364 ("a nonpublic forum is a nontraditional public space the Government has opened to speech with restrictions").

Plaintiffs' related argument that the Pages are not only compatible with expressive activity, but actually do contain discussions over a number of topics, *see* Pls.' MSJ at 25-26, is no more persuasive. That "expressive activity" occurs "in the context of the forum created does not imply that the forum thereby becomes a public forum for First Amendment purposes." *Cornelius*, at 805; *Perry*, 460 U.S. at 47 ("selective access" for some expressive activity "does not transform government property into a public forum"); *Kokinda*, 497 U.S. at 730 ("a practice of allowing some speech activities on" government property does "not add up to the dedication of" that "property to speech activities"). Where, as here, "the government permits only *selective access*" for certain expressive activities, "then it creates a nonpublic forum." *Bryant*, 532 F.3d at 895 (emphasis added); *Perry*, 460 U.S. at 47 (finding that a forum is nonpublic since "[t]here is no . . . evidence . . . which demonstrates that . . . permission has been granted as a matter of course to all who seek to" communicate in the forum). And again, the Supreme Court has repeatedly found forums to be nonpublic even though those forums were being used for expressive activity; *e.g.*, people communicated over certain topics on the public television broadcast in *Arkansas* and the government newspaper in *Bryant*, *see supra* at 21.

Plaintiffs also argue that the Pages are open to the public, and anyone with the requisite social media account can visit, and leave a comment on, those pages. *See* Pls.' MSJ at 24-25. But

"a public forum" is not "created whenever members of the public are permitted freely to visit a place owned or operated by the Government." *Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680 (1992); *see also Greer v. Spock*, 424 U.S. 828, 836 (1976) (rejecting argument that "whenever members of the public are permitted freely to visit a place owned or operated by the Government, then that place becomes a 'public forum' for purposes of the First Amendment."); *Oberwetter v. Hilliard*, 639 F.3d 545, 553 (D.C. Cir. 2011) ("That [a memorial] is open to the public does not alter its status as a nonpublic forum"). And as explained above, although any user is allowed to leave a permissible comment on the Pages, the restrictions placed on those comments by NIH confirm that the Pages are nonpublic. *See supra* at 14-17.

3.      Equally misplaced is Plaintiffs' argument that various other courts have "concluded that the interactive components of government-run social media accounts are public forums." Pls.' MSJ at 27. None of the cases Plaintiffs cite indicates that government social media accounts are always public forums, regardless of the circumstances. Further, those cases are either readily distinguishable or unpersuasive. For starters, many of them dealt with social media pages that, unlike the Pages here, were subject to no real restrictions. For example, Plaintiffs lead with a citation to *Knight First Amendment Institute at Columbia University v. Trump*, where the Second Circuit found that former President Trump's Twitter account was a public forum, reasoning that "[o]pening an instrumentality . . . for *indiscriminate use* by the general public creates a public forum" and that the "interactive features" of President Trump's Twitter account were "accessible to the public *without limitation*." 928 F.3d 226, 237 (2d Cir. 2019) (emphasis added).

Plaintiffs also cite to *Davison v. Randall*, where the Fourth Circuit found that a county official's Facebook page was a public forum for similar reasons. 912 F.3d 666, 682 (4th Cir. 2019), *as amended* (Jan. 9, 2019). There, the county official expressly stated that "'ANY . . . citizen'"

could "make posts to the comments section of" her Facebook page "'*on ANY issues*.'" *Id.* at 682 (emphasis added); *see also id.* at 673. The county official "placed *no restrictions* on the public's access to the page or use of the interactive component of the" page. *Id.* at 682 (emphasis added). The same was true in other cases cited by Plaintiffs. *See Garnier v. Poway Unified Sch. Dist.*, No. 17-CV-2215-W (JLB), 2019 WL 4736208, at *8 (S.D. Cal. Sept. 26, 2019) (the officials did "not argue that they set *any general limitations* on who could follow or comment on their pages, nor on the language the public could use when commenting. Thus, [the officials] opened their pages for *indiscriminate use* by the general public" (emphasis added)); *One Wis. Now v. Kremer*, 354 F. Supp. 3d 940, 954 (W.D. Wis. 2019) (The officials had "not taken *any steps* to limit access to their accounts to their constituents, nor ha[d] they limited access by the general public, save perhaps for a few individuals" (emphasis added)). Here, of course, NIH did not "open[]" the Pages "for *indiscriminate use* by the general public," nor can Plaintiffs say that NIH "placed *no restrictions* on the public's access to the" Pages.

The remaining cases cited by Plaintiffs are unpersuasive. In *Faison v. Jones*, for example, the court conducted only a cursory analysis, and largely relied on *Knight* and *Davison*—both of which, again, relied on the lack of *any* restriction on the relevant social media pages. 440 F. Supp. 3d 1123, 1135 (E.D. Cal. 2020). In *Kimsey v. City of Sammamish*, the court relied on several arguments that do not withstand scrutiny. No. C21-1264 MJP, 2021 WL 5447913 (W.D. Wash. Nov. 22, 2021). The court, for example, stated that "while there [were] rules for comments" on the relevant Facebook page that were enforced "after they have been made," those comments did not require "prior approval." *Id.* at *4. But it is unclear why this distinction—between "prior approval" and *post hoc* enforcement—matters. The ultimate inquiry goes to an agency's *intent*, and a restriction on content that is enforced after a comment is made suggests, just as much as a prior

24

restraint, that an agency did not intend to open its forum for indiscriminate public use. *Cf. Kokinda*, 497 U.S. at 723-30 (a regulation on disruptive activity showed that "[t]he Postal Service ha[d] not expressly dedicated its sidewalks to any expressive activity" even though the regulation was enforced only after plaintiffs spoke on a postal sidewalk for "several hours"). Regardless, here, the keyword filters preclude certain comments from appearing publicly at the outset; they do not apply only "after [a comment] ha[s] been made." *See* Stip. ¶ 30 (a comment containing a filtered term is "automatically . . . hidden from public view as soon as it is posted"). The *Kimsey* court also stated, like Plaintiffs here, that the defendant did not take action against each and every "off topic" post, that Facebook is compatible with expressive activity, and that the defendant allowed certain types of comments on its posts. *See Kimsey*, 2021 WL 5447913, at *4. But as explained above, none of those arguments demonstrates that a government entity intended to open its forum to public discussion on any and every topic. *See supra* at 18-23. Thus, none of the cases Plaintiffs rely upon help their cause.

Accordingly, the Pages are not public forums. The filters that Plaintiffs challenge therefore need only be viewpoint neutral and reasonable.

**II. The relevant keyword filters are both viewpoint neutral and reasonable.**

    *A. The relevant keyword filters do not discriminate based on viewpoint.*

NIH's moderation of comments on the Pages—including its use of keyword filters—is viewpoint neutral. The Guidelines do not purport to bar speech by particular speakers or on particular viewpoints. Likewise, NIH adopted keyword filters—including the animal testing filters at issue here—for the purpose of limiting recurring comments that violate the Guidelines, regardless of the viewpoints expressed therein. Indeed, the animal testing filters apply equally to comments against animal testing and in favor of it.  And Plaintiffs make no claim that their speech

has been restricted while others who favor animal testing have been permitted to speak—an indication of viewpoint discrimination that is entirely missing here.

To establish viewpoint discrimination, Plaintiffs must show that NIH "is impermissibly suppressing [their] viewpoint on an otherwise permitted subject." *Archdiocese*, 897 F.3d at 319. Their assertion of "discriminatory treatment" cannot be "based on hypothesis." *Id*. To meet this burden, Plaintiffs, must show that NIH "*intended* to discourage one viewpoint and advance another." *Perry*, 460 U.S. at 49; *see also Cornelius*, 473 U.S. at 806 ("the government" cannot "den[y] access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject").

Plaintiffs fall well short of this burden. NIH adopted all of its keyword filters—including the animal testing filters—with the intent of targeting comments that recurrently violate the Guidelines. *See* Stip. ¶¶ 58-59. NIH is indifferent to the viewpoints those comments express. Indeed, the animal testing filters—which cover general terms like "animal" and "testing"—apply to comments that both defend and criticize animal testing. Thus, a comment claiming that "animal testing is both safe and ethical" would be hidden under the keyword filters. Indeed, a principal benefit of automatic keyword filters is that they are necessarily agnostic to the viewpoint in any comment; if it contains the filtered word, it is hidden.

In an attempt to show that the filters discriminate based on viewpoint, Plaintiffs lean heavily on keywords that NIH previously used, such as "PETA" and "#stoptesting," claiming that these former filters targeted their views in particular. *See* Pls.' MSJ at 29. But NIH has deleted those filters, as Plaintiffs acknowledge, and it is unclear how they demonstrate that the *current* filters discriminate based on viewpoint. Regardless, although a former filter, like "#stoptesting," may have signaled a certain viewpoint, that does not mean the filter was adopted *because of* that

viewpoint. To the contrary, it means only that, in addition to its broad filters, like "testing"—which would not be triggered by a variant like "#stoptesting"—NIH also crafted certain more specific filters for other terms commonly found in comments that violate the Guidelines, and those terms happened to be used by those criticizing animal testing. If NIH became aware of certain terms commonly used in comments *defending* animal testing, it might craft specific filters for those as well. Thus, NIH did not adopt filters for words used by those criticizing animal testing "merely because [NIH] oppose[d] [their] view." *Perry*, 460 U.S. at 46.

*Madsen v. Women's Health Center* illustrates the point. 512 U.S. 753 (1994). There, a state court enjoined certain anti-abortion protestors from "blocking or interfering with public access to" an abortion clinic. *Id.* at 758. The protestors then "continued to impede access to the clinic by congregating" and engage in other disruptive speech activities, and so the state court broadened its injunction to apply to those activities as well. *Id.* The protestors argued that the injunction amounted to viewpoint discrimination "because it . . . restrict[ed] only the speech of antiabortion protesters." *Id.* at 762. The Supreme Court rejected this argument, explaining:

> [T]he state court imposed restrictions on [the protestors] incidental to their antiabortion message because they repeatedly violated the court's original order. That petitioners all share the same viewpoint regarding abortion does not in itself demonstrate that some invidious . . . viewpoint-based purpose motivated the issuance of the order. It suggests only that those in the group whose *conduct* violated the court's order happen to share the same opinion regarding abortions being performed at the clinic. In short, the fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based.

*Id.* at 763 (emphasis in original). The Supreme Court also noted that "[t]he fact that the injunction . . . did not prohibit activities of those demonstrating in favor of abortion is justly attributable to the lack of any similar demonstrations by those in favor of abortion." *Id.* at 762. Here, similarly, to the extent that NIH's prior filters reflected certain viewpoints, like "#stoptesting," it was because

they applied to comments that "repeatedly violated" the Guidelines, not because NIH objected to the viewpoint those comments expressed. *Id.* at 763. If NIH thus far has not adopted filters for comparable terms used by those defending animal testing, that would be "justly attributable to the lack of any similar" recurring comments from those espousing such views.

Plaintiffs also assert that NIH's current filters cover words more likely to be used by those criticizing animal testing than by those defending it, including general words such as "animal," "testing," and "torture," and the specific words "Suomi" and "Harlow" (referring to individual scientists). Pls.' MSJ at 29. As an initial matter, even assuming these words are, in practice, used more by those who criticize animal testing, a "[restriction] that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see also Perry*, 460 U.S. at 49 (a restriction discriminates based on viewpoint only if it has the *purpose* of "discourag[ing] one viewpoint and advanc[ing] another"). As explained above, NIH strives to target terms commonly found in impermissible comments, regardless of the viewpoints expressed therein. *See supra* at 25-26.

Further, it is unclear whether the terms flagged by Plaintiffs are truly unique to those who criticize animal testing. Plaintiffs cite to no concrete evidence indicating that general terms such as "animal" and "testing" are mostly associated with those who criticize animal testing. *See Archdiocese*, 897 F.3d at 319 (a "claim of discriminatory treatment" cannot be "based on hypothesis"). Plaintiffs simply refer to examples where those criticizing animal testing used those terms, *see* Pls.' MSJ at 29-30, but that says nothing of those who defend animal testing. They too may use general words such as "animal," "testing," and even "torture" (*e.g.*, in a comment stating that "animal testing is not torture"). Likewise, those who wish to argue that the research methods

of Dr. Suomi and Dr. Harlow are safe and humane may understandably use the terms "Suomi" and "Harlow." Thus, Plaintiffs cannot show that NIH's filters apply more to those with their viewpoint, much less that the filters were adopted with the *purpose* of suppressing their viewpoint.

Plaintiffs then argue that NIH does not filter other animal-related terms. *See* Pls.' MSJ at 30. But they do not explain how this shows that the general filters NIH *does* use amount to viewpoint discrimination. Further, there is no indication that any of those other animal-related terms are found in frequently-made comments that violate the Guidelines. If Plaintiffs, or other parties, show that they are, NIH may filter those terms as well.

Plaintiffs finally argue that NIH's filters cannot be seen as an attempt to enforce the Guidelines since they are allegedly overinclusive and underinclusive. *See* Pls.' MSJ at 31-32. As explained in more detail below, *infra* at 32-33, these claims are overstated. Regardless, although keyword filters may be imperfect, that does not mean NIH adopted them with the purpose of suppressing Plaintiffs' viewpoint. It means only that NIH uses a cost-effective, though imperfect, tool for addressing recurring comments that violate the Guidelines. Plaintiffs cannot dispute that off-topic animal testing comments are rampant on the Pages. *See supra* at 7-9. Indeed, they identify no other category of off-topic comments that is more prolific. Given that NIH cannot manually locate and take action against all animal testing comments that violate the Guidelines, it is unsurprising that the agency would resort to an automated means of addressing them. *See infra* at 30-31.

Plaintiffs thus fail to show that there is a genuine issue of fact over whether the broad animal testing filters were created with the purpose of suppressing their viewpoint. Ultimately, Plaintiffs' concern is not that they are being targeted based on their viewpoint, but rather that they want to comment about animal testing in response to any post on the Pages, and the viewpoint-

neutral filters prevent them from doing that. That is an insufficient basis for finding NIH's keyword filters unlawful.

### B.   The relevant keyword filters are reasonable.

"[A] nonpublic forum by definition is not dedicated to general debate or the free exchange of ideas." *Cornelius*, 473 U.S. at 811. The government "may reserve [a nonpublic forum] for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable." *Perry*, 460 U.S. at 46. Thus, "[i]mplicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter." *Id.* at 49. "These distinctions . . . are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property." *Id.* "The reasonability inquiry is not a demanding one, but rather is a forgiving test." *Archdiocese*, 897 F.3d at 331-32. An explanation for a restriction that "rings of 'common-sense' . . . is sufficient . . . to uphold [the restriction] under the reasonableness review." *Kokinda*, 497 U.S. at 734-35.

Here, Plaintiffs do not appear to dispute that the Guidelines are reasonable, including the proscriptions on off-topic posts, repetitive posts, and spam. They argue only that the keyword filters relating to animal testing are unreasonable. Those keyword filters, however, are a necessary and cost-effective way of targeting repeated, off-topic comments on animal testing. As described above, users repeatedly flood the Pages' comment threads with off-topic, redundant, and often abusive comments concerning animal testing. *See supra* at 7-9. These comments are disruptive, and may discourage interested citizens from viewing those Pages. *See* Stip. ¶ 87; *Plowman*, 247 F. Supp. 3d at 778 (the "failure to effectively moderate a public discussion may be as deleterious to dialogue in such a forum as censorship" and allows a "speaker . . . [to] try[] to hijack the" forum).

Due to resource limitations, however, NIH cannot manually review each individual comment and take action against all those that violate the Guidelines. NIH thus relies on filters, which provide an efficient, though imperfect, way of targeting impermissible comments. *See* Stip. ¶ 61. The Supreme Court's decision in *American Library*—holding that pornography filters on public library computers are lawful under the First Amendment—is again informative. There, the Court stated that "because of the vast quantity of material on the Internet and the rapid pace at which it changes, libraries cannot possibly segregate, item by item, all the Internet material that is appropriate for inclusion from all that is not" and so it was "entirely reasonable for public libraries to" use internet filters to "exclude certain categories of content, without making individualized judgments that everything they do make available has requisite and appropriate quality." *Am. Libr.*, 539 U.S. at 208. The Court further noted that the filters were reasonable despite the "tendency of filtering software to 'overblock'—that is, to erroneously block access to . . . speech that falls outside the categories that software users intend to block."[7] *Id.* at 208. Here, similar to *American Library*, the automatic keyword filters are reasonable in light of the circumstances.

Furthermore, the restrictions at issue here are especially reasonable given the alternative avenues available for Plaintiffs to spread their messages on animal testing. *See Perry*, 460 U.S. at 53 ("the reasonableness of [a] limitation[] . . . is . . . supported by the substantial alternative channels that remain open for [speaker's] communication to take place"). Plaintiffs, for example, can use their own Facebook or Instagram pages, or they can even create social media pages dedicated to discussion over NIH and the ethics of animal testing. Although Plaintiffs may believe

---

[7] The Court noted that concerns relating to "overblock[ing]" were especially minimal because "libraries have the capacity to permanently unblock any erroneously blocked site . . . at the request of a patron." *Am. Libr.*, 539 U.S. at 209. Here, similarly, nothing stops a user from requesting that NIH unhide a particular comment on the grounds that it does not violate the Guidelines.

that commenting on the Pages allows them to access a distinct audience, *see* Pls.' MSJ at 13, the "First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." *Cornelius*, 473 U.S. at 809. Accordingly, NIH's animal testing filters satisfy the "forgiving test" for reasonableness. *Archdiocese*, 897 F.3d at 331-32.

In contending otherwise, Plaintiffs argue that the filters are overinclusive (hiding certain comments that do not violate the Guidelines) and underinclusive (failing to hide all comments that violate the Guidelines). *See* Pls.' MSJ at 40. But "there is no requirement that regulations limiting access to a nonpublic forum must be precisely tailored." *Cornelius*, 473 U.S. at 812; *Kokinda*, 497 U.S. at 735–36 (for a nonpublic forum, "[e]ven if more narrowly tailored regulations could be promulgated, however, the [government] is only required to adopt reasonable regulations, not the most reasonable or the only reasonable regulation possible"). Regardless, Plaintiffs' concerns are overstated. For one thing, Plaintiffs do not dispute that a significant number of animal testing comments on the Pages are off-topic. In fact, they cite to only two examples of animal testing comments that they believe are "on-topic." *See* Pls.' MSJ at 31-32. Plaintiffs thus fail to show that the filters are meaningfully overbroad. For another, it is immaterial, and expected, that the animal testing filters will not capture every comment that violates the Guidelines. NIH uses other filters, unrelated to animal testing, to capture other types of recurring comments that violate the Guidelines, and NIH may later add more filters if warranted. *See supra* at 7-9. Although those filters may not capture every comment that violates the Guidelines—a tall order—that does not undermine their reasonableness. *Cf. Kokinda*, 497 U.S. at 733 ("Whether or not the [government] permits other forms of speech, which may or may not be disruptive, it is not unreasonable to

prohibit [the speech at issue here] on the ground that it is unquestionably a particular form of speech that is disruptive.").

This case bears little resemblance to *Minnesota Voters Alliance v. Mansky*, which Plaintiffs invoke to support their argument that the filters here are insufficiently tailored. *See* Pls.' MSJ at 40 (citing 138 S. Ct. 1876 (2018)). There, the Court was reviewing a state law that banned "political apparel" in voting booths. *Id.* at 1883. It found the law to be unreasonable, not because the law was enforced in a manner that was overinclusive and underinclusive, but because the law failed to define "political" and was therefore impermissibly vague. *Id.* at 1888 (the law "does not define the term 'political,'" and so it is difficult to "distinguish[]" what is permitted from what is prohibited); *id.* at 1891 (the law imposed an "indeterminate prohibition"). The Court made clear, however, that it was *not* suggesting that "there is" a "requirement of narrow tailoring in a nonpublic forum." *Id.* at 1888. Here, unlike in *Mansky*, there is no allegation that the Guidelines are impermissibly vague. Indeed, the restrictions in the Guidelines—*e.g.*, the prohibition on off-topic comments—are comparable to those found in the comment guidelines of many other federal and state agencies. *See* Stip. ¶ 51 n.7.

Accordingly, NIH's animal testing filters satisfy the lenient reasonableness standard, and are therefore lawful under the First Amendment.

<u>CONCLUSION</u>

The Pages are nonpublic forums, and the animal testing filters are viewpoint neutral and reasonable restrictions that are fully consistent with the First Amendment. The Court should deny Plaintiffs' Motion for Summary Judgment and grant the Defendants' Cross-Motion for Summary Judgment.

Dated:  May 6, 2022                    Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Principal Deputy Assistant Attorney General

                                       ERIC BECKENHAUER
                                       Assistant Director, Federal Programs Branch

                                       */s/ Kuntal Cholera*

                                       KUNTAL CHOLERA
                                       Trial Attorney
                                       U.S. Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L. Street, NW
                                       Washington D.C. 20005
                                       Kuntal.Cholera@usdoj.gov

                                       *Attorneys for Defendants*