**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, MADELINE
KRASNO, and RYAN HARTKOPF,

          Plaintiffs,

   v.

LAWRENCE A. TABAK, in his official
capacity as Acting Director of the National
Institutes of Health, and XAVIER
BECERRA, in his official capacity as
Secretary of the U.S. Department of Health
and Human Services,

          Defendants.

Civil Action No. 21-2380 (BAH)

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT AND REPLY MEMORANDUM IN
FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT**

## Table of Contents

Table of Authorities ................................................................................................. ii

Introduction ........................................................................................................... 1

Argument ............................................................................................................... 3

    I.      The NIH's keyword blocking unconstitutionally discriminates on the basis of viewpoint ...................................................................................................... 3

    II.    The NIH's keyword blocking is also an unconstitutional content-based restriction in open designated public forums. ................................................. 8

          A.    The NIH's arguments that the Court should adopt a presumption against finding a designated public forum, and should not consider the inherent compatibility of social media accounts with expression, are at odds with settled law .......................................................................... 10

          B.    Objective analysis of the NIH's consistent policy and practice demonstrates that it has created open designated public forums. .................. 13

    III.   Even if the Court concludes that the comment threads are nonpublic or limited public forums, the NIH's keyword blocking is still unconstitutional. ......................... 19

Conclusion ............................................................................................................. 23

## Table of Authorities

**Cases**

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314 (D.C. Cir. 2018) ................................................................................................ passim

*Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998) ...................................... 10, 12, 14

*Blackwell v. City of Inkster*, No. 21-cv-10628-TGB-EAS, 2022 WL 989212 (E.D. Mich. Mar. 31, 2022) ........................................................................................ 15

*Brown v. Entm't Merchants Ass'n*, 564 U.S. 786 (2011) ........................................................ 7

*Bryant v. Gates*, 532 F.3d 888 (D.C. Cir. 2008) ........................................................ 12, 14

*Bynum v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50 (D.D.C. 2012)........................................ 21

*Charudattan v. Darnell*, 834 F. App'x 477 (11th Cir. 2020)........................................ 16

*Davison v. Plowman*, 247 F. Supp. 3d 767 (E.D. Va. 2017) ........................................ 20

*Davison v. Plowman*, No. 1:16cv180 (JCC/IDD), 2017 WL 105984 (E.D. Va. Jan. 10, 2017) ........................................................................................ 16

*Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019)........................................................ 11

*Faison v. Jones*, 440 F. Supp. 3d 1123 (E.D. Cal. 2020)........................................ 17

*Felts v. Reed*, 504 F. Supp. 3d 978 (E.D. Mo. 2020)........................................ 11

*Grace Bible Fellowship, Inc. v. Me. Sch. Admin. Dist. No. 5*, 941 F.2d 45 (1st Cir. 1991) ........................................................................................ 13

*Greer v. Spock*, 424 U.S. 828 (1976)........................................................................ 12

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)........................................ 12

*\*Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001)........................................ 14, 16

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) ................ 12

*Jones v. Heyman*, 888 F.2d 1328 (11th Cir. 1989) ........................................ 20

*\*Kimsey v. City of Sammamish*, No. C21-1264 MJP, 2021 WL 5447913 (W.D. Wash. Nov. 22, 2021) ........................................................................ 16, 20

*Madsen v. Women's Health Ctr.*, 512 U.S. 753 (1994) ........................................ 6

*Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018) ............................................................ 20, 22

*Norse v. City of Santa Cruz*, 629 F.3d 966 (9th Cir. 2010) ........................................................ 21

*Oberwetter v. Hilliard*, 639 F.3d 545 (D.C. Cir. 2011) ................................................................ 12

*\*One Wis. Now v. Kremer*, 354 F. Supp. 3d 940 (W.D. Wis. 2019) ...................................... 11, 12

*Paulsen v. Cty. of Nassau*, 925 F.2d 65 (2d Cir. 1991) ............................................................... 15

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)................................... 12

*PETA v. Gittens*, 215 F. Supp. 2d 120 (D.D.C. 2002) ................................................................... 7

*R.J. Reynolds Tobacco Co. v. FDA*, 845 F. Supp. 2d 266 (D.D.C. 2012) .............................. 8, 18

*Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65 (1st Cir. 2004) ................................................. 17

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1998)........................................... 18

*\*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ............................. 3, 5

*Shurtleff v. City of Boston*, 142 S. Ct. 1583 (2022) ...................................................................... 5

*Stewart v. D.C. Armory Bd.*, 789 F. Supp. 402 (D.D.C. 1992)..................................................... 16

*\*Stewart v. D.C. Armory Bd.*, 863 F.2d 1013 (D.C. Cir. 1988)................................... 11, 13, 15, 19

*Tanner v, Ziegenhorn*, No. 4:17-cv-780-DPM, 2021 WL 4502080 (E.D. Ark.
   Sept. 30, 2021) ......................................................................................................................... 17

*United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*,
   163 F.3d 341 (6th Cir. 1998) ................................................................................................... 14

*United States v. Am. Library Ass'n*, 539 U.S. 194 (2003) ..................................................... 17, 21

*United States v. Kokinda*, 497 U.S. 720 (1990) ..................................................................... 12, 22

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) ................................................. 8

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015) .......................... 15

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ...................................................................... 6

*\*We the People, Inc. of the U.S. v. Nuclear Regul. Comm'n*, 746 F. Supp. 213
   (D.D.C. 1990) ..................................................................................................................... 5, 7, 8

*White v. City of Norwalk*, 900 F.2d 1421 (9th Cir. 1990)............................................................ 20

*Zukerman v. U.S. Postal Serv.*, 961 F.3d 431 (D.C. Cir. 2020) ...................................................... 3

*Zukerman v. U.S. Postal Serv.*, No. 15-cv-2131 (CRC), 2021 WL 4355426
  (D.D.C. Sep. 24, 2021) ........................................................................................................... 7

**Introduction**

Plaintiffs' opening brief explained that the National Institutes of Health ("NIH") is violating the First Amendment by censoring speech critical of its animal testing practices on the comment threads of its public Facebook and Instagram accounts. The NIH opened its Facebook Page and Instagram Account to communicate and interact with members of the public, who use the comment threads connected with the NIH's posts for speech on a virtually limitless array of topics. But from those otherwise open forums, the NIH has surreptitiously suppressed one form of expression—animal advocacy. To do so, the NIH blocked more than two dozen keywords that either directly express disagreement with animal testing or are closely associated with that viewpoint. Any comment in the NIH's comment threads containing one of the blocked keywords is automatically hidden from public view, stifling the speech of animal rights advocates and distorting public debate on the NIH's research practices and ethical responsibilities. This suppression of speech unfavorable to the government in a public forum is textbook viewpoint discrimination, and it is unconstitutional.

The NIH's opposition brief attempts to dress its discriminatory conduct in finer clothes, arguing that its keyword blocking is merely an extension of its viewpoint-neutral comment guidelines prohibiting off-topic speech, Gov't Br. 1–2, but its assertion is nonsensical. The NIH's keyword blocking is a prior restraint, prospectively suppressing all comments that use words like "torture" or "monkey" without regard to whether the comments relate to the topic of the original post. It is not only irrational to suggest that all speech, or even most speech, containing the blocked keywords is off-topic—it is inconsistent with the record, which shows, first, that the NIH has hidden comments written by Plaintiffs even when they related directly to the topic of the NIH's posts, and, second, that the NIH itself raises issues relating to animal testing in its posts. If the

NIH's discriminatory focus on animal testing were not clear enough, its utter lack of enforcement of its off-topic rule to any other type of speech completes the picture. Plaintiffs pointed out scores of off-topic comments left undisturbed in their opening brief, and the NIH merely shrugs in response, suggesting that its enforcement may be imperfect. *See id.* 4. But this is not a question of consistency at the margins—the NIH's complete disinterest in other types of off-topic speech shows that it is not applying a viewpoint-neutral rule in an even-handed manner; it is using its off-topic rule to discriminate against animal advocacy.

The NIH's keyword-blocking practice violates the First Amendment at every turn. The NIH's decision to block all comments containing keywords associated with criticism of animal testing—including terms like "#stopanimaltesting" that on their face discriminate against animal advocates' speech—constitutes viewpoint discrimination and is unlawful in any forum. The NIH strains to argue that the comment threads are nonpublic or limited public forums, but there is no question that by choosing the inherently expressive medium of social media, and by making the comment threads on the NIH Facebook Page and Instagram Account available to the public for expression, the NIH affirmatively created open designated public forums. Thus, even if the blocked keywords do not reflect viewpoint discrimination (and they do), the NIH's censorship is a content-based restriction on speech that triggers strict scrutiny—a burden the NIH tellingly does not even attempt to satisfy. Finally, the NIH's keyword blocking would still fail if the Court concludes the comment threads are nonpublic or limited public forums. The NIH's erratic and inconsistent enforcement of its off-topic rule to target only animal testing advocacy is unreasonable in light of the purposes of the forums, and thus unconstitutional.

Seeking to avoid the outcome warranted by the undisputed facts and the law, the NIH makes a plea for leniency, suggesting that it would be forced to "close the forum" if it is required

to comply with the First Amendment, Gov't Br. 3, because its comment threads would be "overrun" with speech that the NIH considers unproductive, *id.* 1. But application of the First Amendment does not lead inexorably to the outcome the NIH envisions—as Plaintiffs explained in their opening brief, there are a number of better-tailored and viewpoint-neutral tools government agencies can rely on to encourage productive and meaningful discussions online. *See* Pls. Br. 39. And the deference the NIH seeks would be deleterious to free expression in the digital age, allowing the government to create echo chambers where it is as if critical views and controversial topics simply do not exist. The First Amendment does not permit this dangerous approach.

As explained more fully below, the record now before the Court is not in dispute and confirms Plaintiffs' allegations. Accordingly, the Court should grant Plaintiffs' motion for summary judgment and deny the NIH's cross-motion for summary judgment.

## Argument

I.    **The NIH's keyword blocking unconstitutionally discriminates on the basis of viewpoint.**

Although Plaintiffs have demonstrated that the comment threads on the NIH Facebook Page and NIH Instagram Account are open designated public forums, *see* Pls. Br. 34–36; *infra* Part II, the Court need not determine the status of the forum because the NIH's keyword blocking constitutes viewpoint discrimination, which is unlawful in any kind of forum. *See, e.g.*, *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 444 (D.C. Cir. 2020).

The facts are unequivocal: the NIH selected the blocked keywords to target speech critical of animal testing—speech that is also critical of the government itself. *See* Pls. Br. 28–30. The NIH's initial list of blocked keywords included terms that plainly discriminate on their face against animal advocates' speech: "PETA," "PETALatino," "#stopanimaltesting," "#stoptesting," and

"#stoptestingonanimals." Stip. ¶ 58. Apparently recognizing this, the NIH removed them from its list of blocked keywords only after this lawsuit was filed. *Id.* ¶ 60. Their inclusion is still relevant, both because the NIH has not disavowed its authority to block these (or similar) terms again, Gov't Br. 26–27, and because they provide evidentiary support for the inference that the NIH has chosen to single out an anti-animal-testing viewpoint. And the terms that are still blocked today are closely associated with animal advocates' criticism of the NIH's role in animal testing in particular. For example, the NIH censors the terms "Harlow" and "Suomi," the names of two scientists who conducted animal experiments over the course of their careers. Stip. ¶ 58 nn.9–10. PETA has led public campaigns opposing animal testing related to their work. *Id.* Other blocked words are plainly associated with a critical perspective toward animal testing, including words like "torture" and "cruelty." *Id.* ¶ 58; *see also* Pls. Br. 29–30. This is axiomatic viewpoint discrimination.

The NIH's attempts to justify its actions by arguing that it is "indifferent" to the viewpoints censored by the keyword blocking, Gov't Br. 26, and that it has sought only to use keyword blocking as a viewpoint-neutral way to enforce its social media guidelines, *id.* 26–29, are unconvincing. First, the NIH's own description of its decision to block keywords demonstrates that its motive was to single out animal advocates' speech. The NIH's purported indifference to the viewpoints censored by the keywords is directly contradicted by its assertion that comments made by animal advocates in the past are inherently "disruptive" or "threatening." *Id.* 2. Indeed, all of the comments that the NIH identifies as justifying its blanket keyword blocking share a single viewpoint—they are critical of the NIH's funding of animal testing. Thus, even the NIH's own

defense shows that it has targeted animal advocacy because it believes the speech of animal testing critics—not the subject of animal testing more broadly—is problematic.[1]

Even accepting the NIH's implausible assertion that its keyword blocking equally censors speech both supporting and criticizing animal testing, Gov't Br. 26, the fact that the NIH's keyword blocking may affect both viewpoints does not save it. Suppressing all comments expressing a position on animal testing would still unconstitutionally target disfavored perspectives on topics that are otherwise discussed within the forum. *See Rosenberger*, 515 U.S. at 831 ("[E]xclusion of several views on [an issue] is just as offensive to the First Amendment as exclusion of only one."). For example, if the NIH posted about a research study, comments about the ethical implications of the study or the efficacy of its research methods from a wide variety of perspectives would be allowed, including comments about the NIH's entanglements with pharmaceutical companies, Ex. 52 at *11 (Dulcy Morais's comment), its relationship to potentially unethical experiments, Ex. 21 at *16 (Venita Harris Wallace's comment), Ex. 43 at *6 (prettynpixels's comment), and its ability

---

[1] While there is ample evidence in the record to support the conclusion that the NIH targeted criticism of animal testing because it dislikes such speech, the NIH is mistaken in its apparent argument that viewpoint discrimination requires malicious intent. Gov't Br. 26–27. The viewpoint discrimination inquiry looks at whether the government has intentionally drawn lines that discriminate against certain perspectives, not whether the government in fact was motivated by malice against one particular viewpoint. *See Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1593 (2022) (finding viewpoint discrimination even though the city's stated motive was merely to comply with the Establishment Clause); *see also Rosenberger*, 515 U.S. at 831–32, 837 (same). In any event, the NIH cannot merely posit that it acted with viewpoint-neutral motivation; it must demonstrate that fact through record evidence. *See We the People, Inc. of the U.S. v. Nuclear Regul. Comm'n*, 746 F. Supp. 213, 217 (D.D.C. 1990). This it has not done. Instead, the NIH relies exclusively on its assertion in the stipulation that it uses keyword blocking to enforce its guidelines, Stip. ¶ 61, but it offers no actual evidence that this is so. It does not explain, for example, why these keywords were selected and others were not, what information was relied on in that process, and who was involved in that decisionmaking. Therefore, even if the NIH's actual motivation were a deciding factor in this case, the NIH would not be entitled to summary judgment because it has failed to provide evidence to support its claim that its motivation in adopting the keywords was viewpoint-neutral.

to engender trust in different populations, Ex. 21 at *13 (Derrick Mapp's comment), *18 (Katesuubi Katesuubi's comment). The only comments that would not be allowed, however, are those that mention the study's relationship to animal testing—regardless of whether the comments favor or oppose animal testing. Even understanding the NIH's keyword blocking as targeting both support for and criticism of animal testing, then, the NIH still censors a disfavored perspective.[2]

Second, the NIH is on no stronger footing when it claims that it is simply applying a viewpoint-neutral off-topic rule, Gov't Br. 26, because the evidence in the record demonstrates that it has applied that rule in a discriminatory fashion. While an evenly-enforced "off-topic" rule may be constitutional in some contexts, a blanket prior restraint on speech relating to animal testing is not a neutral application of an off-topic rule. The NIH cannot seriously argue that all—or even most—comments containing words like "animal," "hurt," and "testing" are *always* off-topic. Gov't Br. 29. Given the nature of the NIH's work, its involvement in animal testing, and the record before the Court, it is simply not true. First, the NIH itself has published posts to the NIH Facebook Page and NIH Instagram Account that reference animal testing. *See* Ex. 8 (sharing "image of [a] mouse liver"); Ex. 56 (sharing image of accumulation of mucus in mouse lungs and describing study conducted through mouse experimentation); Ex. 57 (describing "[t]wo new NIH-funded studies of mice"). It is nonsensical to say that any comment containing the blocked keywords—which include "mouse" and "mice," Stip. ¶ 58—made in response to those and similar posts would be "off-topic." Second, there are innumerable ways commenters could use the blocked keywords in

---

[2] The NIH's reliance on *Madsen v. Women's Health Center* and *Ward v. Rock Against Racism*, Gov't Br. 27–28, is misplaced. Those cases did not involve direct suppression of speech based on the viewpoint and content of that speech; *Madsen* enjoined specific conduct, 512 U.S. 753, 772 (1994), and *Ward* involved a time, place, and manner restriction that applied "without reference to the content of the regulated speech," 491 U.S. 781, 791 (1989). Here, the line drawn by the NIH looks to the content and perspective of speech, not to its particular form.

a manner that is directly responsive to the topic of the NIH's posts, or to conversations that occur organically in the comment threads. *E.g.*, Stip. ¶¶ 65, 77; Ex. 24 at *2 (hidden comment that related to discussion of COVID-19 research); Ex. 41 at *3 (hidden comment that related to discussion of post-traumatic stress disorder); *see also* Pls. Br. 31–32. It is clear, then, that the NIH is suppressing comments based on the perspective they express, not based on whether they are "on-topic" or "off-topic."

Equally problematic for the NIH's argument here is that out of all the possible kinds of speech that could be considered "off-topic," the only speech that the NIH has singled out for disfavor is that related to criticism of the NIH by animal advocates. *See* Pls. Br. 32–33 (describing discriminatory enforcement of off-topic rule). The NIH attempts to flip its burden, suggesting that it is *Plaintiffs* who must show that "no other category of off-topic comments that is more prolific," Gov't Br. 29, but it is the NIH's burden to defend its decision to "enforce" an off-topic rule against only animal advocacy. This dramatic underbreadth supports the inference that the NIH is suppressing animal testing criticism rather than enforcing a viewpoint-neutral rule. *See PETA v. Gittens*, 215 F. Supp. 2d 120, 134 (D.D.C. 2002) ("[I]nconsistent treatment of messages which are similarly noncompliant . . . is inherently unreasonable and unacceptable discrimination under the First Amendment regardless of whether the Commission believes it is not viewpoint related."); *see also Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 801 (2011) ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."); *Zukerman v. U.S. Postal Serv.*, No. 15-cv-2131 (CRC), 2021 WL 4355426, at *10–11 (D.D.C. Sep. 24, 2021); *We the People, Inc., of the U.S. v. Nuclear Regul. Comm'n*, 746 F. Supp. 213, 219 (D.D.C. 1990). These fundamental flaws in the NIH's purported enforcement of its off-topic rule show that the suppression of animal testing

criticism is not a harmless byproduct of an "imperfect tool," Gov't Br. 29, but the intended outcome of a discriminatory practice.[3]

Accordingly, despite the NIH's convoluted attempts to explain away its targeting of animal advocacy as an application of its viewpoint-neutral commenting guidelines to restrict a subject matter, the NIH has not met its burden of overcoming the clear evidence of viewpoint discrimination before this Court. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *We the People, Inc.*, 746 F. Supp. at 217 (same). Because viewpoint discrimination violates the First Amendment in any type of forum, Plaintiffs are entitled to summary judgment.

## II.    The NIH's keyword blocking is also an unconstitutional content-based restriction in open designated public forums.

Even if it were plausible that the NIH's keyword blocking does not discriminate on the basis of viewpoint, the NIH's actions would still violate the First Amendment. Because the agency has intentionally opened up the comment threads to its social media accounts to the general public for virtually unlimited speech, and because the blocked keywords are content-based, the NIH's keyword blocking can stand only if it survives strict scrutiny. *See* Pls. Br. 34–36. The NIH does not even attempt to meet its burden of showing that its content-based restrictions on speech satisfy strict scrutiny, *see* Gov't Br. 25, and for good reason, *see* Pls. Br. 36–39. Because the record

---

[3] Finally, the NIH's attempts to justify what it refers to as "imperfect[ions]" in its enforcement of its guidelines, Gov't Br. 29, as the result of financial constraints would be unavailing even if this explanation were supported by record evidence and not merely conclusory statements of its intent. "Citizens may not be compelled to forgo their First Amendment rights because officials desire to save money." *R.J. Reynolds Tobacco Co. v. FDA*, 845 F. Supp. 2d 266, 276 (D.D.C. 2012) (cleaned up), *aff'd* 696 F.3d 1205 (D.C. Cir. 2012).

demonstrates that the comment threads are designated public forums, and because the NIH has not and cannot satisfy strict scrutiny, the NIH's keyword blocking violates the First Amendment.

As shown in Plaintiffs' opening brief, the undisputed facts demonstrate that, by opening and operating the comment threads on the NIH Facebook Page and NIH Instagram Account, the NIH intentionally created open forums, not limited or nonpublic ones. Pls. Br. 23–27, 34–36.[4] The NIH did not elect to use a one-way medium like a website to communicate its message to the public, but rather intentionally sought to engage with the public on social media, a medium that facilitates interactive communication among vast members of people worldwide. The NIH's stated purpose of "communicat[ing] and interact[ing] with citizens" online, Stip. ¶ 36, confirms the agency's desire to utilize social media as a site of expression not just for the NIH, but for members of the general public. The comment threads are inherently compatible with public expression, unlike, for example, the televised political debate, post office entrance sidewalk, internal school mailbox system, or school or military newspapers involved in the cases on which the government relies, Gov't Br. 21. And the NIH has made its comment threads available for speech by members of the general public. Stip. ¶¶ 9, 28, 38, 43. The NIH has not sought to disable comments, nor has it meaningfully limited the types of commenters who may speak or the kinds of comments that may appear within the comment threads, *id.*—other than singling out speech critical of its animal testing practices for disfavor. Its consistent practice, then, demonstrates that it has intentionally opened its comment threads to members of the general public for expression on a wide variety of topics. This is the essence of an open designated public forum.

---

[4] The NIH argues that the comment threads are nonpublic forums, Gov't Br. 2, but acknowledges that the same level of scrutiny is applied to both limited and nonpublic forums. *See id.* 10 n.5.

In attempting to escape this conclusion, the NIH relies on erroneous interpretations of governing law and the facts in the record.

A.   **The NIH's arguments that the Court should adopt a presumption against finding a designated public forum, and should not consider the inherent compatibility of social media accounts with expression, are at odds with settled law.**

First, the NIH's argument that the Court should stack the deck in its favor by operating from a presumption that the comment threads are nonpublic forums, Gov't Br. 12–13, is utterly without basis in the law. Nothing in the Supreme Court's or this Circuit's repeated articulations of the public forum doctrine suggest that the government is entitled to such a presumption. The cases cited by the NIH, Gov't Br. 13, did not say that courts should put a thumb on the scale of the government when conducting forum analysis; they merely explained *why* courts scrutinize restrictions in limited or nonpublic forums less skeptically. Indeed, those cases engaged in forum analysis based on objective factors, not pro-government presumptions. *See Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998) (finding public forum because television commission "reserved eligibility for participation in the debate" to approved candidates and did not utilize "an open-microphone format"); *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 320, 322 (D.C. Cir. 2018) (holding that advertising space was nonpublic forum due to plaintiff's concession and defendant's policy and practice of confining advertising space to certain subjects).

There is good reason this presumption does not exist: the objective inquiry this Circuit has applied for decades is designed to limit the government's power to suppress speech and tilt public debate in *de facto* public forums. This does not mean, of course, that the government's hands are tied and it must either allow wholly "unrestricted" speech or "close the forum," Gov't Br. 3. As Plaintiffs explained in their opening brief, Pls. Br. 39, even in open forums government actors that

operate social media accounts have many tools available to promote productive discussion, including enforcing rate limits to ensure a single user does not "spam" a post with repetitive comments, or pinning or engaging with comments it finds valuable. But what the NIH may not do is single out criticism of animal testing and claim it is therefore entitled to the deference afforded in limited public forums—if it could, all government actors could avoid criticism merely by pointing to otherwise unenforced off-topic rules. President Biden could shut down discussion of inflation on his official social media pages, then-President Trump could have suppressed any comments relating to impeachment, and then-President Obama could have done the same regarding Benghazi. This Circuit's well-established approach to ascertaining intent by looking to objective factors avoids these unacceptable outcomes.

Second, the NIH argues that the Court should overlook one of the forum analysis factors, suggesting that a forum's compatibility with expressive activity is merely a one-way ratchet in its own favor: a forum's *in*compatibility is relevant in concluding a forum is nonpublic, but evidence of compatibility is meaningless. Gov't Br. 21–22. This is wrong. Decades of case law in this Circuit and others forecloses the government's novel theory and makes clear that compatibility is an important objective indicator of the government's intent. *See, e.g.*, *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1020 (D.C. Cir. 1988) (faulting the district court for failing to "consider the alleged presence of banners and other expressive activity at the Stadium as evidence of compatibility bearing on the government's intent"); *see also Davison v. Randall*, 912 F.3d 666, 682 (4th Cir. 2019) (discussing compatibility as a factor favoring finding a designated public forum); *Felts v. Reed*, 504 F. Supp. 3d 978, 986 (E.D. Mo. 2020) (same); *One Wis. Now v. Kremer*, 354 F. Supp. 3d 940, 953 (W.D. Wis. 2019) (same).

Having opened a public Facebook page and Instagram account for the express purpose of "communicat[ing] and interact[ing] with citizens," Stip. ¶ 36, the NIH cannot wave away that decision by asking the Court not to consider the nature of the platforms and their compatibility with expression, and acting as if the comment threads were spaces only incidentally open for public expression, Gov't Br. 21–23.[5] As the court in *One Wisconsin Now* put plainly:

> If defendants truly had no intention to create a space for public interaction and discourse, they would not have created public [social media] accounts in the first place. . . . Having opted to create a [social media] account, however, and benefit from its broad, public reach, defendants cannot now divorce themselves from its First Amendment implications and responsibilities as state actors.

*One Wis. Now*, 354 F. Supp. 3d at 954. The comment threads' undisputed compatibility with expressive activity cannot be discounted. Instead, this factor lends strong support to the conclusion that they are open designated public forums.

---

[5] For this reason, the cases on which the government relies are inapposite, at best, because they involved spaces dedicated to specific government functions that were inconsistent with broad expressive activity. *See Ark. Educ. Television Comm'n*, 523 U.S. at 673 (1998) (explaining that television broadcasters "schedule programming that serves 'the public interest, convenience, and necessity,'" making "broad rights of access for outside speakers . . . antithetical" to their purpose); *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 683 (1992) ("Although many airports have expanded their function beyond merely contributing to efficient air travel, few have included among their purposes the designation of a forum for solicitation and distribution activities."); *United States v. Kokinda*, 497 U.S. 720, 728 (1990) ("The postal sidewalk was constructed solely to assist postal patrons to negotiate the space between the parking lot and the front door of the post office, not to facilitate the daily commerce and life of the neighborhood or city."); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 47 (1983) (the purpose of an internal mail system was to "facilitate internal communication of school related matters to teachers" and there was no indication "that the school mailboxes and interschool delivery system [were] open for use by the general public"); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 270 (1988) (school newspaper was "a supervised learning experience for journalism students" rather than a forum for indiscriminate use by "its student reporters and editors, or by the student body generally"); *Greer v. Spock*, 424 U.S. 828, 838 (1976) ("[I]t is consequently the business of a military installation like Fort Dix to train soldiers, not to provide a public forum."); *Oberwetter v. Hilliard*, 639 F.3d 545, 552 (D.C. Cir. 2011) (Jefferson Memorial was a "place[] of public commemoration, not freewheeling forum[] for open expression"); *Bryant v. Gates*, 532 F.3d 888, 896–97 (D.C. Cir. 2008) (advertising section of civilian newspaper was to "further . . . mission-oriented aims" and not to "foster[] communication or assembly by the public").

B.     **Objective analysis of the NIH's consistent policy and practice demonstrates that it has created open designated public forums.**

The NIH's refrain that it only intended to operate a nonpublic forum ignores the evidence in the record showing its consistent policy and practice to the contrary, and attempts to focus the Court's attention on the moderation activities it *could* conduct rather than its actual practices. But the D.C. Circuit has made clear that forum analysis turns on "objective indicia of intent," not simply the agency's stated desires. *Stewart*, 863 F.2d at 1017; *see also Grace Bible Fellowship, Inc. v. Me. Sch. Admin. Dist. No. 5*, 941 F.2d 45, 47 (1st Cir. 1991) (for purposes of forum analysis, "actual practice speaks louder than words"). The focus on objectivity, rather than self-serving statements of intent, protects the public by ensuring that public forums, with their robust protections on free speech, will not "shrink to . . . insignificance." *Stewart,* 863 F.2d at 1017 (cleaned up). Applying the D.C. Circuit's standard, the actual practice described in the parties' joint stipulation reveals that the NIH has made the affirmative choice to open up the comment threads for use by the general public without meaningful restrictions. *See* Pls. Br. 34–36.

In an attempt to distract attention from the record, the NIH relies almost exclusively on its comment guidelines to argue that it did not intend to create designated public forums. But its various attempts to avoid the conclusion that the comment threads are open designated public forums fail. To begin, it is difficult to credit the NIH's argument that the guidelines intentionally and sufficiently restrict the comment threads to nonpublic forum status when those guidelines were not even linked to or described on either the NIH Facebook Page or NIH Instagram Account until well after this lawsuit was filed. *See* Pls. Br. 26 n.13. The guidelines were not set out "prospectively and categorically" in a manner that was easily accessible to forum participants, *see Archdiocese of Wash.*, 897 F.3d at 324, and still to this day do not reveal that the NIH blocks keywords relating

to animal testing. In other words, the NIH has failed to provide the kind of notice that the D.C. Circuit has found important to maintaining a nonpublic forum. *See id.*

The NIH's other attempts to use the guidelines to claim that the comment threads are not designated public forums are equally dubious. First, the NIH makes much of the fact that the guidelines do not announce that the comment threads are "open 'for indiscriminate use by the general public,'" Gov't Br. 13, but of course this is not required. If it were, agencies could suppress disfavored speech in open forums merely by refusing to call them by their names. *See United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 353 (6th Cir. 1998) ("Were we to hold otherwise, the government could circumvent what in practice amounts to open access simply by declaring its 'intent' to designate its property a nonpublic forum in order to enable itself to suppress disfavored speech.").

Second, the NIH tries to bolster its argument that it exercises tight control over the forum by pointing to the provision in the guidelines allowing it to manually review comments before they are posted, Gov't Br. 15, but it has conceded that it does not do this in practice, *see* Stip. ¶ 61; *see also* Pls. Br. 13. The NIH's hands-off approach to review is thus nothing like tightly-managed approval systems in which the government has "reserve[d] eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, obtain permission to use it." *Ark. Educ. Television Comm'n*, 523 U.S. at 697; *compare Bryant v. Gates*, 532 F.3d 888, 892, 895–96 (D.C. Cir. 2008) (finding that advertising system in which ads were submitted and approved by agency prior to being published was a nonpublic forum), *and Archdiocese of Wash.*, 897 F.3d at 321 (same), *with Hopper v. City of Pasco*, 241 F.3d 1067, 1078 (9th Cir. 2001) (finding an open designated forum because "prior to the exclusion of the works at issue here, the city neither pre-screened submitted works, nor exercised its asserted right to exclude works"), *and Blackwell*

14

*v. City of Inkster*, No. 21-cv-10628-TGB-EAS, 2022 WL 989212, at *10 (E.D. Mich. Mar. 31, 2022) (finding that plaintiff plausibly alleged a public forum despite government's policy reserving the right to remove comments that "promote[] private businesses, political affiliations, ideologies or positions").[6]

Third, the NIH invokes the provisions in the guidelines prohibiting certain types of speech, including profanity, off-topic speech, and endorsements, as evidence that it has confined its comment threads to particular topics, Gov't Br. 14, but these guidelines must be analyzed in light of the record evidence that they are essentially unenforced. *See Stewart*, 863 F.2d at 1021; *Paulsen v. Cty. of Nassau*, 925 F.2d 65, 69–71 (2d Cir. 1991). Like the banner policy in *Stewart*, the NIH's guidelines are policies in name only, because the NIH does not moderate its comment threads in the manner described in the guidelines. *See* Pls. Br. 32–33, 34–35 (describing the differences between the NIH's stated policies and its practices).[7] Misreading *Stewart*, the NIH suggests that a paper policy is enough to create a nonpublic forum, and that the only relevant question in *Stewart* was what the armory board's policies were. Gov't Br. 20. But the D.C. Circuit was clear that the crucial question was "what policies the Board *follows* in controlling the use of the Stadium for expressive activity," not merely what policies it *writes*, because "[m]ere statements of policy, if consistently contradicted by practice, are not dispositive." 863 F.2d at 1021 (emphasis added). For

---

[6] The NIH's reliance on *Walker v. Texas Division, Sons of Confederate Veterans, Inc.* is even more perplexing, as *Walker* involved a specialty license plate program in which the state "exercise[d] final authority over each . . . design," took "ownership of each specialty plate design," and used the license plates itself "for government speech." 576 U.S. 200, 216 (2015). None of those facts are present here, and the government does not allege that the comment threads are government speech, as the license plate program in *Walker* was. *Id.* at 219.

[7] Thus, as in many of the social media blocking cases on which Plaintiffs relied in their opening brief, *see* Pls. Br. 27 & n.14, the comment threads on the NIH Facebook Page and NIH Instagram Account are effectively "subject to no real restrictions," Gov't Br. 23–24, and the same analysis applies.

this reason, in a subsequent case challenging the removal of a religious sign pursuant to a new and more explicit armory board policy, the district court concluded that the stadium remained a designated public forum in light of the board's inconsistent enforcement of the new policy. *See Stewart v. D.C. Armory Bd.*, 789 F. Supp. 402, 405 (D.D.C. 1992).[8]

The NIH argues that its suppression of comments associated with animal testing advocacy shows that it has taken steps to "enforce" at least its guideline prohibiting off-topic speech, Gov't Br. 18–19, but singling out speech related to animal testing does not demonstrate purposeful action to consistently limit the comment threads to on-topic speech.[9] Its actions show only that it discriminates against such speech while allowing other types of off-topic speech to flourish. As the Ninth Circuit has explained, "[c]onsistency in application is the hallmark of any policy designed to preserve the non-public status of a forum," and the NIH's failure to enforce its guidelines against any other speech weighs strongly in favor of finding an open forum. *Hopper*, 241 F.3d at 1076; *see also Kimsey v. City of Sammamish*, No. C21-1264 MJP, 2021 WL 5447913, at *4 (W.D. Wash. Nov. 22, 2021) ("[A]n unevenly enforced rule is no policy at all for the purposes of public forum analysis." (cleaned up)). And to the extent the NIH also suggests that it has limited

---

[8] The NIH's reliance on *Charudattan v. Darnell* and *Davison v. Plowman*, Gov't Br. 17, is no more persuasive on this point. In both cases, the plaintiffs agreed, either at the outset of the case or for purposes of the appeal, that the forums were limited ones. *See Davison v. Plowman*, No. 1:16cv180 (JCC/IDD), 2017 WL 105984, at *2 (E.D. Va. Jan. 10, 2017) (explaining the *plaintiff's* argument that the county attorney's Facebook page was a limited public forum); *Charudattan v. Darnell*, 834 F. App'x 477, 480 (11th Cir. 2020) ("In a prior order, the district court determined that the Sheriff's Office Facebook page was a limited public forum, and no party argues to the contrary on appeal."). And in neither case was the court confronted with a prior restraint censoring only a particular subset of disfavored speech; both involved off-topic rules applied individually to comments based on the context of the post and the comments themselves.

[9] As discussed above, referring to the NIH's keyword blocking as "enforcement" of its guidelines is a misnomer, because the NIH uses its keyword blocking to suppress all comments containing words associated with animal advocacy, regardless of whether they violate one of the NIH's guidelines.

the comment threads to certain topics by blocking other terms, Gov't Br. 18, its decision to block comments containing profanity, the names of certain drugs, and the term #believemothers gives it no help. *See* Stip. ¶ 61; Compl., Attachs. 1 & 2, ECF Nos. 7-1 to -2. Assuming, for the sake of argument, that these terms may be constitutionally suppressed, the NIH's decision to limit profanity and a hashtag associated with an anti-vaccination viewpoint does not demonstrate an intention to confine the comment threads to "on-topic" speech; it merely shows that there are other discrete terms the NIH disfavors. *See, e.g.*, *Tanner v, Ziegenhorn*, No. 4:17-cv-780-DPM, 2021 WL 4502080, at *2–3 (E.D. Ark. Sept. 30, 2021) (holding that comment thread was public forum despite defendant's use of profanity filter and additional keyword blocking); *Faison v. Jones*, 440 F. Supp. 3d 1123, 1135 (E.D. Cal. 2020) (finding public forum despite defendant's exercise of limited control over Facebook page through use of profanity filter and hiding or deleting certain comments).

In arguing that what it calls "imperfect enforcement" is sufficient to confine the comment threads, Gov't Br. 18, the NIH relies on *United States v. American Library Association* (*ALA*) and *Ridley v. Massachusetts Bay Transportation Authority*, but neither case supports the radical propositions the NIH makes. To begin, *ALA* was not a public forum case but an unconstitutional conditions case, and the fact that the Court found overbreadth unproblematic in that "very different" context says nothing about the Court's duty here to analyze the NIH's comment threads based on the consistency of its moderation activities. 539 U.S. 194, 206 (2003); *see also id.* at 215–16 (Breyer, J., concurring) (agreeing that the public forum doctrine is not relevant to the analysis of speech regulations attendant to library funding). And the question addressed in *Ridley* was whether "one example of a seemingly contradictory enforcement of [a] policy" would outweigh the government's otherwise "consistent[]" enforcement. 390 F.3d 65, 78 (1st Cir. 2004). But here,

Plaintiffs have not pointed to one example; the record is replete with examples showing that the NIH has not "consistently limit[ed]" speech that violates the guidelines, *id.*, and is instead only relying on the guidelines now to justify its suppression of animal advocacy. *See* Pls. Br. 32–33, 34–35. Holding that such a discriminatory practice confines a forum would give the NIH greater deference to restrict speech in what is, in practice, a forum open for nearly unlimited expression.

Equally unavailing is the NIH's request that the Court overlook its underenforcement of its guidelines because it cannot expend the resources to better moderate the comment threads. Not only has the government failed to show, beyond conclusory statements, that it lacks the resources to better tailor its content moderation, *see* Stip. ¶ 61, it has failed to show how financial constraints justify its near-complete failure to moderate content other than those advocating against animal testing. Even if it had presented evidence of its financial inability to engage in content moderation, it is simply not true that the agency is entitled to greater protections for less precise speech regulations on the basis that money is tight. Quite the opposite: "Citizens may not be compelled to forgo their First Amendment rights because officials desire to save money." *R.J. Reynolds Tobacco Co. v. FDA*, 845 F. Supp. 2d 266, 276 (D.D.C. 2012) (cleaned up), *aff'd* 696 F.3d 1205 (D.C. Cir. 2012); *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1998) ("[W]e reaffirm simply and emphatically that the First Amendment does not permit the State to sacrifice speech for efficiency.").[10]

---

[10] The government also appears to argue that, despite financial constraints, it does engage in manual moderation "where possible" and has in that way confined its comment threads, Gov't Br. 14, but this assertion is belied by the record and entitled to no weight. As the NIH has stipulated, it engaged in only "limited efforts" to manually review comments prior to March 2020, and since then its efforts have been "especially limited" or nonexistent. Stip. ¶ 61; *see also* Pls. Br. 13. Indeed, the NIH has not pointed to even a single instance in which manual moderation was used to suppress a comment on the grounds that it was off-topic.

The undisputed record makes clear, then, that the comment threads are open designated public forums under Supreme Court and D.C. Circuit precedent. As such, the NIH's keyword blocking triggers and fails strict scrutiny. *See* Pls. Br. 36–39. Plaintiffs are entitled to summary judgment.

### III.   Even if the Court concludes that the comment threads are nonpublic or limited public forums, the NIH's keyword blocking is still unconstitutional.

Finally, even if the Court concludes that the comment threads are nonpublic or limited public forums, the NIH's keyword blocking still could not stand. As the NIH concedes, restrictions in those forums must be viewpoint neutral, Gov't Br. 25, and the NIH's keyword blocking is viewpoint discriminatory. *See supra* Part I. The NIH's conduct fails for that reason alone, but it also fails for a second, independent reason: in light of the expressive and interactive purposes served by the comment threads, the NIH's suppression of keywords relating to animal advocacy is entirely unreasonable. *See Stewart*, 863 F.2d at 1019–20 (explaining that "the compatibility of public property with expressive activity . . . is relevant to the ultimate determination of whether restrictions on speech are either reasonable or narrowly tailored to a compelling state interest"); *see also* Pls. Br. 39–40.

The government relies heavily on cases referring to the reasonableness test as a "forgiving" one, Gov't Br. at 30 (quoting *Archdiocese of Wash.*, 897 F.3d at 331–32), and emphasizes that its decisions need not be the "most reasonable" ones, *id.* at 32 (quoting *United States v. Kokinda*, 497 U.S. 720, 735–36 (1990)), in an attempt to convince the Court to overlook the serious overbreadth and underbreadth of its enforcement of its rules. But however "forgiving" the reasonableness inquiry may be, the government must still show that its restrictions are "consistent with [its] legitimate interest in maintaining the property for its dedicated use." *Archdiocese of Wash.*, 897 F.3d at 330. This it cannot do. The NIH points to an interest in limiting "off-topic" comments

because they are "disruptive" and may "discourage interested citizens from viewing" the NIH Facebook Page and Instagram Account. Gov't Br. 30. But rather than create "objective, workable standards" to help page administrators separate "what may come in from what must stay out," the NIH has targeted animal advocacy, and animal advocacy alone, in a way that is completely "unmoored" from of the interests allegedly motivating its speech restrictions. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1888, 1891 (2018).[11]

First, the NIH fails to show that proactively censoring speech critical of its support of animal testing is a "reasonable" way to address off-topic speech. It is true that some courts have approved off-topic rules in public meetings out of recognition that the government has an interest in the "orderly, efficient meetings of public bodies." *Jones v. Heyman*, 888 F.2d 1328, 1332 (11th Cir. 1989); *see also White v. City of Norwalk*, 900 F.2d 1421, 1426 (9th Cir. 1990). It is even true that some courts have recognized this interest in the context of social media pages. *Compare Davison v. Plowman*, 247 F. Supp. 3d 767, 777 (E.D. Va. 2017), *aff'd* 715 F. App'x 298 (4th Cir. 2018), *with Kimsey*, 2021 WL 5447913, at \*5 (rejecting the assertion that an off-topic rule furthers an interest in preventing dilution or distraction). But no court has ever countenanced a prior restraint on a particular topic of conversation as a "reasonable" application of an off-topic rule. With good reason—an off-topic rule, applied neutrally, must be defined by the topic being discussed in a meeting (or comment thread) rather than a categorical prohibition on disfavored

---

[11] The NIH also suggests that speech advocating against animal testing may violate its guidelines prohibiting "abusive" and "redundant" speech, Gov't Br. 30, but the Court need not take this suggestion seriously. The NIH has completely failed to point to any particular comments in the record—much less a meaningful volume of comments—that it finds abusive or that are actually repetitive within the meaning of the guidelines (speech where the commenter "submit[s] the same idea multiple times," Ex. 19). Even if the NIH passed this hurdle, its keyword blocking is not a reasonable response to those problems for the same reasons it is not a reasonable response to an interest in limiting off-topic speech.

speech. Even the NIH appears to concede that some of Plaintiffs' own comments using blocked keywords were "on-topic" within its own interpretation of its rule, Gov't Br. 32, and there is no question that commenters could use the blocked keywords in innumerable ways to draft comments that relate to the topic of a post. *See supra* Part I; Pls. Br. 31–32.

The sweep of the government's blocking, done without any regard for whether speech is actually "off-topic," demonstrates its unreasonableness. The court in *Bynum v. U.S. Capitol Police Board* recognized this point, explaining that while a statute prohibiting certain conduct on the grounds of the U.S. Capitol was reasonable and viewpoint-neutral, the Capitol Police Board's regulations were not because they "invit[ed] the Capitol Police to restrict behavior that is in no way disruptive, such as 'speechmaking . . . or other expressive conduct. . . .'" 93 F. Supp. 2d 50, 57 (D.D.C. 2012) (concluding that the regulations were unconstitutional because they "swe[pt] too broadly" in relation "to the legitimate purposes" articulated by the state); *cf. Norse v. City of Santa Cruz*, 629 F.3d 966, 976 (9th Cir. 2010) (holding that a city must show actual disruption to justify ejection of a city council meeting attendee who engaged in a silent Nazi salute and could not merely assert the act violated its meeting guidelines). The government attempts to brush aside this obvious overbreadth by pointing to *ALA*, Gov't Br. 31, but as explained above, the plurality decision in that case is inapposite—in fact, it made clear that the overbreadth of the blocking filters would play a more decisive role in a case like this one, involving the "direct regulation of private conduct" rather than "exercises of [Congress's] spending power." *See ALA*, 539 U.S. at 209 n.4.

Second, the NIH fails to show that it is "reasonable" to enforce its off-topic rule against animal advocacy alone. *See supra* Part I; Pls. Br. 32–33 (describing the NIH's failure to moderate

other types of off-topic speech).[12] The NIH argues that its inconsistency does not render its keyword blocking unenforceable, relying on *United States v. Kokinda*, Gov't Br. 32–33, but that case gives it no help. Although the government had banned a particular form of expressive conduct (solicitation, which the plurality termed an "inherently disruptive" act), it did not target solicitation alone—instead, it considered whether "other types of potentially disruptive speech" should be permitted "on a case-by-case basis." 497 U.S. 720, 732–33 (1990). Unlike in *Kokinda*, there is nothing "inherently disruptive" about animal advocacy that makes it ripe for categorical treatment, and the NIH does not enforce its guidelines against "other types of potentially [off-topic] speech." *Id.* In any event, as explained in Plaintiffs' opening brief, more recent Supreme Court and D.C. Circuit case law have made clear that inconsistency in application renders speech restrictions unreasonable. *See* Pls. Br. 40; *see also Mansky*, 138 S. Ct. at 1891; *Archdiocese of Wash.*, 897 F.3d at 330 ("[A] challenged regulation may be unreasonable, regardless of the reasons for its adoption, if it is inconsistently enforced.").[13]

Thus, the NIH's keyword blocking is viewpoint-discriminatory, unreasonable, and unconstitutional.

---

[12] The NIH attempts to avoid this conclusion by suggesting that it "uses other filters . . . to capture other types of recurring comments that violate the Guidelines," and that it might add new keyword filters in the future, Gov't Br. 32, but neither of these points creates a question of fact about the NIH's failure to enforce its off-topic rule to other speech. First, to the extent the NIH is referring to filters that hide comments relating to parts of its guidelines not at issue in this case, like a profanity filter, those filters say nothing about whether the NIH's enforcement of its off-topic rule is reasonable. Second, the Court must assess the reasonableness of the NIH's keyword filters now, not in some hypothetical future when it has suppressed even more speech.

[13] The NIH's refrain that it would enforce its guidelines more consistently if it had the financial resources is no more convincing upon reprisal in this context. *See supra* Part II.B.

## Conclusion

For these reasons, the Court should grant Plaintiffs' summary judgment motion and deny

Defendants' cross-motion for summary judgment.

May 27, 2022                                   Respectfully submitted,

                                              /s/ *Stephanie Krent*
                                              Stephanie Krent, *pro hac vice*
                                              Alyssa Morones, *pro hac vice*
                                              Katherine Fallow, *pro hac vice*
                                              Jameel Jaffer (MI0067)
                                              Knight First Amendment Institute
                                                at Columbia University
                                              475 Riverside Drive, Suite 302
                                              New York, NY 10115
                                              (646) 745-8500
                                              stephanie.krent@knightcolumbia.org

                                              *Counsel for Plaintiffs*

                                              /s/ *Caitlin M. Foley*
                                              Caitlin M. Foley, *pro hac vice*
                                              Animal Legal Defense Fund
                                              150 South Wacker Drive, Suite 2400
                                              Chicago, IL 60606
                                              (707) 795-2533 ext. 1043
                                              cfoley@aldf.org

                                              Christopher A. Berry (Bar ID CA00106)
                                              Animal Legal Defense Fund
                                              525 E. Cotati Ave.
                                              Cotati, CA 94931
                                              (707) 795-2533 ext. 1041
                                              cberry@aldf.org

                                              *Counsel for Plaintiffs Madeline Krasno and*
                                                *Ryan Hartkopf*

                                              /s/ *Asher Smith*
                                              Asher Smith, *pro hac vice*
                                              People for the Ethical Treatment of Animals
                                              1536 16th Street NW
                                              Washington, DC 20036
                                              (202) 483-7382

AsherS@petaf.org

*Counsel for Plaintiff People for the Ethical
Treatment of Animals*