# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **People for the Ethical Treatment of Animals, Madeline Krasno, and Ryan Hartkopf,** | |
| Plaintiffs, | |
| v. | Civil Action No. 21-cv-2380 (BAH) |
| **Lawrence A. Tabak, in his official capacity as Director of the National Institutes of Health, and Xavier Becerra, in his official capacity as Secretary of the U.S. Department of Health and Human Services,** | |
| Defendants. | |

**REPLY IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 4

I. The Pages are not designated public forums because NIH did not make an affirmative choice, or evince a clear intent, to open the Pages for discussion on any topic. .................. 4

    A. *Multiple factors confirm that NIH did not "clearly intend" for the Pages to be public forums.* ......................................................................................... 5

    B. *Plaintiffs' arguments do not demonstrate that NIH clearly intended to open the Pages to discussion on any topic.* ..................................................... 7

II. The animal testing filters are viewpoint neutral because they were not adopted for the purpose of suppressing any viewpoint. ............................................................. 13

III. The animal testing filters are reasonable. ......................................................... 21

CONCLUSION ................................................................................................................ 25

i

# TABLE OF AUTHORITIES

## Cases

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
  897 F.3d 314 (D.C. Cir. 2018) ............................................................................ *passim*

*Arkansas Educ. Television Comm'n v. Forbes*,
  523 U.S. 666 (1998) ....................................................................................... 8, 12

*Bryant v. Gates*,
  532 F.3d 888 (D.C. Cir. 2008) ........................................................................ 5, 11

*Bynum v. U.S. Capitol Police Board*,
  93 F. Supp. 2d 50 (D.D.C. 2000) .......................................................................... 24

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
  473 U.S. 788 (1985) ................................................................................... 5, 10, 23

*Davison v. Plowman*,
  247 F. Supp. 3d 767 (E.D. Va. 2017) ................................................................... 21

*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988) ................................................................................... 4, 5, 11

*Int'l Soc'y For Krishna Consciousness, Inc. v. Lee*,
  505 U.S. 672 (1992) .............................................................................................. 11

*Madsen v. Women's Health Center, Inc.*,
  512 U.S. 753 (1994) ...................................................................................... 16, 18

*One Wisconsin Now v. Kremer*,
  354 F. Supp. 3d 940 (W.D. Wis. 2019) ................................................................ 11

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
  460 U.S. 37 (1983) ............................................................................. 10, 13, 21, 22

*Ridley v. Mass. Bay Transp. Auth.*,
  390 F.3d 65 (1st Cir. 2004) ............................................................................. 5, 20

*Rosenberger v. Rector & Visitors of University of Virginia*,
  515 U.S. 819 (1995) .............................................................................................. 14

*Shurtleff v. City of Boston*,
  142 S. Ct. 1583 (2022) ......................................................................................... 14

*United States v. Am. Libr. Ass'n, Inc.*,
  539 U.S. 194 (2003) ..................................................................................... *passim*

*United States v. Kokinda*,
497 U.S. 720 (1990) ................................................................................................ *passim*

*United States v. Napper*,
574 F. Supp. 1521 (D.D.C. 1983) ........................................................................... 13

*United States v. Playboy Entertainment Group, Inc.*,
529 U.S. 803 (2000) ................................................................................................ 19

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) .................................................................................................. 6

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ................................................................................... 13, 14, 17

<u>**INTRODUCTION**</u>

The National Institute of Health's ("NIH's") Facebook and Instagram pages (the "Pages") have been overrun by off-topic, and often abusive, animal testing comments. Plaintiffs can hardly dispute this, nor do they even allege—much less provide evidence showing—that any other category of off-topic comments is nearly as pervasive on the Pages. Nevertheless, Plaintiffs contend that there is little NIH can do about this. Even though Plaintiffs have multiple other avenues for engaging in speech about animal testing, including on their own social media pages, Plaintiffs effectively argue that the First Amendment gives them (and anyone else) the right to hijack NIH's Pages and use them as platforms for protest over any issue they choose, even if it means disrupting fruitful discussions over NIH's social media posts. Plaintiffs' position defies clear Supreme Court and D.C. Circuit precedent, as illustrated by their frequent resort to bluster rather than binding authority.

The Court should grant Defendants' Motion for Summary Judgment because the Pages are nonpublic forums, and thus the restrictions at issue—the animal testing keyword filters—need only be, and are, viewpoint neutral and reasonable. *First*, the Pages are not, as Plaintiffs contend, designated public forums. Plaintiffs do not dispute that a designated public forum is created only when the government made an affirmative choice, and clearly intended, to open the forum to discussion over *any topic*. If the government allows for certain types of speech, but not others, in a government-run forum, then that forum is nonpublic. Here, multiple factors confirm that NIH did not intend (much less *clearly* intend) for the Pages to be open to discussion on any topic: NIH declared that its social media pages are not intended to be public forums, issued guidelines restricting the types of comments allowed on its social media pages (the "Guidelines"), adopted several keyword filters that automatically and consistently hide several types of impermissible

1

comments, engaged (and intends to again engage) in efforts to manually remove impermissible comments, and expressly reserved the right to remove impermissible comments. NIH, in short, made clear that the Pages were not intended to be open to discussion on any topic, and Plaintiffs offer little to suggest otherwise.

Instead, Plaintiffs primarily urge the Court to disregard the many restrictions that NIH places on the Pages because the agency does not take action against *all* off-topic posts. The relevant inquiry, however, is whether NIH intended for the Pages to be open to discussion on any topic, and the enforcement actions NIH *does* take—*e.g.*, through filters that target off-topic comments on animal testing, certain drugs, and so on—make clear that it did not intend for the Pages to be open to discussion on any topic. Plaintiffs also renew their argument that social media sites are compatible with expressive activity. But the Supreme Court has repeatedly held that mere compatibility with expressive activity does not make a forum public. Indeed, a nonpublic forum, by definition, is one that may allow for (and is thus compatible with) at least some expressive activity. The question, again, is whether the forum is intended to permit expressive activity over *any topic*. Thus, the Supreme Court has found that a television broadcast, a sidewalk, a mail system, and certain newspapers are not public forums even though, like social media sites, they are structurally compatible with many forms of speech. Accordingly, the Pages are nonpublic forums, and so any restrictions placed thereon need only be viewpoint neutral and reasonable.

*Second*, the animal testing filters are viewpoint neutral. The Supreme Court has held that a restriction discriminates based on viewpoint only if the government *intended* to suppress one viewpoint and elevate another. Here, NIH has stated that it adopted all of its keyword filters— including the animal testing filters—to target recurrent comments that violate the Guidelines, regardless of viewpoint. And that stated justification is fully consistent with the record: multiple

exhibits demonstrate just how rampant off-topic animal testing comments are on the Pages, and Plaintiffs do not seriously dispute that those comments overwhelmingly have no material connection to the topics of NIH's posts. Thus, there is nothing suspect about NIH's stated justification for the filters: to target recurring, off-topic comments. Further, the nature of the animal testing filters also undermines any inference of discriminatory intent. Plaintiffs do not dispute that several of those filters include broad terms, such as "animal" and "testing," that could also appear in comments defending animal testing.

Nevertheless, Plaintiffs ask this Court to infer that NIH intended to suppress their viewpoint because certain of its prior and current filters allegedly disproportionately affect those who criticize animal testing. But a restriction does not discriminate based on viewpoint simply because it happens to have a greater effect on those with one particular viewpoint; it must be adopted with the *purpose* of suppressing that viewpoint. Here, NIH adopted the animal testing filters because they apply to terms found in recurring, off-topic comments. That more of those comments happen to come from those who oppose animal testing is irrelevant.

Plaintiffs also assert that the Court can infer viewpoint discrimination because there are other off-topic posts against which NIH does not take action. But NIH has already provided a viewpoint-neutral explanation for this. NIH, like any government entity, has limited resources, and obviously cannot review each of the thousands of comments on the Pages to ensure that they all comply with the Guidelines. NIH thus primarily relies on keyword filters, and it adopts filters to target frequently-made comments that violate the Guidelines—including off-topic animal testing comments. Critically, Plaintiffs identify no other category of recurring, off-topic comments for which NIH has not adopted filters. And if they ever do, NIH may well adopt filters for those as well. Thus, the Court cannot infer that NIH harbored any discriminatory motive simply because

NIH has not taken action against all, or additional categories of, off-topic comments. Thus, Plaintiffs have failed to show that NIH adopted the animal testing filters for the purpose of suppressing Plaintiffs' viewpoint and elevating a contrary viewpoint.

*Finally*, the animal testing filters satisfy the lenient reasonableness inquiry. The Pages have been inundated with disruptive animal testing comments that inhibit productive discussions and may discourage interested citizens from even visiting the Pages. But NIH cannot manually review and hide each comment that violates the Guidelines. It thus relies on a cost-effective, though imperfect, tool: keyword filters. In light of the circumstances, those filters are certainly a reasonable means of addressing a legitimate concern. Those filters are especially reasonable here because, as Plaintiffs do not dispute, they have several alternative avenues for speaking about animal testing, including through their own social media pages. Plaintiffs, in response, rehash their arguments that the filters are overinclusive and underinclusive. But those concerns are overstated, and the Supreme Court has already found that restrictions need not be perfectly tailored to be reasonable. The animal testing filters thus satisfy the lenient reasonableness test, and the Court should grant Defendants' Motion for Summary Judgment.

<u>**ARGUMENT**</u>

I.   **The Pages are not designated public forums because NIH did not make an affirmative choice, or evince a clear intent, to open the Pages for discussion on any topic.**

Plaintiffs do not dispute that the Supreme Court has set a high bar for determining that a government entity has created a designated public forum. Government-run forums "may be deemed to be [designated] public forums only if" the government "opened those [forums] for *indiscriminate use* by the general public." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267

(1988) (emphasis added).[1] "To create such a [designated public forum], the government must make an *affirmative choice* to open up its property for use as a public forum," *United States v. Am. Libr. Ass'n*, *Inc.*, 539 U.S. 194, 206 (2003) (emphasis added), and it must have "demonstrate[d] [a] *clear intent* to create a public forum," *Hazelwood*, 484 U.S. at 270 (emphasis added). "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985). Plaintiffs fall well short of this bar here.

### A. Multiple factors confirm that NIH did not "clearly intend" for the Pages to be public forums.

The evidence in the record does not show that NIH clearly intended to open the Pages to discussion on any topic. To the contrary, multiple factors show otherwise. For one, NIH expressly stated that its social media pages "*are not intended to serve as public forums*." Ex. 19 (emphasis added). Although this statement, in itself, may not be dispositive, it is still valuable evidence the Court should consider when assessing NIH's intent. *See Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 77 (1st Cir. 2004) (the government's "present characterization" of "a forum" cannot be "disregarded" in the public forum analysis). Additionally, the subject-matter restrictions NIH placed on the Pages further show that it did not intend for the Pages to be open to discussion on any topic. *See Cornelius*, 473 U.S. at 799 ("Government restrictions on . . . content . . . are relevant to ascertaining the Government's intent as to the nature of the forum created"); *Bryant v. Gates*, 532 F.3d 888, 896-97 (D.C. Cir. 2008) (a policy of "exclud[ing] . . . [comments]" from a newspaper showed the latter was not a public forum); *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 323 (D.C. Cir. 2018) (by disallowing ads over "certain subjects" on its

---

[1] Internal quotation marks and citations are omitted through this brief, unless otherwise stated.

advertising space, WMATA "plainly evinced" its intent" to "convert[] that space into a non-public forum"). The Guidelines specifically prohibit several types of comments on the pages, including those that (i) are off-topic or repetitive, (ii) endorse commercial products, (iii) contain images or videos, and (iv) provide links to external websites. *See* Ex. 19.

Further, NIH has consistently taken enforcement actions against several types of impermissible comments. NIH had adopted a number of filters—which consistently and automatically hide comments that contain the filtered terms—to target, among other things, common off-topic comments relating to animal testing and certain drugs (*e.g.*, "marijuana"), and impermissible comments containing external website links (*e.g.*, "www," "org," "com," "http," "gmail," AND "www.facebook.com"). *See* Compl., Attachs. 1 & 2. NIH, moreover, has not relied on filters alone. Subject to resource constraints, NIH has engaged in limited manual moderation activities, and intends to resume those activities in the future.[2] *See* Stip. ¶ 61. Further, NIH has expressly reserved the right to review comments on the Pages, and remove those that violate the Guidelines. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 216 (2015) (the "exercise[]" of "final authority over" speech "militates against a determination that" the government intended to "create[] a public forum"). All of these factors—NIH's statement of intent, its Guidelines, its keyword filters, its manual moderation efforts, and its express reservation of rights to remove impermissible comments—make clear that NIH did not "clearly intend" to open the Pages to discussion over any and every topic.

---

[2] In their Reply, Plaintiff state that "NIH has not pointed to" a "single instance" where "manual moderation was used to" hide a comment because it was off-topic. Pls.' Reply at 18 n.10. But Plaintiffs fail to explain why NIH should have to. The parties agreed, in the stipulation, that NIH has engaged in efforts to manually hide impermissible comments, and intends to do so again in the future. *See* Stip. ¶ 61. Plaintiffs included nothing in the stipulation to call that fact into question, and they are bound by it now.

To the extent there were any doubt over NIH's intent, the Court should err against finding the Pages to be public forums. Otherwise, NIH may understandably "elect to close" the comment threads on the Pages "entirely rather than deal with the administrative burden or floodgate consequences of accepting" comments "without effective subject-matter restrictions." *Archdiocese*, 897 F.3d at 337 (Wilkins, J. concurring)—thus *reducing* avenues for speech. Plaintiffs, in response, state that NIH can resort to two other measures, *see* Pls.' Reply at 11, but one is impractical and the other is insufficient. Plaintiffs first propose that NIH limit the number of comments that each user can leave on the Pages. *See id.* But Plaintiffs never explain how NIH can enforce this limit. They do not suggest that there is an automated way to cap a user's comments, and NIH obviously lacks the resources to manually keep track of how many comments each user has left on the Pages. *See* Stip. ¶ 61. Furthermore, Plaintiffs also propose that NIH simply "engag[e] with comments it finds valuable." Pls.' Reply at 11. But this would presumably also require manual review, and regardless would not stop the Pages from being overrun by impermissible comments. Thus, Plaintiffs' proposed alternatives would not spare NIH from the ramifications of a decision finding the Pages to be public forums.

### B. Plaintiffs' arguments do not demonstrate that NIH clearly intended to open the Pages to discussion on any topic.

1. In contending that the restrictions imposed on the Pages do not render them nonpublic forums, Plaintiffs first claim that users lacked notice of the Guidelines because the Pages previously did not directly link to them. *See* Pls.' Reply at 13. But the Guidelines were on NIH's official government site under a page titled "Social Media & Outreach," labeled as "NIH Comment Guidelines," Ex. 19, And Plaintiffs cite to no case suggesting that greater notice is required.[3] Nor

---

[3] Plaintiffs' notice argument relies on *Archdiocese*, which stated only that the government should "set prospective, categorical, subject-matter rules" on a forum, which, in themselves, will

can they. In multiple cases where the Supreme Court found a forum to be nonpublic, the restrictions on that forum were not published directly in the forum. *See*, *e.g.*, *Arkansas*, 523 U.S. at 680 (no indication that the public broadcast televised the restrictions on who would be allowed to speak); *United States v. Kokinda*, 497 U.S. 720, 723 (1990) (no indication that the Postal Service published, on the public sidewalk at issue, the restrictions on speech imposed thereon).

Plaintiffs then renew their argument that NIH does not take action against all off-topic posts. *See* Pls.' Reply at 16-17. But again, the relevant inquiry is whether NIH clearly intended to open the Pages to discussion on *any topic*, and although NIH cannot take action against all off-topic comments, the enforcement actions it does take—*e.g.*, through automated filters that target several types of comments—confirm that NIH did not intend to allow for discussion over any topic on the Pages. *See supra* at 5-6. *American Library*—a case concerning the constitutionality of pornography filters on public library computers—is instructive. There, the Supreme Court concluded that internet access on a public library computer is not a "designated public forum" even though "a library . . . does not review every Web site that it makes available" to determine whether it includes acceptable content. *Am. Libr.*, 539 U.S. at 206-08. The Court reasoned that "[a] library's failure to make . . . judgments about all the material it furnishes from the Web does not somehow taint the judgments it does make." *Id.* at 208.

Here, as in *American Library*, NIH's "failure to" review "all the material" on the Pages and hide all off-topic comments does not tarnish the significance of the enforcement actions "it does [t]ake." Plaintiffs, in response, first contend that *American Library* was not a "public forum" case. *See* Pls.' Reply at 17. This is patently incorrect. The Court there assessed whether "[i]nternet

---

"provide[] public notice of what speech is permissible." 897 F.3d at 337. Here, the Guidelines constitute "prospective, categorical, subject-matter rules," and so they provide adequate notice.

access in a public library satisf[ies] [the] definition of a 'designated public forum.'" *Id.* at 206. Plaintiffs also argue that *American Library* involved a distinct context. But the facts are materially similar to those here: both cases concern whether conduits for transmitting content over the internet constitute public forums. *American Library* is thus informative, and confirms that the Pages are nonpublic forums even though NIH does not engage in more extensive moderation practices.

Plaintiffs next argue that NIH does not pre-screen comments before they are posted on the Pages. *See* Pls.' Reply at 14. But as NIH explained in its opening brief, keyword filters functionally pre-screen comments by "automatically" hiding those that contain a filtered term "as soon as [they are] posted." Stip. ¶ 30. Regardless, it is unclear why pre-screening is necessary for the Pages to be considered nonpublic forums. The ultimate inquiry goes to NIH's intent, and a restriction on content that is enforced after a comment is made suggests, just as much as a prior restraint, that NIH did not intend to open the Pages for indiscriminate use. *Cf. Kokinda*, 497 U.S. at 723-30 (a speech restriction showed that "[t]he Postal Service ha[d] not expressly dedicated its sidewalks to any expressive activity" even though the restriction was enforced only after plaintiffs spoke on a postal sidewalk for "several hours"). Plaintiffs' next argument—that the Court should only consider the "off-topic" restriction, and should not look at the other restrictions and keyword filters, *see* Pls.' Reply at 17—fails as well, and for a similar reason. Again, the Court must assess whether NIH clearly intended for the Pages to be open to discussion on *any* topic, and every subject-matter restriction placed on the Pages—including, *e.g.*, restrictions on commercial speech and external website links—would be relevant to that inquiry.

Plaintiffs suggest that NIH's policies are immaterial if "consistently contradicted by practice." *See* Pls.' Reply at 15-16 (citing the D.C. Circuit's *Stewart v. D.C. Armory Board* decision). But here, there is no contradictory practice, but at most imperfect enforcement: as

explained above, even if NIH cannot take action against all impermissible comments, its filters automatically and consistently hide impermissible comments on several topics, and those restrictions confirm that NIH did not intend for the Pages to be open to discussion on any topic. Accordingly, the restrictions NIH has placed on the Pages confirm that they are nonpublic forums.

2.   In an attempt to show that NIH did intend for the Pages to be public forums, Plaintiffs again rely on a number of arguments that the Supreme Court has already rejected. For example, Plaintiffs again argue that social media pages are inherently compatible with expressive activity. *See* Pls.' Reply at 11-12. But "the mere fact that an instrumentality" can be "used for the communication of ideas does not make a public forum." *Perry*, 460 U.S. at 49 n.9; *see also Cornelius*, 473 U.S. at 805 (that "expressive activity" occurs "in the context of the forum created does not imply that the forum thereby becomes a public forum for First Amendment purposes"). Rather, the government must make an "affirmative choice" to open the forum to "*indiscriminate use*." *Supra* at 4-5. In fact, mere compatibility with expressive activity cannot serve as evidence that a forum is public given that a nonpublic forum, by definition, is one that may allow for—and is thus compatible with— certain expressive activity. *See*, *e.g.*, *Perry*, 460 U.S. at 49; Defs.' MSJ at 22.

Thus, as explained in NIH's opening brief, the Supreme Court and D.C. Circuit have found a number of forums to be nonpublic even though they are obviously compatible with expressive activity, such as a television broadcast, a sidewalk, a mail system, and certain newspapers. *See* Defs.' MSJ at 21. In response, Plaintiffs first contend that those other forums are not inherently compatible with general expressive activity. *See* Pls. Reply at 9. But that cannot be. A person can communicate about any topic over a public broadcast, from a sidewalk, through letter mail, or through a newspaper article. Plaintiffs then argue that even if those forums are compatible with speech over any topic, they were "dedicated to specific" purposes "that were inconsistent with

broad expressive activity." Pls.' Reply at 12 n.5. But that is precisely the point: those forums, like the Pages here, were dedicated to speech over certain topics (or speech by certain individuals), and thus they were nonpublic even though they are structurally compatible with expressive activity.[4]

Plaintiffs' related argument—that any member of the public may visit the Pages, *see* Pls.' Reply at 9—likewise fails. The Supreme Court has already held that "a public forum" is not "created whenever members of the public are permitted freely to visit a place owned or operated by the Government." *Int'l Soc'y For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680 (1992); *see also* Defs.' MSJ at 22-23. NIH has set limits on the comments members of the public may leave on the Pages, thus confirming that the Pages are nonpublic. *See supra* at 5-6. Finally, Plaintiffs argue that NIH opened the Pages for the purpose of "communicat[ing] and interact[ing] with citizens." Pls.' Reply at 12. But NIH made clear that it did not open the Pages for the purpose of hosting communications and interactions over *any topic*. *See supra* at 5-6. Thus, Plaintiffs fail to show that NIH clearly intended for the Pages to be public forums. *See Bryant*, 532 F.3d at 895.

If there were any doubt on that score, the Court should err against finding that a government-run forum is a designated public forum. *See* Def.'s MSJ at 12-13. Such a presumption is consistent with the rule that a designated public forum is created only when the government has demonstrated a *clear intent* to create a public forum. *See Hazelwood*, 484 U.S. at 270. And it also "*furthers* First Amendment interests," because governments may be more likely to open forums for speech if courts are likely to find those forums to be nonpublic, and thus subject to meaningful

---

[4] Plaintiffs rely on *One Wisconsin Now v. Kremer*, where the district court found a Twitter page to be a designated public forum, in part because "Twitter remains a social media platform, and interaction remains a key component of this platform." 354 F. Supp. 3d 940, 954 (W.D. Wis. 2019). As explained above, the court's reasoning is inconsistent with binding case law finding several forums to be nonpublic—*e.g.*, a television broadcast and public sidewalk—even though "interaction" is a "key component of" those forums.

restrictions. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 680, 11 (1998); *see also Archdiocese*, 897 F.3d at 337 (D.C. Cir. 2018) (Wilkins, J. concurring) (the "government may elect to close a forum entirely rather than deal with the administrative burden or floodgate consequences of accepting private speech without effective subject-matter restrictions").

Plaintiffs' contention that these cases only explain why governments are given more latitude in regulating nonpublic forums, but establish no presumption, *see* Pls.; Reply at 10, is incorrect. For example, in concluding that the public broadcast at issue in *Arkansas* "was not a designated public forum," the Supreme Court noted that strictly enforcing the "distinction between 'general access,' . . . which indicates the property is a designated public forum, and 'selective access,' . . . which indicates the property is a nonpublic forum . . . furthers First Amendment interests" by "encourag[ing] the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all." *Id.* at 678-80. The Court noted that it was reluctant to find that the broadcast "was a public forum" because that ruling "would result in less speech" by potentially causing the "public television broadcaster . . . not to air" any "views at all." *Id.* at 680–81. Thus, *Arkansas* shows that courts should err against finding a forum to be public.

Plaintiffs also protest that, in assessing the government's intent, the Court must look to objective indicia of intent rather than any presumption. *See* Pls.' Reply at 10. But it is unclear why the two are mutually exclusive. The Court can consider objective indicia of intent, and if there remains any doubt over NIH's intent here, the Court can err in favor of finding the Pages to be nonpublic forums. But the Court need invoke no presumption to resolve this case: as even the objective indicia in the record make clear, NIH did not make an affirmative choice to open the

Pages for unrestricted expressive activity, much less evince a *clear intent* to do so. Thus, the animal testing filters need only be reasonable and viewpoint neutral, which they are.

## II.   The animal testing filters are viewpoint neutral because they were not adopted for the purpose of suppressing any viewpoint.

Plaintiffs fail to establish that NIH has engaged in viewpoint discrimination because the record does not show that the animal testing filters were adopted for the purpose of suppressing Plaintiffs' viewpoint in favor of a contrary viewpoint. To establish viewpoint discrimination, a plaintiff must do more than show that a restriction disproportionately affects one viewpoint; it must show that the government "*intended* to discourage one viewpoint and advance another." *Perry*, 460 U.S. at 49 (emphasis added); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (a "regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others").[5] Importantly, "the Government enjoys a presumption of having undertaken action in good faith and in a non-discriminatory fashion." *United States v. Napper*, 574 F. Supp. 1521, 1523 (D.D.C. 1983).

Plaintiffs contend, in a footnote, that "[t]he viewpoint discrimination inquiry looks at whether the government has intentionally drawn lines that discriminate against certain perspectives, not whether the government in fact was motivated by malice against one particular viewpoint." Pls.' Reply at 5 n.1. But the Supreme Court has clearly stated that viewpoint discrimination exists only when the government targets a viewpoint with the *purpose* of suppressing that viewpoint. *See supra*. Indeed, the Supreme Court has stated that, when

---

[5] Plaintiffs argue that *Ward* "involved a time, place and manner restriction that applied without reference to" content. Pls.' Reply at 6 n.2. Regardless of the facts in *Ward*, the Court there stated that, in determining whether a restriction is neutral, "[t]he government's purpose is the controlling consideration," both "in time, place, or manner cases in particular" and "*in speech cases generally*." 491 U.S. at 791 (emphasis added).

determining whether a speech restriction is neutral, "[t]he *principal inquiry* . . . is whether the government has adopted a regulation of speech because of *disagreement with the message it conveys*." *Ward*, 491 U.S. at 791 (emphasis added). To show otherwise, Plaintiffs primarily rely on the Supreme Court's recent decision in *Shurtleff v. City of Boston,* 142 S. Ct. 1583 (2022). *Shurtleff*, however, did not repudiate the longstanding rule that a restriction discriminates based on viewpoint only if the government intended to suppress that viewpoint. Indeed, there, Boston did not even dispute that it engaged in viewpoint discrimination when it refused to allow Shurtleff to fly his flag on city property. *See id.* at 1593 ("Boston concedes that it denied Shurtleff 's request" to fly his flag "solely because the . . . flag promot[ed] a specific religion."). Boston simply argued that the flags raised on its property "constitute[] government speech," and so "Boston may refuse flags based on viewpoint." *Id.* at 1589. Plaintiffs also cite to *Rosenberger v. Rector & Visitors of University of Virginia*, but there, the Supreme Court stated that viewpoint discrimination is "when the specific motivating ideology or the opinion or perspective of the speaker *is the rationale for the restriction*." 515 U.S. 819, 829 (1995) (emphasis added). Accordingly, to establish viewpoint discrimination, Plaintiffs must show that NIH adopted the animal testing filters with the purpose of suppressing Plaintiffs' viewpoint and promoting a contrary viewpoint.

Plaintiffs fail to make that showing here. NIH has made clear that it adopted the animal testing filters—and all of its other filters—because they target recurring comments that violate the Guidelines. *See* Stip. ¶¶ 58-59. NIH's "concern about" the disruption caused by those comments "*per se* does not reveal an effort to suppress expression merely because public officials oppose the speaker's view." *Kokinda*, 497 U.S. at 736. Further, NIH's concern is consistent with the record. As explained in NIH's opening brief, scores of NIH social media posts that do not even reference animal testing—*e.g.*, posts concerning the hardships associated with Alzheimer's disease, sickle

cell diagnostic machines, and gene therapies for rare diseases—are nonetheless overrun with animal testing comments. *See* Defs.' MSJ at 7-8. Thus, there is no reason to question that NIH's stated justification for adopting the animal testing filters—to help limit the number of repetitive, off-topic comments—is genuine.

Further, the nature of the animal testing filters themselves also undermines any inference that NIH sought to suppress viewpoints that are critical of animal testing. Those filters include many broad terms, such as "animal" and "testing," that may also be found in comments that defend animal testing. *See* Compl., Attachs. 1 & 2. Accordingly, the record shows that NIH did not adopt the animal testing filters for the purpose of suppressing comments critical of animal testing and promoting comments that defend animal testing. Plaintiffs' arguments in response lack merit.

1. Plaintiffs offer no concrete evidence that NIH adopted the filters at issue with the purpose of suppressing their viewpoint. Instead, Plaintiffs suggest that the Court can infer viewpoint discrimination based solely on the nature of NIH's animal testing filters—both past and present—and certain statements NIH has made in this litigation. Plaintiffs are wrong.

Plaintiffs first reiterate their argument that certain of NIH's prior filters, such as "PETA" and "#stoptesting," were tailored towards comments critical of animal testing. *See* Pls.' Reply at 3. But those filters do not show that NIH's *intent* was to suppress the viewpoint of those opposing animal testing. Rather, they show only that, in addition to NIH's broad filters—such as "animal" and "testing," which would cover comments both for and against animal testing—NIH also adopted certain specific filters to target other terms commonly found in repetitive, off-topic comments, and those comments happened to criticize animal testing. If NIH were aware of other terms commonly found in off-topic comments *defending* animal testing, NIH would likely adopt filters for those as well.

Again, *Madsen v. Women's Health Center, Inc.* is instructive. 512 U.S. 753 (1994). There, the Supreme Court found that "an injunction that restrict[ed] only the speech of antiabortion protesters" was not "viewpoint based" because no "invidious . . . viewpoint-based purpose motivated the issuance of the order." *Madsen*, 512 U.S. at 762-63. The Court noted that the injunction targeted antiabortion protestors, not because the district court disagreed with their viewpoint, but "because [those protestors] repeatedly" engaged in proscribed activities. *Id.* at 763. The Court stressed that it was irrelevant that those covered by the injunction "all share[d] the same viewpoint regarding abortion." *Id.*; *see id.* at 763 ("the fact that the injunction covered people with a particular viewpoint does not itself render the injunction . . . viewpoint based"). Here, as in *Madsen*, the filters at issue were adopted because they target comments that "repeatedly violate[]" the Guidelines, and it is irrelevant that those comments may more often be made by those who "share the same viewpoint regarding" animal testing.

Plaintiffs, in response, argue that "*Madsen* enjoined specific conduct" and did not involve the "direct suppression of speech based on the viewpoint." Pls.' Reply at 6 n.2. True, *Madsen* did restrict several types of conduct, but that included several forms of speech, including certain forms of "demonstrating," "singing," and "chanting." 512 U.S. at 760. Further, it is also true that *Madsen* did not involve the "suppression of speech based on the viewpoint," but that is precisely the point: the Supreme Court reached that conclusion after finding that the injunction there—like the filters at issue here—was not issued with the *purpose* of suppressing any particular viewpoint. Accordingly, the now-deleted animal testing filters that Plaintiffs reference do not demonstrate that NIH ever acted with the intent of suppressing a particular viewpoint. And in any event, those filters do not show that the current, broad filters, such as "animal" and "testing," discriminate based on viewpoint.

Plaintiffs claim that some of NIH's current, broad filters, such as "Harlow" and "Suomi"—referencing two NIH scientists who allegedly engage in animal testing—are more likely to target comments critical of animal testing. *See* Pls.' Reply at 4. But even assuming this assertion were true, NIH adopted those filters because they cover terms often found in comments that violate the Guidelines, and thus it is irrelevant that those terms happen to be found in comments criticizing animal testing. *See Ward*, 491 U.S. at 791 (a "regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others"). Regardless, there is no support for Plaintiffs' assertion that filters like "Harlow" and "Suomi" disproportionately target comments criticizing animal testing. Those defending the alleged practices of Doctors Harlow and Suomi could likewise leave comments that use those terms. Thus, the nature of NIH's filters—both past and present—does not suggest that NIH intended to suppress one viewpoint and elevate another.

Perhaps recognizing that NIH's filters do not constitute evidence of viewpoint discrimination, Plaintiffs also try to rely on certain statements made by NIH in this litigation. For example, Plaintiffs point out that NIH has argued that repetitive, off-topic comments criticizing animal testing are "disruptive" and "threatening." Pls.' Reply at 4. But NIH did not state that those comments are "disruptive" and "threatening" *because they criticize animal testing*. They are "disruptive" because they are overwhelmingly repetitive and off-topic, and they are often "threatening" because they include violent content (*e.g.*, wishing death upon NIH scientists). *See* Defs.' MSJ at 7-8. If those defending animal testing repeatedly left off-topic comments on the Pages, NIH would consider those comments disruptive too. Plaintiffs also argue that all of the example comments identified by NIH include statements criticizing animal testing. But that is because the repetitive, off-topic animal testing comments on the Pages happen to come from those

17

criticizing animal testing. The lack of any example comments from those speaking "in favor of" animal testing "is justly attributable to the lack of any similar," off-topic comments "by those in favor of" animal testing. *Madsen*, 512 U.S. at 762.

Accordingly, Plaintiffs fail to refer to any evidence indicating that NIH adopted the animal testing filters with the purpose of suppressing their viewpoint.

2.   Plaintiffs then question whether NIH's stated justification for the animal testing filters—to target recurring, off-topic comments—is sincere, arguing first that animal testing comments are not always necessarily off-topic. In support, Plaintiffs cite a few NIH posts that "reference" animal testing, and claim that even for others that do not, certain animal testing comments may still be relevant. *See* Pls.' Reply at 6-7. But Plaintiffs can hardly dispute, based on the record before the Court, that the overwhelming majority of animal testing comments on the Pages are off-topic. For one, even if a handful of NIH posts reference animal testing, vastly more obviously do not. Indeed, most of the exhibits in the record contain NIH posts that do not refer to animal testing, *see*, *e.g.*, Exs. 1-7, 9-18, 25-31, 33-36, and Plaintiffs cite only three NIH posts that they believe do refer to animal testing, *see* Pls.' Reply at 6. Further, even assuming NIH, on occasion, receives an on-topic animal testing comment, NIH's posts frequently receive a torrent of animal testing comments that make no attempt to be on-topic. *See* Defs.' MSJ at 7-8 (displaying several redundant comments such as "free the beagles," "#animalcruelty," "murderers," and "burn in hell"). Tellingly, Plaintiffs specifically flag only *two* animal testing comments that they believe are on-topic. *See* Pls.' Reply at 7. Thus, there is nothing suspect about NIH's representation that it adopted the animal testing filters because they target recurring, off-topic comments on the Pages.

Plaintiffs then argue that NIH has adopted filters for animal testing comments, but does not take action against certain other types of off-topic comments. *See Id.* at 5 n.1, 7. But NIH has

provided a viewpoint-neutral explanation for why it adopted filters targeting certain off-topic comments but not others. NIH lacks the resources to manually review all comments and hide all those that violate the Guidelines. *See* Defs.' MSJ at 7. NIH thus uses keyword filters to target frequently-made comments that violate the Guidelines, and that includes off-topic animal testing comments. *See* Stip. ¶¶ 58-59. Importantly, Plaintiffs refer to no other category of off-topic comments that is nearly as pervasive on the Pages as animal testing comments. And if Plaintiffs ever do so, NIH will likely adopt filters for those comments as well. In response, Plaintiffs complain that, in asking them to identify some other category of common, off-topic comments, NIH is seeking to "flip its burden." Pls.' Reply at 7. But it is *Plaintiffs* who are asking the Court to infer viewpoint discrimination based solely on the lack of filters for certain other off-topic comments; NIH is arguing only that that inference is unjustified, especially where Plaintiffs identify no other category of off-topic comments that is as common as animal testing comments and for which NIH refuses to adopt filters. Regardless, Plaintiffs cite to no authority indicating that it is *NIH's* burden to demonstrate that it did not engage in viewpoint discrimination, and for good reason: it would contravene the presumption that government actors act in good faith and without discriminatory motives.[6] *See supra* at 13.

Plaintiffs also dispute NIH's reference to resource constraints, calling NIH's claims "conclusory." Pls.' Reply at 8 n.3. But Plaintiffs have stipulated that those constraints are real. *See* Stip. ¶ 61 (NIH's manual moderation "efforts became especially limited due to the resource constraints of the COVID-19 pandemic," and "if the NIH had the resources to manually moderate

---

[6] Plaintiffs cite to *United States v. Playboy Entertainment Group, Inc.*, which found only that in certain free speech cases, the government may have the burden on certain issues; *e.g.*, in certain cases concerning commercial speech restrictions, the government must "identify[] a substantial interest." 529 U.S. 803, 817 (2000). That case, however, never found that the government ever has the factual burden of demonstrating that it did not intend to discriminate based on viewpoint.

its social media accounts on a more consistent basis, it would have done so"). In any event, NIH need not submit exhaustive evidence to prove the obvious: like any other government agency, it lacks the staffing to manually review each of the thousands of comments left on its social media pages. Plaintiffs also note that the government cannot violate "First Amendment rights" in order "to save money." Pls.' Reply at 8 n.3. NIH, however, is not arguing that it wishes to "save money," but rather that, as a practical matter, it cannot manually review all comments. Furthermore, NIH is not referring to resource constraints to excuse a First Amendment violation, but rather to show that no First Amendment violation has occurred. In particular, NIH's argument is that in light of those resource constraints, the Court cannot infer a discriminatory motive—and thus a First Amendment violation—based on NIH's inability to target all off-topic comments.

Accordingly, Plaintiffs have provided no reason for the Court to question NIH's stated justification for adopting the animal testing filters.

3. In a final effort, Plaintiffs advance a novel theory: that in adopting terms that target animal testing comments in general, NIH has engaged in viewpoint discrimination by excluding *all* viewpoints on animal testing. *See* Pls.' Reply at 5-6. But it is immaterial that the filters at issue apply to one or more viewpoints on animal testing. "The essence of viewpoint discrimination is not that the government incidentally prevents certain viewpoints from being heard in the course of suppressing certain general topics of speech, rather, it is a governmental intent to intervene in a way that prefers one particular viewpoint in speech over other perspectives on the same topic." *Ridley*, 390 F.3d at 82; *see also supra* at 13-14. Here, as explained above, the animal testing filters limit comments on a "general topic[] of speech"—off-topic animal testing comments—but do not "inten[d] to intervene in a way that prefers one particular viewpoint" on animal testing "over other perspectives" on animal testing. The filters thus do not discriminate based on viewpoint.

Further, Plaintiffs' theory, if accepted, would prevent the government from ever imposing subject-matter limits on a nonpublic forum; after all, any subject-matter limit would necessarily exclude all viewpoints on the excluded subject-matter. The Supreme Court, however, has expressly noted that in a "nonpublic forum," the government has a "right to make distinctions in access on the basis of subject matter." *Perry*, 460 U.S. at 49. Accordingly, Plaintiffs' novel theory fails, and NIH's animal testing filters thus do not discriminate based on viewpoint.

### III. The animal testing filters are reasonable.

Plaintiffs all but concede that "[t]he reasonability inquiry is not a demanding one, but rather is a forgiving test." *Archdiocese*, 897 F.3d at 329-30. Nor do they dispute that an explanation for a restriction that "rings of 'common-sense' . . . is sufficient . . . to uphold [the restriction] under the reasonableness review." *Kokinda*, 497 U.S. at 734-35. Here, the animal testing filters are reasonable in light of the circumstances. Users have flooded the Pages with off-topic, and often abusive, animal testing comments. *See supra* at 14-15, 18. These comments are disruptive, and may discourage interested citizens from viewing those Pages. *See* Stip. ¶ 87; *Davison v. Plowman*, 247 F. Supp. 3d 767, 778 (E.D. Va. 2017) (the "failure to effectively moderate a public discussion may be as deleterious to dialogue in such a forum as censorship" and allows a "speaker . . . [to] try[] to hijack the" forum).

NIH, however, lacks the resources to manually review each and every comment on the Pages and hide the animal testing comments that violate the Guidelines. NIH thus relies on automatic keyword filters, which provide an efficient, though imperfect, way of targeting impermissible comments. *See* Stip. ¶ 61. Those filters thus satisfy the "forgiving" reasonableness test, especially in light of *American Library*, where the Supreme Court found that it was reasonable for public libraries to rely on broad pornography filters on public computers. The Court reasoned

that "because of the vast quantity of material on the Internet and the rapid pace at which it changes, libraries cannot possibly segregate, item by item, all the Internet material that is appropriate for inclusion from all that is not" and so it was "entirely reasonable for public libraries to" use internet filters to "exclude certain categories of content, without making individualized judgments that everything they do make available" is appropriate. *Am. Libr.*, 539 U.S. at 208. Here, as in *American Library*, the filters at issue are reasonable in light of the circumstances.

Further, Plaintiffs do not address the argument that the animal testing filters are especially reasonable given the alternative avenues available for Plaintiffs to spread their messages on animal testing. *See Perry*, 460 U.S. at 53 ("the reasonableness of [a] limitation[] . . . is . . . supported by the substantial alternative channels that remain open for [the speaker's] communication"); Defs.' MSJ at 31-32. Plaintiffs can use their own Facebook or Instagram pages, or they can even create social media pages dedicated to discussion over NIH and the ethics of animal testing.

In response, Plaintiffs first question whether animal testing comments on the Pages have in fact been redundant or abusive. *See* Pls.' Reply at 20 n.11. The Court, however, need only look to the example posts in the record which are described above, and in Defendants' opening brief. *See* Defs.' MSJ at 8-9. Those posts received dozens of repetitive comments on animal testing, and some were undoubtedly abusive (*e.g.*, stating "GO TO HELL," "BURN IN HELL," and "You should have your head put in those cages"). *Id.*

Plaintiffs then argue that the animal testing filters are overinclusive and underinclusive; *i.e.*, the filters target animal testing comments that may be on-topic, and NIH does not target certain other comments that are off-topic. *See* Pls.' Reply at 20-22. But "there is no requirement that regulations limiting access to a nonpublic forum must be precisely tailored." *Cornelius*, 473 U.S. at 812. Regardless, these arguments fail for a number of other reasons. First, the filters are not

unjustifiably overbroad. As explained above, the vast majority of animal testing comments are off-topic, and Plaintiffs flag two examples of animal testing comments they believe are on-topic. *See supra* at 18. Further, in light of the circumstances, the filters are reasonable even if they capture a few on-topic animal testing comments. A "categorical" approach to animal testing comments is "necessary . . . because" NIH "lacks the resources to" adopt a "case-by-case approach" whereby it reviews each animal testing comment and hides only those that are off-topic. *Kokinda*, 497 U.S. at 732, 736. The Supreme Court reached a nearly identical conclusion in *American Library*. There, the Court found the categorical pornography filters to be reasonable despite their "tendency . . . to 'overblock'—that is, to erroneously block access to constitutionally protected speech that falls outside the categories that software users intend to block." *Am. Libr.*, 539 U.S. at 208. The Court reasoned, in part, that this concern was minimal because "[w]hen a patron encounters" an erroneously "blocked site, he need only ask a librarian to unblock it." *Id.* at 209 As noted in NIH's opening brief, nothing prevents users from similarly asking NIH to un-hide animal testing comments that they believe are on-topic. *See* Defs.' MSJ at 31 n.7.

Noting that *American Library* involved an indirect restriction (libraries had to impose the filters as condition for receiving federal funds), Plaintiffs suggest that the Court there "made clear that the overbreadth of the blocking filters would play a more decisive role in a case . . . involving the direct regulation of private conduct." Pls.' Reply at 21. That is incorrect. In fact, in the footnote in *American Library* that Plaintiffs quote, the Court noted only that certain cases cited by the dissent on the overbreadth issue were "inapposite" because those cases concerned the "direct regulation of private conduct." *Am. Libr.*, 539 U.S. at 209 n.4. The Court never suggested that its overall reasoning for rejecting the overbreadth argument hinged on any distinction between direct and indirect regulations. And for good reason: its reasons for rejecting that argument—*e.g.*, the

practical difficulties of sifting through internet content and the ability to selectively unblock content—apply regardless of whether the speech restriction at issue applies directly or indirectly.[7]

Second, Plaintiffs' "underinclusiveness" argument is equally flawed. For one thing, contrary to Plaintiffs' assertion, NIH does not target only animal testing comments pursuant to the proscription on off-topic comments; NIH also targets, for example, certain off-topic comments concerning drugs (*e.g.*, "marijuana" and "cannabis"). *See* Compl., Attachs. 1 & 2. Further, NIH has explained why it focuses on animal testing comments in particular: the Pages are littered with off-topic animal testing comments. *See supra* at 14, 18. Once more, Plaintiffs do not identify any other category of off-topic comments that is more prevalent on the Pages.

In any event, the restrictions at issue here—the animal testing filters—are not unreasonable simply because NIH currently does not have filters addressing still other off-topic comments. The Supreme Court's decision in *Kokinda* illustrates the point. There, the plaintiffs were challenging a regulation that categorically prevented "soliciting" on a Postal Service sidewalk because the Postal Service found solicitation to be "disruptive." *Kokinda*, 497 U.S. at 724, 732. The Supreme Court rejected the argument that the regulation was "unreasonable" simply because the Postal Service "permit[ted] other types of potentially disruptive speech." *Id.* at 733. The Court found the "underinclusive" argument to be "anomalous" because "the single issue before" the Court was whether the "prohibition of solicitation was unreasonable," and the Court found that it was not

---

[7] Plaintiffs cite to *Bynum v. U.S. Capitol Police Board*, where the Court found a regulation on speech in the Capitol to be unreasonable, in part because it covered certain forms of speech that were "in no way disruptive." 93 F. Supp. 2d 50, 57 (D.D.C. 2000). *Bynum*, however, involved a different context, and any overbreadth there could not be justified by the same technological and practical concerns that justify any overbreadth here. *See supra* at 21-22. *American Library* is more relevant because that case, like this one, concerned filters on internet content. Further, *Bynum* undermines Plaintiffs' claim. There, the court found the Capitol to be a nonpublic forum because "Congress ha[d] not opened the Capitol" to "free and open public discourse." 93 F. Supp. 2d at 56. Likewise, here, NIH does not allow "free and open public discourse" on the Pages.

regardless of "[w]hether . . . the Service permit[ted] other forms of speech" that "may . . . be disruptive." *Id.* The Court further stressed that it was "hardly unreasonable" for the Postal Service to focus specifically on solicitation because the "[t]he Postal Service's judgment [was] based on" what it had "learned from" its "real-world experience" with solicitation. *Id.* at 735.

Here, as in *Kokinda*, the "single issue" is whether the animal testing filters are reasonable, and they are regardless of whether NIH adopts filters for certain other comments that may also be off-topic. Further, NIH focuses on animal testing comments in particular because of its "real-world experience" with how repetitive and disruptive those comments are. Plaintiffs try to distinguish *Kokinda*, noting that, there, the Postal Service made "case-by-case determinations" over whether to allow other forms of disruptive speech. *See* Pls.' Reply at 22. But that distinction is irrelevant; the point is that Supreme Court upheld the solicitation ban even though the Postal Service did not take action against other forms of disruptive speech. Its reasoning applies equally here.

Accordingly, even if the animal testing filters incidentally capture a handful of on-topic comments and do not cover some other types of off-topic comments, those filters meet the "forgiving" reasonableness test. In light of the circumstances, NIH sensibly chose to rely on efficient, automated keyword filters to address the sheer number of off-topic animal testing comments on the Pages. The animal testing filters are therefore reasonable.

## CONCLUSION

The Court should grant Defendants' Motion for Summary Judgment.

Dated:  June 17, 2022   Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ERIC BECKENHAUER
Assistant Director, Federal Programs Branch

*/s/ Kuntal Cholera*

KUNTAL CHOLERA
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
Kuntal.Cholera@usdoj.gov

*Attorneys for Defendants*