IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **People for the Ethical Treatment of Animals, Madeline Krasno, and Ryan Hartkopf,**<br><br>Plaintiffs,<br><br>v.<br><br>**Lawrence A. Tabak, in his official capacity as Director of the National Institutes of Health, and Xavier Becerra, in his official capacity as Secretary of the U.S. Department of Health and Human Services,**<br><br>Defendants. | Civil Action No. 21-cv-2380 (BAH) |

### THE NATIONAL INSTITUTES OF HEALTH'S RESPONSE TO PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

The National Institutes of Health ("NIH") respectfully responds to Plaintiffs' notice of supplemental authority concerning the Ninth Circuit's recent decision in *Garnier v. O'Connor-Ratcliff*, which considered the forum status of certain social media pages. 41 F.4th 1158 (9th Cir. 2022).[1] Contrary to Plaintiffs' suggestion, *Garnier* only confirms that the NIH social media pages at issue here (the "Pages") are nonpublic forums.

*Garnier* concerned three social media pages—one on Twitter and two on Facebook—operated by members of a school district's Board of Trustees (the "Trustees"). The Trustees did not "establish[] *any* rules of etiquette or decorum regulating how the public was to interact with their social media accounts" and "[t]here were . . . *no* size or subject limits set for comments." *Id.*

---

[1] Internal citations and quotation marks are omitted throughout this memorandum unless otherwise stated.

1

at 1165 (emphasis added). Nevertheless, the Trustees, on an *ad hoc* basis, deleted certain comments from two parents, and eventually blocked those parents from the social media pages at issue altogether. *See id.* at 1165-66. The parents brought suit and asserted a First Amendment claim, arguing that the social media pages at issue were public forums. *See id.* at 1166-67. Later, after the lawsuit was filed, the Trustees began "using Facebook's 'word filters' feature," adding a large number of "commonly used English words" to their keyword filter list. *Id.* at 1166.

The Ninth Circuit concluded that the Twitter page at issue was a public forum, and that the Trustees' Facebook pages were also public forums, but only "before the Trustees began using word filters to curtail comments on their Facebook posts." *Id.* at 1178-79. The court first noted that a "designated public forum exists where the government intentionally opens up a . . . forum for public discourse, and that "a nonpublic forum"—also called a "limited public forum"[2]— is a forum "that the government intentionally opened to certain groups or to certain topics." *Id.* at 1177-78. The court found that the Trustees' Twitter page and "Facebook pages, before the implementation of word filters on Facebook," were "designated public fora" because "[b]efore the Trustees began using word filters, their social media pages were open and available to the public without any restriction on the form or content of comments" and the Trustees "never adopted any formal rules of decorum or etiquette for their pages." *Id.* at 1178-79. The court, however, stated that once the Trustees added keyword filters to their Facebook pages, they had a "practice of regulating the content" on, and "exercise[d] . . . clear and consistent control over," those pages, thus converting them into nonpublic forums. *Id.* at 1179.

---

[2] Courts use the terms "nonpublic forums" and "limited public forums, interchangeably. *See Pulphus v. Ayers*, 249 F. Supp. 3d 238, 247 (D.D.C. 2017) ("The Supreme Court . . . seems to use the term non-public forum and limited public forum interchangeably").

*Garnier* supports NIH's position. At a minimum, it does nothing to support Plaintiffs' position. Here, as in *Garnier*, NIH uses a number of keyword filters, *see* Defs.' MSJ at 7-9, and through those filters it has a "practice of regulating the content" on, and "exercise[s] . . . clear and consistent control over," its Pages. The Pages are thus nonpublic forums.

In their Notice, Plaintiffs note that the keyword filters at issue in *Garnier* were expansive. *See* Pls.' Notice at 2; *Garnier*, 41 F.4th at 1166. But that is irrelevant. As an initial matter, the Ninth Circuit's conclusion that the Trustees' filters rendered their Facebook pages nonpublic did not hinge on the breadth of those filters; the court gave no indication that its decision would have been different had the filters been narrower. The Court simply noted that the Trustees, through their filters, had a "practice of regulating the content" on, and "exercise[d] . . . clear and consistent control over," their Facebook pages, and thus the Trustees' Facebook pages ceased being public forums after "the Trustees began using [those] word filters." *Garnier*, 41 F.4th at 1179. NIH's filters, regardless of their breadth, likewise demonstrate that NIH has a "practice of regulating the content" on, and "exercise[s] . . . clear and consistent control over," the Pages. But even if *Garnier*'s reasoning had been limited to filters that are sufficiently broad, NIH's filters are broad. Those filters target several categories of comments, including comments containing profanity and off-topic comments referencing external websites, certain drugs, or animal testing. *See* Defs.' MSJ at 7; Stip. ¶ 59; Compl. Attachs. 1, 2. *Garnier* thus confirms that the Pages are nonpublic forums.

In any event, even if *Garnier*'s keyword filter analysis were found inapplicable here, *Garnier* still would not support Plaintiffs' claim that NIH's pages are public forums. The Ninth Circuit found that the Trustees' Twitter page and Facebook pages (before the filters were added) were public forums because they were "open and available to the public *without any restriction on the form or content of comments*" and the Trustees "never adopted *any* formal rules" regulating

3

the content on those pages. *Garnier*, 41 F.4th at 1178 (emphasis added). Further, it does not appear that, before the filters were added, there were any other indicia suggesting that the Trustees did not intend for their social media pages to be public forums. Here, of course, NIH *does* have "formal rules" restricting the types of content allowed on the Pages, and has attempted to enforce those rules through keyword filters and certain manual moderation efforts. *See* Defs.' MSJ at 6-9 (discussing NIH's extensive comment guidelines and its attempts to enforce them). And other factors confirm that NIH did not intend for the Pages to be public forums; *e.g.*, NIH explicitly stated that the Pages were not intended to be public forums. *See* Defs.' MSJ at 13-14.

Plaintiffs note that in *Garnier*, the court stated that social media pages are compatible with expressive activity. *See* Pls.' Notice at 3. But the court did not state that mere compatibility with expressive activity is sufficient to render a forum—including a social media forum—to be public. To the contrary, the court expressly noted that the Trustees' Facebook pages were nonpublic once they were subject to keyword filters even though, despite those filters, they were still compatible with certain expressive activity. *See Garnier*, 41 F.4th at 1179 (noting that, "even with the addition of word filters, members of the public . . . remain able to register . . . reactions to the Trustees' [Facebook] posts"). And as explained in Defendants' opening and reply briefs, the Supreme Court has repeatedly made clear that mere compatibility with expressive activity does not make a forum public. *See* Defs.' MSJ at 21-23; Defs.' Reply at 10-11.

Plaintiffs also refer to the Ninth Circuit's strict scrutiny analysis where it found that the actions taken against the *Garnier* plaintiffs were not "narrowly tailored" to serve the Trustees' interest in limiting "disruption" and "facilitating discussion on [the Trustees'] social media pages." *See Garnier*, 41 F.4th at 1179-82; Pls.' Notice at 2-3. Plaintiffs claim that this shows that NIH cannot justify its keyword filters based on an interest in limiting disruption. *See* Pls.' Notice at 2-

4

3. This argument, however, assumes that NIH's pages are public forums and that, consequently, the restrictions placed thereon must satisfy strict scrutiny. As explained in NIH's briefs, the Pages are nonpublic forums, and thus the restrictions placed thereon need only (and do) satisfy the lenient reasonableness standard. *See supra* at 2-3; Defs.' MSJ at 30-33; Defs.' Reply at 21-25.

In any event, the *Garnier* court's strict scrutiny reasoning is inapplicable here. For example, the court noted that "[t]he record in [that] case did not support the . . . contention that the [plaintiffs'] comments actually disrupted their pages or interfered with their ability to host discussion on their pages." *Garnier*, 41 F.4th at 1181. Here, by contrast, NIH has provided uncontroverted evidence indicating that animal testing comments have been disruptive. For one thing, unlike *Garnier*, which dealt with comments from two people, NIH has provided evidence indicating that many users have flooded the Pages with off-topic, repetitive animal testing comments. *See* Defs.' MSJ at 7-9 & n.2. Further, NIH has also provided evidence indicating that other social media users have complained about repetitive comments on the Pages concerning animal testing, thus demonstrating that those posts are indeed disruptive. *See* Stip. ¶ 87. NIH's animal testing filters are thus tailored towards comments that are known to disrupt discussions and discourage participation.

Additionally, the *Garnier* court also reasoned that the Trustees' remedial actions against the plaintiffs were not "narrowly tailored" because the Trustees "block[ed]" the plaintiffs altogether and thus "prevented them from leaving any comments at all" even though there were "easily available alternative modes of regulation." *Garnier*, 41 F.4th at 1182. Here, Plaintiffs do not allege that NIH's filters block any user from posting on NIH's pages altogether, and they fail to show that there was a practical, "easily available alternative" to keyword filters for dealing with the torrent of off-topic animal testing comments. *See* Defs.' Reply at 7, 19-20.

5

Accordingly, *Garnier* confirms that the Pages are nonpublic forums, and otherwise does nothing to support Plaintiffs' Motion for Summary Judgment.

Dated:  August 24, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ERIC BECKENHAUER
Assistant Director, Federal Programs Branch

*/s/ Kuntal Cholera*

KUNTAL CHOLERA
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
Kuntal.Cholera@usdoj.gov

*Attorneys for Defendants*